UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

---

MARISSA DARLINGH,

       Plaintiff,

v.

ADRIA MADDALENI, in her individual and official capacity, THERESE FREIBERG, in her individual and official capacity, and OPHELIA KING, in her individual and official capacity, and MILWAUKEE BOARD OF SCHOOL DIRECTORS,

       Defendants.

Case No. 22-CV-1355

Jury Trial Demanded

---

## COMPLAINT

Plaintiff Marissa Darlingh, by her undersigned attorneys at the Wisconsin Institute for Law & Liberty, hereby alleges as follows:

### INTRODUCTION

1.    Plaintiff Marissa Darlingh was, until recently, a school counselor in the Milwaukee Public School District. Last April she attended a rally at the State Capitol in Madison—on a Saturday, on her own time, nearly 100 miles from Milwaukee— where she gave a short, unscripted speech to express her objection to gender identity ideology and certain transgender-related policies and her view about how these harm children. Some protestors at this event who heard Ms. Darlingh speak and disagreed with what she said quickly organized a campaign to get her fired from her job. Defendants King, Freiberg, and Maddaleni caved to this campaign and ultimately did

terminate her for her speech. The process they followed and the timing of their actions strongly suggest that they intended to (and ultimately did) cause as much damage to Ms. Darlingh as possible. Their actions violated Ms. Darlingh's clearly established constitutional rights under the First Amendment and the Due Process Clause. This action seeks to vindicate those rights.

## PARTIES

2.    Plaintiff Marissa Darlingh is a citizen and resident of the United States and the State of Wisconsin. Until September 30, 2022, Ms. Darlingh was a school counselor at Allen-Field Elementary School in the Milwaukee Public School District.

3.    Defendant Adria Maddaleni is the Chief Human Resources Officer for the Milwaukee School District. She is sued in her individual and official capacities.

4.    Defendant Therese Freiberg is the Director of the District's Department of Employee Relations. She is sued in her individual and official capacities.

5.    Defendant Ophelia King is a "Manager II School Counseling" for the District and was Ms. Darlingh's direct supervisor. She is sued in her individual and official capacities.

6.    Defendant Milwaukee Board of School Directors is the school board of the Milwaukee Public School District, organized pursuant to chapter 119 of the Wisconsin statutes.

## JURISDICTION AND VENUE

7.    This case arises under the Constitution and laws of the United States, and subject matter jurisdiction is therefore proper under 28 U.S.C. §§ 1331 and 1343.

This Court has authority to grant the requested declaratory relief pursuant to 28 U.S.C. §§ 2201 and 2202, and Fed. R. Civ. P. 57. It has authority to award damages and to issue injunctive relief pursuant to 42 U.S.C. § 1983. It has authority to award attorneys' fees and costs pursuant to 42 U.S.C. § 1988.

8.     A substantial part of the events or omissions giving rise to this cause of action occurred in Milwaukee County, Wisconsin, which is within the Eastern District of Wisconsin, Milwaukee Division. Venue is therefore proper under 18 U.S.C. § 1391(b)(1) and (2).

## STATEMENT OF FACTS

**A.     Ms. Darlingh's Employment Contract and Status**

9.     From March 4, 2021, until September 30, 2022, Marissa Darlingh was a school counselor at Allen-Field Elementary School in the Milwaukee Public School District.

10.     In this position, Ms. Darlingh was a "certificated" employee in the "Group C – Teacher" classification.

11.     Because Ms. Darlingh completed more than one year of work as a school counselor with the District, she was considered a non-probationary employee.

12.     According to the District's Employee Handbook, a true and accurate copy of which is attached to this Complaint as Exhibit 1, non-probationary employees can "only be disciplined or discharged for just cause." Ex. 1 at 1, 9, 28.

13.     The District renewed Ms. Darlingh's contract for the 2022–2023 school year on April 14, 2022.

## B. Ms. Darlingh's Short, Unscripted Speech during a Saturday Rally at the Capitol in Madison

14.    On April 22–24, 2022, a group of women organized an event in Madison entitled "Sisters 4 Sisters," which they described as "[a] weekend of radical feminist action, discussion, community, and solidarity."[1]

15.    The weekend included a panel of speakers at the Madison library,[2] workshops,[3] a bike ride, and various other events.

16.    Much of the event focused on the effects of gender identity ideology and transgender-related policies on women and women's rights.

17.    As part of the weekend, the group hosted a rally at the State Capitol in Madison on Saturday, April 23, 2022.

18.    The rally included a "speaker's corner," where anyone attending was invited to speak. Many of the speeches were short and unscripted. The rally was recorded and posted on YouTube.[4]

19.    A group of people protested the event.

---

[1] Sisters 4 Sisters Event Page, Facebook, https://www.facebook.com/S4S2022.

[2] https://www.youtube.com/watch?v=CvE2Na8la9s

[3] https://www.youtube.com/watch?v=Nka-ViErhoI; https://www.youtube.com/watch?v=o7rjDPA8HBw

[4] https://www.youtube.com/watch?v=4jB70PNoJeI

20.     During the panel of speakers at the library, they stood outside the library chanting "no terfs on our turf"[5] and various other things.[6]

21.     During the "speaker's corner," the protesters would not cede the Capitol steps during the permitted time and attempted to shout down the women speaking.[7]

22.     Some even yelled at them, calling them "lesbian Nazis" and other things.[8]

23.     Ms. Darlingh attended this event, and recalls activists calling her a "cunt" and "lesbian Nazi" at various points.

24.     She also saw multiple activists wearing shirts that said "protect trans kids" next to an image of a knife, *infra* par. 99, ex. 12 at 15, which she took as a threat to harm them, based on a long history of threats against women who share her views.[9]

25.     In light of this, tensions were high during the event.

26.     Ms. Darlingh spoke briefly during the "speaker's corner."

27.     She identified herself as an elementary school counselor in the Milwaukee Public Schools, and then stated that she "oppose[s] gender ideology" in elementary schools and that young children should not be "exposed to the harms of gender identity ideology."

---

[5] The acronym "TERF" stands for "Trans-Exclusionary Radical Feminist."

[6] *See* Courage Calls to Courage - Public Speaking Panel, YouTube, at 0:00–0:35, https://www.youtube.com/watch?v=g-tHgmf_-II

[7] *Supra* n. 4 at 14:11–14:45.

[8] https://www.youtube.com/shorts/zAYgkmVBxbY

[9] For hundreds of examples, *see* https://terfisaslur.com/

28.     She said that she does not support and would not encourage the social or medical gender transition of children because she "exist[s] in this world to serve children" and "to protect children."

29.     She also criticized those "who want children to have unfettered access to hormones—wrong-sex hormones—and surgery."

30.     In the passion of the moment, Ms. Darlingh used the f-word multiple times during her short, unscripted speech, and at one point said, "fuck transgenderism," referring to the "gender identity ideology" that she believes is harmful to children.[10]

31.     As she later learned, and as outlined in more detail below, the group protesting at this event immediately organized a campaign to "cancel" Ms. Darlingh and get her fired from her job at the Milwaukee Public Schools, which was ultimately successful.

---

[10] Her full speech can be viewed at the video linked in footnote 4, from 12:35–14:12. A transcript of the most relevant portion is as follows:

> I didn't plan on speaking and I've been screaming a lot but my name is Marissa Darlingh, I am an elementary school counselor in Milwaukee Public Schools. And I oppose gender ideology ever entering the walls of my school building. On my dead fucking body will my students be exposed to the harms of gender identity ideology. Not a single one of my students under my fucking watch will ever ever transition socially and sure as hell not medically. Absolutely not. I exist in this world to serve children. I exist to protect children. I feel like I'm disassociating right now because this is very intense very intense. I think someone else is speaking through me right now, but fuck transgenderism. Fuck it. Fuck transgenderism. Fuck these people behind us who want children to have unfettered access to hormones, wrong-sex hormones, and surgery. [Interruption by protestors].

## C. DPI Investigation

32.     Less than a week later, on April 29, 2022, Ms. Darlingh received a letter from the Wisconsin Department of Public Instruction (DPI) indicating that DPI had "opened an investigation to determine whether to initiate educator license revocation proceedings against [her]" for "immoral conduct." A true and accurate copy of this letter is attached to this Complaint as Exhibit 2.

33.     The only "immoral conduct" DPI identified was Ms. Darlingh's short speech at the Capitol on April 23.

34.     In particular, DPI pointed to her statements that she "oppose[s] gender identity ideology from ever entering [her] school building," that she "do[es] not believe children should have access to hormones or surgery," that "none of her students will ever transition socially or medically under [her] 'fucking watch,'" and her other uses of the f-word.

35.     Ms. Darlingh was given 30 days to respond.

36.     DPI attempted to use the threat of an investigation to scare Ms. Darlingh into surrendering her educator license, and, in turn, her livelihood.

37.     DPI's letter offered her the "option to voluntarily surrender [her] license and bring the DPI's investigation of this matter to a close," and DPI attached to its letter an "Agreement to Surrender License" for her to sign and return.

38. When DPI initiates an investigation like this, it notes on the "License Lookup" feature of its public website that the teacher is "Under Investigation." Ms. Darlingh's license is listed with that status to this day.[11]

39. On May 25, 2022, Ms. Darlingh sent DPI a response letter, declining the "offer" to surrender her license, and explaining that DPI's investigation and threat to suspend her license based on her public speech violated her First Amendment rights.

40. In light of the harm to her reputation and serious risk to her livelihood, Ms. Darlingh chose to defend herself publicly, and publicized her response to DPI.[12]

41. DPI's investigation of Ms. Darlingh generated interest from the media, and she spoke with multiple news organizations, including Fox News and the Milwaukee Journal Sentinel.

42. Since her response on May 25, 2022, and as far as she is aware, DPI has taken no further action to revoke her license, though the "License Lookup" feature on DPI's website still lists her license status as "Under Investigation."

## D. Defendants' Investigation and Ultimate Termination of Ms. Darlingh for Her Speech

### 1. April 26 – June 2

43. As Ms. Darlingh later learned, Defendant Ophelia King, Ms. Darlingh's supervisor, also began investigating Ms. Darlingh on April 26, right after the event

---

[11] Wisconsin Department of Public Instruction, Educator License Lookup, https://elo.wieducatorlicensing.org/datamart/licenseDetails.do?xentId=870025.

[12] Wisconsin Institute for Law & Liberty, *State Threatens School Counselor's License After She Denounced Gender Ideology at Public Rally* (May 25, 2022), https://will-law.org/state-threatens-school-counselors-license-after-she-denounced-gender-ideology-at-public-rally/

at the capitol, in response to a campaign by a few of the protesters at the event to get Ms. Darlingh fired from her job. *Infra* par. 90, Ex. 11 at 4.

44.     Shortly after the event, approximately nine individuals sent emails to various District staff calling for Ms. Darlingh to be fired for her speech. *Infra* par. 90, Ex. 11 at 10–34.

45.     Three of the emails are identical to one another, word-for-word, and the rest all follow the same basic structure. *Infra* par. 90, Ex. 11 at 14–15, 17–18, 22–23.

46.     One of the emails even describes who coordinated this campaign and how: "This was sent to me by a friend in Madison. She is part of a group who was counter protesting [at the April 23 event]. … She and some other folks in Madison are attempting to shed light on this situation and those involved. One happens to be an elementary guidance counselor at MPS. She asked that people … call, write, etc. to people at the school." *Infra* par. 90, Ex. 11 at 30.

47.     None of the people who sent these emails claimed to be students in the District, parents of students in the District, staff in the District, have any other relationship with the District, or even *claimed to live in the District*.

48.     None described having any interaction with Ms. Darlingh at her job or any knowledge of how she performs her job.

49.     As a part of her investigation in response to these emails, Defendant King interviewed four students at the school where Ms. Darlingh worked. *Infra* par. 90, Ex. 11 at 8.

50. One of the four described Ms. Darlingh as one of her "favorite staff." The student stated that Ms. Darlingh "helps them with their problems whenever they want to hurt somebody, and listen[s] to how my recess went."

51. Another of the four students also said Ms. Darlingh was one of "their favorite teachers." This student "explained that when they are mad, frustrated, or sad Ms. Marissa would pick them up. 'I talk to Ms. Marissa about how I feel, she is my check-in and check-out person and I am working on being respectful to other students.'"

52. The only criticism of Ms. Darlingh from these student interviews was that she enforces the rules during "circle time."

53. Between April and early June, Ms. Darlingh continued to do her job without incident.

54. In mid-May, during a counseling lesson called "Emotional Bank Accounts," Ms. Darlingh's students wrote her a card with supportive notes, and at least seven different students described her as the best in the school: "You're the best teacher in the building"; "the best"; "the best counselor"; "best teacher"; "You are the best counselor and cool"; "best calming teacher"; "eres mi mejor amiga" (you are my best friend). Other students described her as "so kind," "a great person," "a good mentor," "thoughtful," "sweet," "very nice," "fun and caring and chill," and that she "cares about people." A true and accurate copy of these notes is attached to this Complaint as Exhibit 3.

55. After Ms. Darlingh was suspended, as described below, one teacher in the school had multiple students asking "to see [Ms. Darlingh] to talk to her." *Infra* par. 99, Ex. 12 at 13.

**2. Incident on June 3**

56. On June 3, another teacher in Ms. Darlingh's school decided to show an article about Ms. Darlingh to her classroom of 5th grade students and told them "they have the right not to see her for counseling services"—a transparent attempt to rally opposition to Ms. Darlingh. *Infra* par. 90, Ex. 11 at 48.

57. Ms. Darlingh saw her name and picture projected on the smartboard as she walked by, and she entered the classroom briefly (for approximately sixteen seconds) to ask why the teacher was talking about her to the class. *Infra* par. 90, Ex. 11 at 48.

58. Ms. Darlingh left and told the principal what was happening, who then intervened.

59. The principal told the teacher she should not "be talking about this" in her classroom and made clear that he "never approved her decision to discuss news articles about Ms. Darlingh."

60. He directed that teacher to leave for the day.

61. The principal then collected statements from Ms. Darlingh, the teachers involved, and the students.

62. In her statement, Ms. Darlingh explained that she has "never brought [her] personal political beliefs into [her] work," but that it appeared that this teacher

and one other teacher were attempting to mount "a campaign to turn students against [her]." *Infra* par. 90, Ex. 11 at 53–54.

63.     Nevertheless, Ms. Darlingh offered "to have a conversation with one or both [of these teachers] with mediation."

64.     Most of the statements taken from the students in the classroom suggest the incident had little effect on them. *E.g.*, *infra* par. 90, Ex. 11 at 63 ("I don't remember what Mx. Chappelle said."); *id*. at 65 ("I don't know what is going on."); *id*. at 66 ("Mx. Chappelle show[ed] the thing … she started reading a litt[le] then Ms. Marissa c[ame] and said [some]thing."); *id*. at 68 ("I s[aw] somet[hing] but I forgot it."); *id*. at 69 ("The background story of some person I forgot their name. I don't remember the other parts."); *id*. at 70 ("I don't know").

65.     That same day, the other teacher mentioned above cornered Ms. Darlingh twice (once in her office, and once as she was walking out to her car), in a way that Ms. Darlingh perceived as aggressive and hostile, both times related to her speech in April.

66.     Ms. Darlingh submitted a "Request for GPS: Guided Problem Solving," in an attempt to mediate with this coworker. A true and accurate copy of this request is attached to this Complaint as Exhibit 4.

67.     Shortly thereafter, an employee from the District's Human Resources Department notified Ms. Darlingh that the other teacher "declined to participate." A true and accurate copy of this email is attached to this Complaint as Exhibit 5.

### 3. Disciplinary Letter #1

68. On June 9, 2022, Ms. Darlingh received a letter from her supervisor, Defendant King, stating that "certain facts have come to my attention which might lead to disciplinary action regarding your failure to follow District Rules and Policies," and listing various District policies Ms. Darlingh allegedly violated. A true and accurate copy of this letter is attached to this Complaint as Exhibit 6.

69. The letter, however, did not specify what conduct by Ms. Darlingh violated any of the District's policies.

70. The letter indicated that a conference was scheduled for June 15, 2022, because it was "necessary … to confer regarding this matter at the earliest possible opportunity."

71. Defendant King hand delivered this letter to Ms. Darlingh, without any prior warning, and then pressured her to open it in her presence by asking, "don't you want to open it?" suggesting that Defendant King was excited about the prospect of terminating Ms. Darlingh.

72. Prior to this letter, and despite investigating Ms. Darlingh since April, Defendant King never had any conversation with Ms. Darlingh about her speech.

73. Defendant King never communicated that Ms. Darlingh had violated any policies, nor did Defendant King ever give Ms. Darlingh any sort of warning or opportunity to correct any perceived violations of District policy.

74. And Defendant King had never observed Ms. Darlingh's work, either in an informal or formal capacity.

75.     The District's handbook provides that "generally, discipline is progressive in nature and requires communication with employees and/or their representatives." *Supra* par. 12, Ex. 1 at 15.

76.     And the handbook further recommends that "[a]ny particular concern related to an employee's conduct may be settled by informal discussion with the immediate supervisor."

77.     Yet Defendant King did not initiate any kind of "informal discussion" with Ms. Darlingh prior to sending her the formal misconduct letter.

78.     Given that there had been no prior warning or discussion and that the letter itself did not even explain how Ms. Darlingh had violated any policies, undersigned counsel sent an email to Ms. King and others on June 13, 2022, asking for notice, prior to the hearing, of what Ms. Darlingh had allegedly done to violate the policies listed in the letter, so that she could meaningfully respond.

79.     Larry Cote, an "employment relations specialist" with the District's Department of Employment Relations (headed by Defendant Freiberg), responded that Ms. Darlingh *would not* receive reasonable advanced notice of what the conference was about, but instead would be provided a "packet" of materials just minutes before the conference, and would have an opportunity to respond during the conference. A true and accurate copy of this email exchange is attached to this Complaint as Exhibit 7.

### 4.     Disciplinary Letter #2

80.     On the evening of June 13, 2022, two days before the conference with respect to the first disciplinary letter, Ms. Darlingh received an email from Defendant

Freiberg directing her "not [to] report to work tomorrow," because she would be receiving a *second* letter "placing you on paid investigatory suspension pending scheduling of a second conference." A true and accurate copy of that email is attached to this Complaint as Exhibit 8.

81.    The following day, June 14, the School District sent Ms. Darlingh a second letter, entitled an "Emergency Scheduling Letter," notifying her that she was immediately suspended from her position as a school counselor. A true and accurate copy of this letter is attached to this Complaint as Exhibit 9.

82.    The letter stated that "the first three days of your suspension will be paid, and the remaining days will be unpaid."

83.    The District sent this letter exactly three days before Ms. Darlingh's last scheduled day of work for the 2021–22 school year (June 16, 2022).

84.    The timing of this letter strongly suggests that Defendants purposefully intended to put Ms. Darlingh into an unpaid suspension during the summer and at the beginning of the next school year, making it difficult for her to know the status of her job in the months leading up to the next school year.

85.    Like the first letter, this second letter stated that Ms. Darlingh was alleged to have violated various District policies—the *exact same* list of policies as the first letter—but failed to describe any specific conduct by Ms. Darlingh that violated any of the policies.

86.     The second letter further directed Ms. Darlingh "not [to] enter any MPS buildings or come onto any school grounds as of June 14, 2022," and "not to have any contact with school staff, students, or parents until further notice."

87.     Later that day, Defendant Freiberg sent Ms. Darlingh a separate "no trespass order," signed by Defendant Adria Maddaleni, prohibiting Ms. Darlingh from "enter[ing] upon the land and/or premises" of "ALL Milwaukee Public Schools School buildings and owned land," including even the "Central Administration Building." A true and accurate copy of this no-trespass order is attached hereto as Exhibit 10.

88.     The no-trespassing order states that "it shall remain in effect until officially rescinded IN WRITING by the administrator in charge."

89.     Unlike the first letter, however, and despite being labeled an "Emergency" misconduct letter, the second letter stated that "an Emergency Conference will be scheduled [during] the Fall 2022–23 School year."

**5.      The June 15 Misconduct Hearing**

90.     As promised, just minutes before the June 15 conference (related to the first letter), Ms. Darlingh received a 126-page "packet" containing 48 exhibits, all of which centered around Ms. Darlingh's speech at the Capitol on April 23. A true and correct copy of this "packet" is attached to this Complaint as Exhibit 11.

91.     Exhibits 1-7 related to the initial complaints and investigation in early April discussed above, exhibits 8–11 involved DPI's investigation and the media coverage of Ms. Darlingh's defense of her license and livelihood, exhibits 12–24

related to the incident on June 3, and exhibits 25–48 included copies of various District policies and standards.

92.     The conference was conducted over Zoom, and the four attendees were Defendant King (Ms. Darlingh's supervisor), Defendant Freiberg, Director of the District's Department of Employment Relations, Ms. Darlingh, and undersigned counsel (Luke Berg).

93.     During the hearing, Defendant King "presented" the packet by showing each exhibit on her screen, allowing Ms. Darlingh to read each exhibit, and then moving to the next, without any comment.

94.     After the entire packet had been presented in this way, Defendant King finished her portion of the conference without any further statements or explanation.

95.     She did not connect anything in the packet to any policy violations or explain how Ms. Darlingh had violated any District policy.

96.     After Defendant King finished her "presentation," Defendant Freiberg communicated that Ms. Darlingh would have ten minutes to confer with counsel, after which she could respond orally to the information presented in the packet.

97.     Counsel objected to this process and asked for an opportunity to respond in writing, having received this packet only minutes before the hearing.

98.     Defendants Freiberg and King conferred off camera, and then agreed to allow Ms. Darlingh to submit a written response two weeks later.

**6.     Ms. Darlingh's Response**

99.     Ms. Darlingh submitted her response to the District on June 27, 2022. A true and accurate copy of her response is attached to this Complaint as Exhibit 12.

100. While Defendants still had not explained how Ms. Darlingh had violated any District policies—much less given her any opportunity to correct any violation—Ms. Darlingh addressed in detail how her speech on her own time, outside of work hours, nearly 100 miles from Milwaukee, was protected by the First Amendment and did not violate any of the District policies that the District had identified. Ex. 12 at 3, 6–10.

101. Nevertheless, although her speech was constitutionally protected and unpunishable, Ms. Darlingh "acknowledge[d] that her use of profanity went too far" and offered to "issue an apology to anyone who was offended by her use of profanity and to meet with any staff or students who were offended by what she said, to apologize directly and to listen to them and to how her words affected them." Ex. 12 at 1.

102. Ms. Darlingh explained that her "fuck transgenderism" comment was "referring to policies and ideologies that she believes harm children, and not in any way referring to transgender students or individuals." Ex. 12 at 2.

103. She emphasized that she "has and always will equally love, respect, and serve all students under her care, including transgender-identifying students."

104. Ms. Darlingh also directly addressed a Milwaukee Journal Sentinel article that the District included in its "packet," because that article had misquoted her. Ex. 12 at 6.

105.    She explained that she spoke to the reporter in part to "clarify her statements and views," but the reporter had "inaccurately reported that [Ms. Darlingh] said she would not use students' preferred names or pronouns."

106.    Ms. Darlingh explained that she told the reporter she "would follow the parents' lead as to a student's names and pronouns, even if the student transitioned," and that her counsel had "asked the paper to issue a correction, which it ultimately did," "though it buried that clarification deep in the article."

107.    Ms. Darlingh explained that she believed "following the parents' lead as to names/pronouns is consistent with the District's policies," but to the extent it was not, she asked for "clarification" from the District, as she was "never given, or trained on, the 'Gender Inclusion Guidance' document" (one of the things the District indicated she had violated).

108.    She concluded that her "hope is to work with the District and any staff or students who were offended by her speech to resolve this so that she and her colleagues can get back to doing the jobs that they love." Ex. 12 at 10.

### 7.    Defendants' Refusal to Schedule the Second "Emergency" Misconduct Conference Pursuant to Which She Was Suspended

109.    During the conference on June 15 (relating to the first letter), Ms. Darlingh, through counsel, asked why the "emergency" conference related to the second letter could not be scheduled promptly, given that the first, non-emergency letter had stated that meeting "at the earliest possible opportunity" was "necessary." *Supra* Ex. 6.

110. The only justification given by Defendants Freiberg and King was that the District ordinarily does not schedule misconduct hearings outside of the employee's work hours.

111. Counsel asked, and Defendants Freiberg and King confirmed, that *they* continue to work throughout the summer.

112. Counsel then explained that Ms. Darlingh was available any time for the "emergency" misconduct hearing and asked that it be scheduled promptly so that, if it resulted in her termination, she would have time to search for a new job before the new school year began.

113. Defendant Freiberg responded that they would get back to Ms. Darlingh after the hearing.

114. On June 16, one day after the conference on the first letter, counsel followed up via email reiterating that Ms. Darlingh "would like to proceed with [the Emergency Misconduct conference] so that, if she is terminated, she has sufficient time to find a new job."

115. Larry Cote responded, "as it was previously explained, Emergency Conferences are not held on off hours, vacation days, weekends, holidays, during approved leaves, or summer break. The Emergency Conference will not be held until the Fall." A true and accurate copy of this email chain is attached hereto as Exhibit 13.

116.    Counsel then explained that suspending Ms. Darlingh without pay (per the letter, only the first three days were to be paid)[13] without notice of what she had allegedly done to violate the District's policies or any opportunity to respond violated her due process rights. Ex. 13 at 2–4.

117.    Counsel further explained that waiting until the fall to schedule this "emergency" misconduct hearing would do substantial additional damage to Ms. Darlingh (and indeed seemed calculated to do exactly that).

118.    Mr. Cote responded on June 30 reiterating the District's position, but added that, in light of Ms. Darlingh's concerns about finding a new job for the fall if she were terminated, the District "will be moving forward to issue a written disposition in the current misconduct" (relating to the first letter), Ex. 13 at 1—though Defendants ultimately waited another three months to issue that disposition, one month into the new school year, making it exceedingly difficult for Ms. Darlingh to find a new job.

119.    Ms. Darlingh then submitted a grievance under the District's grievance procedures in an attempt to speed up the "emergency" misconduct conference, but that grievance was denied by one of Defendant Freiberg's subordinates.

---

[13] In response to Ms. Darlingh's complaints about the process, the District backed off its initial position in its letter that her suspension would be unpaid after the first three days. Instead, Defendant Freiberg communicated that Ms. Darlingh would be paid *until* the District held the "emergency" misconduct conference.

120.    On August 25, four days before what would have been Ms. Darlingh's first day back at school, counsel emailed Defendant Freiberg asking when the "emergency" misconduct hearing would be scheduled.

121.    Defendant Freiberg responded, "Yes we are aware. We will be following up with further information."

122.    Over the next month, counsel repeatedly followed up with Defendant Freiberg, and she continued to respond only that "we are aware" and "will follow up as soon as possible," but Defendants never actually scheduled the "emergency" misconduct hearing, raising further doubts that there ever was any separate "misconduct" behind the second letter. A true and accurate copy of this email chain is attached to this Complaint as Exhibit 14.

### 8.    Ms. Darlingh's Termination

123.    On September 30, 2022, Defendant Freiberg sent Ms. Darlingh a letter notifying her that she had been terminated, effective immediately, as a result of the first letter and misconduct hearing. The letter is signed by Defendant Adria D. Maddaleni, the "Chief Human Resources Officer" for the District. A true and correct copy of this letter is attached to this Complaint as Exhibit 15.

124.    The letter makes clear that the entire basis for Ms. Darlingh's termination was "[t]he comments [she] made on April 23, 2022." Ex. 15.

125.    Among other things, the letter repeatedly asserts, inaccurately, that Ms. Darlingh "made it clear you will not respect a transgender student's wishes and use their preferred name and pronouns," Ex. 15 at 8—even though Ms. Darling stated explicitly in her response that she "would follow the parents' lead as to a student's

names and pronouns, even if the student transitioned," and that she "has and always will equally love, respect, and serve all students under her care, including transgender-identifying students."

126. The District's letter cited no examples whatsoever of Ms. Darlingh ever *not* "us[ing] [a student's] preferred name and pronouns," or treating any transgender student differently from any other student.

127. Regarding the second, "emergency" misconduct letter and hearing, the District's letter stated that because Ms. Darlingh's employment was terminated, "this second disciplinary hearing is not necessary at this time." "Should this ever change," the letter adds, "the District reserves the right to resume this second disciplinary hearing and take additional disciplinary action." Ex. 15 at 8.

## CAUSES OF ACTION

## CLAIM ONE: VIOLATION OF THE FIRST AMENDMENT, § 1983

128. Plaintiff realleges and incorporates by reference all previous allegations.

129. The First Amendment of the United States Constitution protects Ms. Darlingh's ability to speak on her own time on matters of public concern.

130. Ms. Darlingh did not forfeit her constitutional right to speak on her own time solely because she was employed by the Milwaukee School District.

131. Ms. Darlingh spoke as a private citizen when she spoke at the rally at the State Capitol on April 23, 2022.

132. Ms. Darlingh spoke as a private citizen when she spoke to the media to defend herself in response to DPI's threat to revoke her license for her speech.

133.   Ms. Darlingh's speech at the State Capitol on April 23, a Saturday, was not part of her duties as a school counselor.

134.   Ms. Darlingh's comments to the media, on her own time, to defend herself in response to DPI's threat to revoke her license for her speech, was not part of her duties as a school counselor.

135.   Ms. Darlingh's speech on April 23 addressed matters of public concern.

136.   Ms. Darlingh's comments to the media, on her own time, to defend herself in response to DPI's threat to revoke her license for her speech, addressed matters of public concern.

137.   Indeed, the topics Ms. Darlingh addressed are of immense public concern.

138.   Ms. Darlingh's constitutional right to comment on matters of public concern outweighs the District's interest in efficient provision of services.

139.   Neither Ms. Darlingh's speech on April 23, nor her comments to the media in defense of her license, caused a significant disruption either to her duties as a school counselor or to the District's services to its students.

140.   The primary motivating factor in Defendants' decision to terminate Ms. Darlingh was her speech on April 23, 2022.

141.   Upon information and belief, Defendant Milwaukee Board of School Directors delegated final policy-making authority to one or more of Defendants Maddaleni, Freiberg, and/or King with respect to Ms. Darlingh's termination.

142. Upon information and belief, Ms. Darlingh's suspension in June was based on her speech on April 23 or her comments to the media in defense of DPI's threat to terminate her license for her speech.

143. Upon information and belief, Defendant Milwaukee Board of School Directors has delegated final policy-making authority to one or more of Defendants Maddaleni, Freiberg, and/or King with respect to Ms. Darlingh's suspension in June.

144. Upon information and belief, the second "emergency" misconduct letter is based on Ms. Darlingh's speech on April 23 or her comments to the media in defense of DPI's threat to terminate her license for her speech.

145. Upon information and belief, Defendant Milwaukee Board of School Directors has delegated final policy-making authority to one or more of Defendants Maddaleni, Freiberg, and/or King with respect to the second "emergency" misconduct letter and the threat of further discipline.

146. Upon information and belief, the no-trespassing order sent on June 14 is based on Ms. Darlingh's speech on April 23 or her comments to the media in defense of DPI's threat to terminate her license for her speech.

147. The no trespassing order remains in place, even though Ms. Darlingh has been terminated.

148. Ms. Darlingh's voting location is on School District property.

149. Many kinds of publicly accessible events are held on Milwaukee School District property, yet Ms. Darlingh is unable to attend any such events due to the no-trespass order.

150.    Upon information and belief, Defendant Milwaukee Board of School Directors has delegated final policy-making authority to one or more of Defendants Maddaleni, Freiberg, and/or King with respect to the no-trespassing order.

151.    Defendants' retaliatory actions against Ms. Darlingh for her speech— her suspension, the no trespassing order, her termination, and continued threat of punishment for the second "emergency" misconduct letter—would deter a person of ordinary firmness from exercising her right to free speech in the future.

152.    Defendants retaliated against Ms. Darlingh for the viewpoints she expressed during her speech on April 23, 2022 and her comments to the media in defense of DPI's threat to terminate her license for her speech.

153.    Defendants' retaliatory actions against Ms. Darlingh violated her clearly established rights under the First Amendment to the United States Constitution.

154.    Ms. Darlingh is suffering a current and ongoing deprivation in the form of a retaliatory penalization for having exercised her free speech rights, and remains presently in this state of penalty so long as Defendants continue to foreclose her employment on this impermissible basis.

155.    Defendants Maddaleni, Freiberg, and/or King acted in bad faith and with malicious intent toward Ms. Darlingh, as evidenced by the timing and process by which they retaliated against her for her speech.

## CLAIM TWO: VIOLATION OF THE FOURTEENTH AMENDMENT, § 1983

156.    Plaintiff realleges and incorporates the preceding allegations of the complaint.

157.    The Due Process Clause of the Fourteenth Amendment to the United States Constitution prohibits government actors from "depriv[ing] any person of life, liberty, or property, without due process of law."

158.    The Due Process Clause generally requires notice and a hearing before, or reasonably promptly after, a deprivation of property rights.

159.    The "just cause" provision in Ms. Darlingh's employment contract provided her with an assurance that she would not be arbitrarily terminated by Defendants.

160.    As a non-probationary employee that could only be terminated for just cause, Ms. Darlingh had a constitutionally-protected property interest in her continued employment with the Milwaukee Public School District.

161.    Defendants violated Ms. Darlingh's due process rights when they suspended her in June pursuant to the second "emergency" letter without providing her notice of the basis of that suspension or any reasonably prompt opportunity to respond.

162.    Defendants violated Ms. Darlingh's due process rights when they imposed a no-trespass order on her in June pursuant to the second "emergency" letter without providing her notice of the basis of that no-trespass order or any reasonably prompt opportunity to respond.

163. Defendants' violations of Ms. Darlingh's due process rights caused Ms. Darlingh significant mental and emotional distress.

164. Defendants' violations of Ms. Darlingh's due process rights prevented her from knowing the status of her job throughout the summer, significantly increasing the damages to her from her eventual termination.

165. The no-trespass order remains in place to this day and continues to harm Ms. Darlingh.

166. Defendants had no good justification for delaying providing Ms. Darlingh with notice and a hearing with respect to the "emergency" misconduct letter and her suspension and the no-trespass order pursuant to that "emergency" misconduct letter.

167. Defendants Maddaleni, Freiberg, and/or King acted in bad faith and with malicious intent toward Ms. Darlingh, as evidenced by their refusal to notify Ms. Darlingh of the basis of the "emergency" misconduct letter, suspension, and no-trespass order, their refusal to promptly (or ever) schedule a hearing, and their patently absurd justification for delaying notice and a hearing.

168. Defendants have violated Ms. Darlingh's clearly established Due Process rights under the Fourteenth Amendment.

## REQUEST FOR RELIEF

Plaintiff therefore requests the following relief:

A.    A declaration that Defendants violated Ms. Darlingh's First Amendment Rights;

B.    A declaration that Defendants violated Ms. Darlingh's Due Process rights;

C.    An injunction requiring Defendants to reinstate Ms. Darlingh to her prior status and position at Allen-Field Elementary School and award her back-pay for the interim;

D.    An injunction prohibiting Defendants from further disciplining Ms. Darlingh for her First Amendment protected speech;

E.    An injunction prohibiting Defendants from taking any further action on the "Emergency" misconduct letter;

F.    An injunction requiring Defendants to remove their no-trespass order against Ms. Darlingh;

G.    Compensatory damages, including, but not limited to, damages for lost income and benefits, mental and emotional distress, loss of reputation, humiliation, and inconvenience;

H.    Nominal damages;

I.    Punitive damages against Defendants Maddaleni, Freiberg, and/or King;

J.    Costs and attorneys' fees under 42 U.S.C. § 1988; and

K.    Any such other relief as the Court deems appropriate.

Dated: November 16, 2022

Respectfully Submitted,

WISCONSIN INSTITUTE FOR LAW & LIBERTY

Rick Esenberg (#1005622)
rick@will-law.org

/s/ Luke N. Berg
Luke N. Berg (#1095644)
(414) 727-7361 | luke@will-law.org

Lucas T. Vebber (#1067543)
lucas@will-law.org

Cara M. Tolliver (#1112818)
cara@will-law.org

330 E. Kilbourn Ave., Suite 725
Milwaukee, WI 53202
Phone: (414) 727-9455
Fax: (414) 727-6385

*Attorneys for Plaintiff*