UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

MARISSA DARLINGH,

        Plaintiff,

                                                     Case No. 22-CV-1355

   v.

ADRIA MADDALENI, THERESE FREIBERG,
OPHELIA KING, and MILWAUKEE BOARD OF
SCHOOL DIRECTORS,

        Defendants.

---

**PLAINTIFF'S BRIEF IN SUPPORT OF
MOTION FOR PRELIMINARY INJUNCTION**

---

WISCONSIN INSTITUTE FOR
LAW & LIBERTY

Rick Esenberg
Luke N. Berg
Cara M. Tolliver
Lucas T. Vebber

330 E. Kilbourn Ave., Suite 725
Milwaukee, WI 53202
Phone: (414) 727-9455
Fax: (414) 727-6385

rick@will-law.org
luke@will-law.org
cara@will-law.org
lucas@will-law.org

*Attorneys for Plaintiff*

# TABLE OF CONTENTS

INTRODUCTION ..................................................................................................1

FACTUAL AND PROCEDURAL BACKGROUND.......................................................2

    A. Ms. Darlingh's Employment Contract and Status ........................................2

    B. Ms. Darlingh's Short Speech at a Saturday Rally at the Capitol ..................2

    C. DPI Investigation ........................................................................................4

    D. Defendants' Investigation and Termination of Ms. Darlingh for Her Speech..............5

ARGUMENT ....................................................................................................13

    I. This Court Should Grant an Injunction Reinstating Ms. Darlingh to Her Position. ..........14

    A. Defendants' Termination of Ms. Darlingh Violated the First Amendment.................14

    B. The Balancing of Harms and Public Interest Strongly Favor an Injunction Reinstating Ms. Darlingh. ..........................................................27

    II. This Court Should Grant an Injunction Ordering Defendants to Remove the Public Property Ban. ..................................................................30

    A. Defendants' Public Property Ban Violates Ms. Darlingh's First Amendment and/or Due Process Rights. ..........................................................31

    B. Ms. Darlingh is Irreparably Harmed by the Public Property Ban..............35

CONCLUSION.................................................................................................35

# INTRODUCTION

The Supreme Court has long recognized "that citizens do not surrender their First Amendment rights by accepting public employment." *Lane v. Franks*, 573 U.S. 228, 231 (2014). Instead, "speech by public employees on subject matter related to their employment *holds special value* precisely because those employees gain knowledge of matters of public concern" and thus are "uniquely qualified to comment on [such] matters." *Id*. at 240 (emphasis added, citation omitted). Teachers, in particular, are "the members of a community most likely to have informed and definite opinions as to [school-related issues]," so "it is essential that they be able to speak out freely on such questions without fear of retaliatory dismissal." *Pickering v. Bd. of Ed. of Twp. High Sch. Dist. 205, Will Cnty., Illinois*, 391 U.S. 563, 572 (1968).

Nevertheless, Defendants fired Plaintiff Marissa Darlingh, a public employee and school counselor, for a short, unscripted speech she gave back in April, where she expressed her views about how certain transgender-related policies and ideologies harm children. Ms. Darlingh delivered that speech on a Saturday, on her own time, at a rally in Madison, 80 miles from where she worked, during a "speaker's corner" on the steps of the state capitol—the epitome of what the First Amendment protects. Yet Defendants suspended and then terminated her for that speech.

Defendants also imposed an indefinite ban on entering District property against Ms. Darlingh, which remains in place *to this day*, prohibiting her from entering public property even when open to general public for public events, including voting and school board meetings. Defendants have refused to tell her the basis for the order or give her any reasonable opportunity to respond, violating not only her First Amendment rights, but also her right to due process.

Both her termination and the property ban do ongoing harm to her. This Court should grant an injunction requiring Defendants to reinstate Ms. Darlingh to her position and ordering them to remove the property ban against her.

## FACTUAL AND PROCEDURAL BACKGROUND

### A.    Ms. Darlingh's Employment Contract and Status

From March 4, 2021, until September 30, 2022, Plaintiff Marissa Darlingh was a school counselor, under contract, at Allen-Field Elementary School in the Milwaukee Public School District. Darlingh Decl. ¶ 2. In this position, Ms. Darlingh was a "certificated" employee. Darlingh Decl. ¶ 3; Berg Decl. Ex. 1 at 1. Because Ms. Darlingh completed more than one year of work as a school counselor with the District, she was considered a non-probationary employee. Darlingh Decl. ¶ 3; Berg Decl. Ex. 1 at 28. Pursuant to the District's Employee Handbook, non-probationary employees can "only be disciplined or discharged for just cause." Berg Decl. Ex. 1 at  9, 28. The District renewed Ms. Darlingh's contract for the 2022–2023 school year on April 14, 2022. Darlingh Decl. ¶ 4. Outside of the circumstances at issue in this case, Ms. Darlingh has never been subject to disciplinary action, formal or informal. Darlingh Decl. ¶ 6. Ms. Darlingh loves and is devoted to the students she serves; she even has a tattoo on her right hand drawn by one of her fourth graders who cannot read. Darlingh Decl. ¶ 5; Berg Decl. Ex. 9 at 11.

### B.    Ms. Darlingh's Short Speech at a Saturday Rally at the Capitol

On April 22–24, 2022, a group of women organized an event in Madison entitled "Sisters 4 Sisters," which they described as "[a] weekend of radical feminist action, discussion, community, and solidarity."[1] The weekend included a panel of speakers at the Madison library,[2]  workshops,[3] and other events. Darlingh Decl. ¶¶ 7–8. The group also hosted a rally at the State Capitol in Madison on Saturday, April 23, 2022, which was recorded and posted on YouTube.[4] The rally

---

[1] Sisters 4 Sisters Event Page, Facebook, https://www.facebook.com/S4S2022.
[2] https://www.youtube.com/watch?v=CvE2Na8la9s
[3] https://www.youtube.com/watch?v=Nka-ViErhoI
[4] https://www.youtube.com/watch?v=4jB70PNoJeI

included a "speaker's corner," where anyone attending was invited to speak. Darlingh Decl. ¶ 9–10. Many of the speeches were short and unscripted.

A group of people counter-protested the event. *Id.* ¶ 11. During the panel of speakers at the library, the counter-protestors stood outside the library chanting "no terfs on our turf"[5] and various other things.[6] During the "speaker's corner," they attempted to shout down the women speaking.[7] *Id.* ¶ 11. Some even yelled at them, calling them "lesbian Nazis" and other things.[8] Ms. Darlingh attended this event, and recalls activists calling her a "cunt" and "lesbian Nazi" at various points. *Id.* ¶ 12. She also saw multiple activists wearing shirts that said "protect trans kids" next to an image of a knife, which she took as a threat to harm her and the women at the event, based on a long history of threats against women who share her views.[9] *Id.* ¶ 13; Berg Decl. Ex. 9 at 15.

Ms. Darlingh spoke briefly during the "speaker's corner." Darlingh Decl. ¶ 14. She identified herself as an elementary school counselor in the Milwaukee Public Schools, and then stated that she "oppose[s] gender ideology" in elementary schools and that young children should not be "exposed to the harms of gender identity ideology." *Supra* n. 4 at 12:35–14:12. She said that she does not support and would not encourage the social or medical gender transition of children because she "exist[s] in this world to serve children" and "to protect children." *Id.* She also criticized those "who want children to have unfettered access to hormones—wrong-sex hormones—and surgery." *Id.* In the passion of the moment, Ms. Darlingh used the word "fuck"

---

[5] The acronym "TERF" stands for "Trans-Exclusionary Radical Feminist."
[6] *See* https://www.youtube.com/watch?v=g-tHgmf_-II at 0:00–0:35.
[7] *Supra* n. 4 at 14:11–14:45.
[8] https://www.youtube.com/shorts/zAYgkmVBxbY
[9] For hundreds of examples, *see* https://terfisaslur.com/

multiple times during her short, unscripted speech, and at one point said, "fuck transgenderism," referring to the "gender identity ideology" that she believes is harmful to children.[10] *Id.*

As Ms. Darlingh later learned, the group counter-protesting at this event immediately organized a campaign to get her fired from her job at the Milwaukee Public Schools.

### C.      DPI Investigation

Less than a week later, on April 29, 2022, Ms. Darlingh received a letter from the Wisconsin Department of Public Instruction (DPI) indicating it had "opened an investigation to determine whether to initiate educator license revocation proceedings against [her]" for "immoral conduct." Darlingh Decl. ¶ 15; Berg Decl. Ex. 2. The only "immoral conduct" DPI identified was Ms. Darlingh's short speech at the Capitol on April 23. Berg Decl. Ex. 2. Ms. Darlingh was given 30 days to respond. DPI attempted to use the threat of an investigation to scare Ms. Darlingh into surrendering her educator license, and, in turn, her livelihood. The letter offered the "option to voluntarily surrender [her] license and bring the DPI's investigation of this matter to a close," and DPI attached an "Agreement to Surrender License" for her to sign and return. *Id.* When DPI

---

[10] Her full speech can be viewed at the video linked in footnote 4, from 12:35–14:12. A transcript of the most relevant portion is as follows:

> I didn't plan on speaking and I've been screaming a lot but my name is Marissa Darlingh, I am an elementary school counselor in Milwaukee Public Schools. And I oppose gender ideology ever entering the walls of my school building. On my dead fucking body will my students be exposed to the harms of gender identity ideology. Not a single one of my students under my fucking watch will ever ever transition socially and sure as hell not medically. Absolutely not. I exist in this world to serve children. I exist to protect children. I feel like I'm disassociating right now because this is very intense very intense. I think someone else is speaking through me right now, but fuck transgenderism. Fuck it. Fuck transgenderism. Fuck these people behind us who want children to have unfettered access to hormones, wrong-sex hormones, and surgery. [Interruption by protestors].

initiates such an investigation, it notes on the "License Lookup" feature of its public website that the teacher is "Under Investigation."[11] Ms. Darlingh's license is listed with that status to this day.

On May 25, 2022, Ms. Darlingh sent DPI a response letter, declining the "offer" to surrender her license, and explaining that DPI's investigation and threat to suspend her license based on her public speech violated her First Amendment rights. Darlingh Decl. ¶ 17. In light of the harm to her reputation and serious risk to her livelihood, Ms. Darlingh chose to defend herself publicly, and publicized her response to DPI. Darlingh Decl. ¶ 18. DPI's investigation of Ms. Darlingh generated interest from the media, including Fox News and the Milwaukee Journal Sentinel. *Id*. ¶ 19. Since her response on May 25, 2022, and as far as she is aware, DPI has taken no further action to revoke her license. *Id*. ¶ 20.

### D. Defendants' Investigation and Termination of Ms. Darlingh for Her Speech

#### 1. April 26 – June 2

Defendant Ophelia King, Ms. Darlingh's supervisor, also began investigating Ms. Darlingh on April 26, right after the event at the capitol, in response to a campaign by a few of the counter-protesters at the event to get Ms. Darlingh fired from her job. Berg Decl. Ex. 8 at 4.

Shortly after the event, approximately nine individuals sent emails to various District staff calling for Ms. Darlingh to be fired for her speech. Berg Decl. Ex. 8 at 10–34. Three of the emails are identical to one another, word-for-word, and the rest all follow the same basic structure. Berg Decl. Ex. 8 at 14–15, 17–18, 22–23. One of the emails even describes who coordinated this campaign and how:

> "This was sent to me by a friend in Madison. She is part of a group who was counter protesting [at the April 23 event]. … She and some other folks in Madison are attempting to shed light on this situation and those involved. One happens to be an

---

[11]    Wisconsin Department of Public Instruction, Educator License Lookup, https://elo.wieducatorlicensing.org/datamart/licenseDetails.do?xentId=870025.

elementary guidance counselor at MPS. She asked that people … call, write, etc. to people at the school."

Berg Decl. Ex. 8 at 30. None of the people who sent these emails are students in the District, parents of students, staff in the District, or have any interaction with Ms. Darlingh at her job or knowledge of how she performs her job. Berg Decl. Ex. 8 at 10–34.

As a part of her investigation in response to these emails, Defendant King interviewed four students at the school where Ms. Darlingh worked. Berg Decl. Ex. 8 at 8. One of the four described Ms. Darlingh as one of her "favorite staff." The student stated that Ms. Darlingh "helps them with their problems whenever they want to hurt somebody, and listen[s] to how my recess went." *Id*. Another of the four students also said Ms. Darlingh was one of "their favorite teachers." This student "explained that when they are mad, frustrated, or sad Ms. Marissa would pick them up. 'I talk to Ms. Marissa about how I feel, she is my check-in and check-out person and I am working on being respectful to other students.'" *Id*. The only "criticism" of Ms. Darlingh from these student interviews was that she enforces the rules during "circle time." *Id*.

Between April and early June, Ms. Darlingh continued to do her job without incident. Darlingh Decl. ¶ 21. In mid-May, during a counseling lesson called "Emotional Bank Accounts," Ms. Darlingh's students wrote her a card with supportive notes, and at least seven different students described her as the best in the school: "You're the best teacher in the building"; "the best"; "the best counselor"; "best teacher"; "You are the best counselor and cool"; "best calming teacher"; "eres mi mejor amiga" (you are my best friend). Darlingh Decl. ¶ 22, Ex. 1. Other students described her as "so kind," "a great person," "a good mentor," "thoughtful," "sweet," "very nice," "fun and caring and chill," and that she "cares about people." *Id*. After Ms. Darlingh was suspended, as described below, one teacher in the school had multiple students asking "to see [Ms. Darlingh] to talk to her." Berg Decl. Ex. 9 at 13.

## 2.  Incident on June 3

On June 3, another teacher in Ms. Darlingh's school decided to show an article about Ms. Darlingh to her classroom of 5th grade students and told them "they have the right not to see her for counseling services"—a transparent attempt to rally opposition to Ms. Darlingh. Berg Decl. Ex. 8 at 48. Ms. Darlingh saw what was happening and told the principal, who then intervened. Darlingh Decl. ¶ 24; Berg Decl. Ex. 8 at 48. The principal told the teacher that she should not "be talking about this" in her classroom and made clear that he "never approved her decision to discuss news articles about Ms. Darlingh." *Id*. He directed that teacher to leave for the day. *Id*. The principal then collected statements from Ms. Darlingh, the teachers involved, and the students. *Id.*

In her statement, Ms. Darlingh explained that she has "never brought [her] personal political beliefs into [her] work," but that it appeared that this teacher and one other teacher were attempting to mount "a campaign to turn students against [her]." Berg Decl. Ex. 8 at 53–54. Nevertheless, Ms. Darlingh offered "to have a conversation with one or both [of these teachers] with mediation." *Id*. Darlingh Decl. ¶ 28–29. By contrast, the other teacher never spoke with Ms. Darlingh about her speech before bringing it into the school. *Id*. ¶ 25.

Most of the statements taken from the students in the classroom suggest the incident had little effect on them. Berg Decl. Ex. 8 at 63 ("I don't remember what Mx. Chappelle said."); id. at 65 ("I don't know what is going on."); id. at 66 ("Mx. Chappelle show[ed] the thing … she started reading a litt[le] then Ms. Marissa c[ame] and said [some]thing."); id. at 68 ("I s[aw] somet[hing] but I forgot it."); id. at 69 ("The background story of some person I forgot their name. I don't remember the other parts."); id. at 70 ("I don't know"). That same day, another teacher cornered Ms. Darlingh twice (once in her office, and once as she was walking out to her car), in a way that Ms. Darlingh perceived as aggressive and hostile, both times related to her speech in April. Darlingh Decl. ¶ 27. Ms. Darlingh submitted a "Request for GPS: Guided Problem Solving," in

an attempt to mediate with this coworker, but the other teacher "declined to participate." Darlingh Decl. ¶¶ 30–31, Exs. 2, 3.

### 3. Disciplinary Letter #1

On June 9, 2022, Ms. Darlingh received a letter from her supervisor, Defendant King, stating that "certain facts have come to my attention which might lead to disciplinary action regarding your failure to follow District Rules and Policies," and listing various District policies Ms. Darlingh allegedly violated. Berg Decl. Ex. 3. The letter, however, did not specify what conduct by Ms. Darlingh violated any of the District's policies. *Id*. The letter indicated that a conference was scheduled for June 15, 2022, because it was "necessary … to confer regarding this matter at the earliest possible opportunity." *Id*. Defendant King hand-delivered this letter to Ms. Darlingh, without any prior warning, and then pressured her to open it in her presence by asking, "don't you want to open it?" Darlingh Decl. ¶ 33.

Prior to this letter, and despite investigating Ms. Darlingh since April, Defendant King never had any conversation with Ms. Darlingh about her speech. *Id*. ¶ 34. Defendant King never communicated that Ms. Darlingh had violated any policies, nor did Defendant King ever give Ms. Darlingh any sort of warning or opportunity to correct any perceived violations of District policy. *Id*. And Defendant King had never observed Ms. Darlingh's work, either in an informal or formal capacity. *Id*. ¶ 35. The District's handbook provides that "generally, discipline is progressive in nature and requires communication with employees and/or their representatives." Berg Decl. Ex. 1 at 15. And it further recommends that "[a]ny particular concern related to an employee's conduct may be settled by informal discussion with the immediate supervisor." *Id*. Yet Defendant King did not initiate any kind of "informal discussion" with Ms. Darlingh prior to delivering the misconduct letter. Darlingh Decl. ¶ 34.

Given that there had been no prior warning or discussion and that the letter itself did not explain how Ms. Darlingh had violated any policies, counsel for Ms. Darlingh sent an email to Ms. King and others on June 13, 2022, asking for more information, prior to the hearing, so that she could meaningfully respond. Berg Decl. Ex. 4. An "employment relations specialist" in Defendant Freiberg's Department responded that Ms. Darlingh would not receive advanced notice, but instead would receive a "packet" minutes before the conference. *Id.*

#### 4.        Disciplinary Letter #2 and Public Property Ban

On the evening of June 13, 2022, two days before the scheduled hearing with respect to the first disciplinary letter, Ms. Darlingh received an email from Defendant Freiberg directing her "not [to] report to work tomorrow," because she would be receiving a second letter "placing you on paid investigatory suspension pending scheduling of a second conference." Berg Decl. Ex. 5.

The following day, June 14, the School District sent Ms. Darlingh a second letter, entitled an "Emergency Scheduling Letter," notifying her that she was immediately suspended from her position as a school counselor. Berg Decl. Ex. 6. Like the first letter, this second letter stated that Ms. Darlingh was alleged to have violated a similar list of policies as the first letter, but failed to describe any specific conduct by Ms. Darlingh that violated any of the policies. *Id.* The second letter further directed Ms. Darlingh "not [to] enter any MPS buildings or come onto any school grounds as of June 14, 2022," and "not to have any contact with school staff, students, or parents until further notice." *Id.* Unlike the first letter, however, and despite being labeled an "Emergency" misconduct letter, the second letter stated that "an Emergency Conference will be scheduled [during] the Fall 2022–23 School year." *Id.*

The District sent this letter exactly three days before Ms. Darlingh's last scheduled day of work for the 2021–22 school year (June 16, 2022). *Id.*; Darlingh Decl. ¶ 38. The letter stated that "the first three days of your suspension will be paid, and the remaining days will be unpaid." Berg

Decl. Ex. 6. The timing of this letter strongly suggests that Defendants intended to put Ms. Darlingh into an unpaid suspension during the summer, making it difficult for her to know the status of her job in the months leading up to the next school year.

Later that day, Defendant Freiberg sent Ms. Darlingh a separate "notice of no trespass" (hereafter "public property ban") signed by Defendant Adria Maddaleni, prohibiting Ms. Darlingh from "enter[ing] upon the land and/or premises" of "ALL Milwaukee Public Schools School buildings and owned land," including even the "Central Administration Building." Berg. Decl. Ex. 7. The order states that "it shall remain in effect until officially rescinded IN WRITING by the administrator in charge." *Id*. Under the terms of that order, Ms. Darlingh is prohibited from entering public property even when other members of the public are free to do so. She cannot go to sporting events, concerts, plays, or other community events. She cannot vote on school property. She cannot go to school board meetings. The order threatens fines up of to $500 and imprisonment in jail for up to 60 days if she violates the order. *Id*. The Defendants have never rescinded the public property ban. Darlingh Decl. ¶ 40.

### 5. The June 15 Hearing

Ms. Darlingh's first and only "hearing" in this matter was held via Zoom on June 15, and related only to her first discipline letter dated June 9th. Minutes before the "hearing," Ms. Darlingh received a 126-page "packet" containing 48 exhibits, all of which centered around Ms. Darlingh's speech at the Capitol on April 23. Berg. Decl. Ex. 8; Darlingh Decl. ¶ 46.

During the "hearing," Defendant King "presented" the packet by showing each exhibit on her screen, allowing Ms. Darlingh to read each exhibit, and then moving to the next, without any comment. Darlingh Decl. ¶ 48. After the entire packet had been presented in this way, Defendant King finished her portion of the conference without any further statements or explanation. *Id*. ¶ 49. She did not connect anything in the packet to any alleged policy violations or explain how Ms.

Darlingh had violated any District policy. *Id*. After Defendant King finished her "presentation," Defendant Freiberg communicated that Ms. Darlingh would have ten minutes to confer with counsel, after which she could respond orally to the information presented in the packet. *Id.* ¶ 50. Ms. Darlingh objected to this process because she had just seen these materials for the first time minutes before the "hearing" and asked for an opportunity to respond in writing. *Id*. Defendants Freiberg and King conferred, and then agreed to allow Ms. Darlingh to submit a written response two weeks later. *Id*.

### 6. Ms. Darlingh's Response

Ms. Darlingh submitted her response to the District on June 27, 2022. Berg Decl. Ex. 9. Darlingh addressed in detail how her speech on her own time, outside of work hours, 80 miles from Milwaukee, was protected by the First Amendment and did not violate any of the District policies that the District had identified. *Id*. at 3, 6–10. Nevertheless, although her speech was constitutionally protected and unpunishable, Ms. Darlingh "acknowledge[d] that her use of profanity went too far" and offered to "issue an apology to anyone who was offended by her use of profanity and to meet with any staff or students who were offended by what she said, to apologize directly and to listen to them and to how her words affected them." *Id*. at 1. Ms. Darlingh explained that her "fuck transgenderism" comment was "referring to policies and ideologies that she believes harm children, and not in any way referring to transgender students or individuals." *Id*. at 2. She emphasized that she "has and always will equally love, respect, and serve all students under her care, including transgender-identifying students." *Id*.; Darlingh Decl. ¶¶ 53–56. Defendants never replied or presented any evidence refuting these statements by Ms. Darlingh.

Ms. Darlingh also directly addressed a Milwaukee Journal Sentinel article that the District included in its "packet," because that article had misquoted her. Berg Decl. Ex. 9 at 6. She explained that the reporter had "inaccurately reported that [Ms. Darlingh] said she would not use

students' preferred names or pronouns." *Id.*; Darlingh Decl. ¶¶ 57–58. Ms. Darlingh explained that she told the reporter she "would follow the parents' lead as to a student's names and pronouns, even if the student transitioned." She also noted that she had "asked the paper to issue a correction, which it ultimately did," "though it buried that clarification deep in the article." Berg Decl. Ex. 9 at 6; Darlingh Decl. ¶¶ 59–60. Ms. Darlingh explained that she believed "following the parents' lead as to names/pronouns is consistent with the District's policies," but to the extent it was not, she asked for "clarification" from the District, as she was "never given, or trained on, the 'Gender Inclusion Guidance' document." Berg Decl. Ex. 9 at 6; Darlingh Decl. ¶¶ 59, 61–63. She concluded that her "hope is to work with the District and any staff or students who were offended by her speech to resolve this so that she and her colleagues can get back to doing the jobs that they love." Berg Decl. Ex. 9 at 10. No clarification was ever received.

### 7. Defendants' Refusal to Schedule the Second "Emergency" Conference or Explain the Basis for the Suspension and Public Property Ban

As a reminder, Ms. Darlingh received a second discipline letter suspending her and the public property ban on June 14th, and was told that an "emergency" hearing would be scheduled later. Ms. Darlingh tried all summer to have that "emergency" hearing held but the Defendants refused, because, they claimed, such hearings are not held during *the employee*'s "off hours"— even though Defendants Freiberg and King work during the summer and Ms. Darlingh offered to make herself available during their work days. Berg Decl. Ex. 10; Darlingh Decl. ¶¶ 64–70.

Counsel for Ms. Darlingh made it clear that Ms. Darlingh was available any time for the hearing and asked that it be scheduled promptly so that, if it resulted in her termination, she would have time to search for a new job before the new school year began. *Id.* Counsel explained that failing to provide Ms. Darlingh with notice or a reasonably prompt hearing violated her due process rights, and further explained that waiting until the fall to schedule this "emergency" hearing would

do substantial additional damage to Ms. Darlingh. Berg Decl. Ex. 10. Nevertheless, Defendants refused to schedule the hearing. Darlingh even submitted a grievance under the District's grievance procedures in an attempt to speed up the "emergency" hearing, but that grievance was denied by one of Defendant Freiberg's subordinates. Darlingh Decl. ¶ 70.

On August 25, four days before what would have been Ms. Darlingh's first day back at school, counsel emailed Defendant Freiberg asking when the "emergency" hearing would be scheduled. Berg Decl. Ex. 11. Defendant Freiberg responded, "Yes we are aware. We will be following up with further information." *Id*. Over the next month, counsel repeatedly followed up, and Defendant Freiberg continued to respond that "we are aware" and "will follow up as soon as possible," but *Defendants never actually scheduled or held the "emergency" hearing*, nor provided the basis for the suspension and public property ban. *Id*.

### 8. Ms. Darlingh's Termination

On September 30, 2022, Defendant Freiberg sent Ms. Darlingh a letter notifying her that she had been terminated, effective immediately. Berg Decl. Ex. 12. The letter is signed by Defendant Adria D. Maddaleni, the "Chief Human Resources Officer" for the District. *Id*. The letter makes clear that the entire basis for Ms. Darlingh's termination was "[t]he comments [she] made on April 23, 2022." *Id*.

## ARGUMENT

To obtain a preliminary injunction, a plaintiff "must establish that [it] is likely to succeed on the merits, that [it] is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of the equities tips in [its] favor, and that an injunction is in the public interest." *Higher Soc'y of Indiana v. Tippecanoe Cnty., Indiana*, 858 F.3d 1113, 1116 (7th Cir. 2017) (citations omitted). Ms. Darlingh satisfies these requirements.

## I.     This Court Should Grant an Injunction Reinstating Ms. Darlingh to Her Position.

### A.     Defendants' Termination of Ms. Darlingh Violated the First Amendment.

The Supreme Court has held, and repeatedly reaffirmed, that government employers may not fire or retaliate against their employees for First-Amendment-protected speech. *E.g.*, *Kennedy v. Bremerton Sch. Dist.*, 142 S. Ct. 2407, 2423–25 (2022); *Lane*, 573 U.S. at 236; *Garcetti v. Ceballos*, 547 U.S. 410, 419 (2006); *Connick v. Myers*, 461 U.S. 138, 142 (1983); *Pickering*, 391 U.S. at 574. A First Amendment retaliation claim has three basic elements: Ms. Darlingh must show that: "(1) she engaged in constitutionally protected speech; (2) she suffered a deprivation because of her employer's action; and (3) her protected speech was a but-for cause of her employer's action." *Milliman v. Cnty. of McHenry*, 893 F.3d 422, 430 (7th Cir. 2018). Here, the second and third elements are beyond dispute. Ms. Darlingh was terminated, a sufficient "deprivation," *see*, *e.g.*, *Lane*, 573 U.S. at 235, and Defendants' termination letter openly states that she was fired for "[t]he comments [she] made on April 23, 2022." Berg Decl. Ex. 12 at 6.

In determining whether a public employee's speech is constitutionally protected, courts engage in a two-step inquiry. *E.g.*, *Lane*, 573 U.S. at 237; *Kennedy*, 142 S. Ct. at 2423. First, the employee must establish that she "spoke as a citizen on a matter of public concern." *Lane*, 573 U.S. at 237 (quoting *Garcetti*, 547 U.S. at 418) (the Seventh Circuit often splits this inquiry into two parts, *e.g.*, *Kristofek v. Vill. of Orland Hills*, 832 F.3d 785, 792 (7th Cir. 2016)). If the employee did speak as a private citizen on a matter of public concern, the court then "balance[s] [ ] the interests of the employee, as a citizen, in commenting upon matters of public concern and the interest of the State, as an employer, in promoting the efficiency of the public services it performs through its employees." *Lane*, 573 U.S. at 231 (quoting *Pickering*, 391 U.S. at 568).

### 1. Ms. Darlingh Spoke as a Private Citizen on a Matter of Public Concern

As to whether an employee speaks as a "private citizen," the "critical question," the Court has held, is "whether the speech at issue is itself ordinarily within the scope of an employee's duties, not whether it merely concerns those duties." *Lane*, 573 U.S. at 240; *e.g.*, *Kristofek*, 832 F.3d at 793 (looking to the "applicable job description" and any other "responsibilities that the employee is expected to perform"). Notably, speech "does not transform … into employee—rather than citizen—speech" merely because it "concerns" or is "acquired by virtue of [the citizen's] public employment." *Lane*, 573 U.S. at 240; *Kristofek*, 832 F.3d at 793.

In this case, Ms. Darlingh unquestionably spoke in her capacity as a private citizen, and not as a part of her official duties. She spoke on a Saturday, on her own time, at a public rally, 80 miles from the District and community in which she works. *Supra* pp. 2–4. This was not an internal memo she drafted as part of her job, *see Garcetti*, 547 U.S. at 421–22, a grievance about some decision circulated to her coworkers, *see Connick*, 461 U.S. at 141–42, 148–49, or a complaint raised internally up the chain of command, *see Bivens v. Trent*, 591 F.3d 555, 560 (7th Cir. 2010). She spoke on her own initiative, entirely apart from and outside her job duties. Simply put, attending and speaking at this rally was not in any way part of "the scope of [her] duties as a [school counselor]." *See Kennedy*, 142 S. Ct. at 2425.

The mere fact that Ms. Darlingh identified herself as a school counselor, *see* Berg Decl. Ex. 12 at 6, does not mean that she no longer spoke as a private citizen. Indeed, in *Pickering* itself, the seminal case on public-employee speech, a teacher wrote a letter to the editor commenting on the school district's budget, 391 U.S. at 564, and the Court not only did not find it problematic that the teacher had identified himself, the Court emphasized that "teachers are, as a class, the members of a community most likely to have informed and definite opinions as to how funds allotted to the

operations of the schools should be spent" and therefore must "be able to speak out freely on such questions," *id*. at 572. The Court has reiterated the point multiple times since: "It bears emphasis that our precedents dating back to *Pickering* have recognized that speech by public employees on subject matter related to their employment holds special value precisely because those employees gain knowledge of matters of public concern through their employment." *Lane*, 573 U.S. at 240; "[P]ublic employees are uniquely qualified to comment" on "government policies that are of interest to the public at large," *City of San Diego, Cal. v. Roe*, 543 U.S. 77, 80 (2004); "[T]he public has a right to hear the views of public employees," *Borough of Duryea, Pa. v. Guarnieri*, 564 U.S. 379, 397 (2011).

With respect to whether speech involves a "matter of public concern," the Supreme Court has held that this includes "any matter of political, social, or other concern to the community" or "subject of legitimate news interest; that is, a subject of general interest and of value and concern to the public." *Lane*, 573 U.S. at 241 (quoting *Snyder v. Phelps*, 562 U.S. 443, 453 (2011)). This inquiry "turns on the content, form, and context of the speech." *Id*. (cleaned up).

Ms. Darlingh's speech clearly addressed a topic of immense "public concern." She spoke briefly at a public rally to express her concerns about "expos[ing]" children to "the harms of gender identity ideology" and giving children "unfettered access to hormones—wrong-sex hormones— and surgery" and "socially" and "medically" transitioning them to a different gender identity. She even emphasized that she was motivated to speak by her passion to "serve" and "protect" children from these harms. This subject is one of the most profound ontological, social, and moral topics of our time, and one need not search long to find a robust debate on the subject and experts raising

similar concerns.[12] The "content" of Ms. Darlingh's speech was not directed to any District policy or decision in particular, or even to the District at all—she was speaking generally about her opposition to some of the "harms of gender identity ideology" to children. And the "form" and "context" for her speech also strongly support that it addressed a matter of public concern. Indeed, it is difficult to conceive of any speech closer to "the heart of the First Amendment," *Lane*, 573 U.S. at 235, than one given during a "speakers' corner" at a rally on the steps of a state capitol.

## 2. *Pickering* Balancing Favors Ms. Darlingh's Right to Speak on Such an Important Topic.

Since Ms. Darlingh clearly spoke as a private citizen on a matter of public concern, this Court then considers whether her interest "as a citizen, in commenting upon matters of public concern" outweighs the District's interest, "as an employer, in promoting the efficiency of the public services it performs through its employees." *Kristofek*, 832 F.3d at 795 (quoting *Pickering*, 391 U.S. at 568). Importantly, the Supreme Court has emphasized that "a stronger showing [of government interests] may be necessary if the employee's speech more substantially involve[s] matters of public concern." *Lane*, 573 U.S. at 242 (quoting *Connick*, 461 U.S. at 152). The Seventh Circuit has too: "when a public employee's speech has touched upon a matter of 'strong public concern,' the government employer typically must 'offer particularly convincing reasons to suppress it.'" *Kristofek*, 832 F.3d at 796 (citing *Gustafson v. Jones*, 117 F.3d 1015, 1019 (7th Cir. 1997)); *McGreal v. Ostrov*, 368 F.3d 657, 681–82 (7th Cir. 2004). An employer's "mere incantation of the phrase 'internal harmony in the workplace' is not enough to carry the day,"

---

[12] *See, e.g.*, *Britain changes tack in its treatment of trans-identifying children*, The Economist (Nov. 17, 2022), https://www.economist.com/britain/2022/11/17/britain-changes-tack-in-its-treatment-of-trans-identifying-children; Megan Twohey & Christina Jewett, *They Paused Puberty, but Is There a Cost?*, N.Y. Times (Nov. 14, 2022), https://www.nytimes.com/2022/11/14/health/puberty-blockers-transgender.html (reporting that "concerns are growing among some medical professionals about the consequences of [puberty blockers]").

*Harnishfeger v. United States*, 943 F.3d 1105, 1121 (7th Cir. 2019), because "First Amendment rights cannot be trampled based on hypothetical concerns." *Kristofek*, 832 F.3d at 796 (citations omitted).

> The Seventh Circuit has identified seven factors to consider when conducting this balance:
>
> "(1) whether the speech would create problems in maintaining discipline or harmony among co-workers; (2) whether the employment relationship is one in which personal loyalty and confidence are necessary; (3) whether the speech impeded the employee's ability to perform her responsibilities; (4) the time, place and manner of the speech; (5) the context in which the underlying dispute arose; (6) whether the matter was one on which debate was vital to informed decisionmaking; and (7) whether the speaker should be regarded as a member of the general public."

*Kristofek*, 832 F.3d at 796 (citations omitted). And "[t]he initial, and often determinative, question is whether the speech interferes with the employee's work or with the efficient and successful operation of the office." *Knapp v. Whitaker*, 757 F.2d 827, 842 (7th Cir. 1985).

Here, the balance weighs heavily in Ms. Darlingh's favor. First, the "time, place and manner" of Ms. Darlingh's speech (factor 4), the fact that she spoke "as a member of the general public" (factor 7), and that she addressed a topic in which "debate [is] vital," (factor 6), all cut in favor of Ms. Darlingh's First Amendment rights. Again, she spoke on a Saturday, on her own time, 80 miles from the school District and community in which she works, on a topic that is critically important to the health and well-being of children in this state and around the country. Likewise, the "context in which the dispute arose" (factor 5) also supports Ms. Darlingh's First Amendment rights. The dispute over her speech began at the rally, outside of work, between the feminists participating in the rally and a group of protestors, none of whom have claimed to have any interaction with Ms. Darlingh. *Supra* pp. 5–6.

Ms. Darlingh's teaching position is not one in which "personal loyalty and confidence are necessary," and regardless her speech did *not* call into question her loyalty to the District (factor

2). As a preliminary matter, the "personal loyalty" factor typically applies to public-safety-related jobs. *See*, *e.g.*, *Lalowski v. City of Des Plaines*, 789 F.3d 784, 792 (7th Cir. 2015) (quoting *Breuer v. Hart*, 909 F.2d 1035, 1041 (7th Cir. 1990)) ("[T]here is a particularly urgent need for close teamwork among those involved in the 'high stakes' field of law enforcement."). The same concern is not present for public school employees. *See Pickering*, 391 U.S. at 570 (noting that a teacher's "employment relationships with the Board and, to a somewhat lesser extent, with the superintendent are not the kind of close working relationships for which it can persuasively be claimed that personal loyalty and confidence are necessary to their proper functioning"); *Knapp*, 757 F.2d at 839, 842 (reciting this part of *Pickering*, and finding no disruption to relationships between teachers and administrators).

In any event, Ms. Darlingh's speech did not in any way call into question her loyalty to the District. She was not criticizing her employer's decisions or policies, her speech was not "directed at" or "towards" any District employees or any particular person, *see Knapp*, 727 F.2d at 838, 842; *Pickering*, 391 U.S. at 569–70, nor was she even commenting on any District policy or practice directly; she was merely expressing her views about the effect of certain ideologies and policies on children. The District may disagree with her opinions, but such disagreements are bound to exist—and must be allowed to exist—especially on such an immensely consequential topic.

Finally, Ms. Darlingh's speech did not "impede [her] ability to perform her responsibilities" or "create problems in maintaining discipline or harmony among co-workers" (factors 1 and 3). After her speech in April, Ms. Darlingh continued to do her job without incident. Darlingh Decl. ¶ 21. In fact, the District's so-called "misconduct packet," which contains information gathered by her supervisor after her speech, does not indicate that any students or parents of students *were even aware of her speech at the rally*. Berg Decl. Ex. 8 at 4–9. Defendant

King asked four students whether "students are free and safe to be whom they want to be" and who their "favorite person" is at the school, and all four answered yes to the first question, and two said Ms. Darlingh was their favorite staff member. Berg Decl. Ex. 8 at 8.

Similarly, on May 26, 2022—a month after her speech—Ms. Darlingh received notes from her students during a counseling lesson describing her as "car[ing] about people," the "best teacher in the building," "a great person," "so kind," "sweet," and "thoughtful," among other things, Darlingh Decl. ¶ 22, Ex. 1; *supra* p. 6, further indicating that Ms. Darlingh's speech did not "imped[e] the [] proper performance of [her] daily duties" or "interfer[e] with the regular operation of the schools generally." *Lane*, 573 U.S. at 237 (quoting *Pickering*, 391 U.S. at 572–73). And following Ms. Darlingh's suspension, one teacher even reported multiple "children asking to see [Ms. Darlingh] to talk to her." Berg Decl. Ex. 9 at 13.

The District is likely to point to the nine-or-so emails sent to various District employees calling for the District to "fir[e]" or "severe[ly] reprimand and/or punish" Ms. Darlingh for her speech, Berg Decl. Ex. 8 at 10–34, yet these do not constitute the kind of interference or disruption to the District capable of overriding Ms. Darlingh's First Amendment rights. In the first place, none of the individuals who sent these emails claim to be students in the District, parents of students in the District, or staff in the District, nor do they claim to have any interaction with Ms. Darlingh on the job or any knowledge of how she performs her job. *Id*. And none describe any interference or disruption to the District whatsoever. *Id*. Instead, what these emails *do* show is a coordinated campaign by the protestors at the rally to have Ms. Darlingh fired for expressing her views—three are identical and the rest all follow the same basic structure, Berg Decl. Ex. 8 at 14–15, 17–18, 22–23, with one even describing this campaign. *Id*. at 30; *supra* pp. 5–6.

This campaign is a classic "heckler's veto," in which individuals who object to some viewpoint attempt to *create* a disruption to silence speech they disagree with. *See Zamecnik v. Indian Prairie Sch. Dist. No. 204*, 636 F.3d 874, 879 (7th Cir. 2011) (discussing the doctrine of the heckler's veto). Fortunately, hecklers do not get the veto. *Feiner v. New York*, 340 U.S. 315, 320 (1951) ("We are well aware that the ordinary murmurings and objections of a hostile audience cannot be allowed to silence a speaker."); *Zamecnik*, 636 F.3d at 879 ("[T]he fact that homosexual students and their sympathizers harassed [plaintiff] because of their disapproval of her message is not a permissible ground for banning it"). In short, these emails could not, and indeed did not, create any disruption or interference to the District or Ms. Darlingh's duties sufficient to rise to a "particularly convincing" justification to punish Ms. Darlingh for her speech.

The District may also point to the June 3 incident—in which another teacher showed her students an article about Ms. Darlingh to rally opposition to her, *see supra* pp. 7–8—but allowing this manufactured disruption to be used against Ms. Darlingh would also amount to a "heckler's veto." "[E]ven if [ ] speech is deeply offensive to members of the school community and may cause a disruption, the school cannot punish the [speaker]; 'that would be a heckler's veto.' The school may suppress the disruption, but it may not punish the off-campus speech that prompted [others] to engage in misconduct." *Mahanoy Area Sch. Dist. v. B. L. by & through Levy*, 141 S. Ct. 2038, 2056 (2021) (Alito, J., concurring) (citations omitted); *see also id.* at 2047–48 (majority op.) (noting no evidence of any "substantial disruption").

In other words, the June 3 incident was not *caused* by Ms. Darlingh's speech in April, but by another teacher who attempted to bring the issue into the classroom and create controversy in the School. *See Zamecnik*, 636 F.3d at 880 (affirming summary judgment in favor of plaintiffs and finding that plaintiff's speech, which Defendant school district had banned, was not what had given

rise to the disruption at the school). When an objector attempts to create a disruption, "schools should punish the rioters, not the speaker." *Mahanoy Area Sch. Dist.*, 141 S. Ct. at 2056 (Alito, J., concurring) (citations omitted); *see Nelson v. Streeter*, 16 F.3d 145, 150 (7th Cir. 1994) ("The rioters are the culpable parties, not the artist whose work unintentionally provoked them … ."). The school principal recognized this, promptly sending the other teacher home for the day and documenting that he had "never approved her decision to discuss news articles about Ms. Darlingh" and that "no one [was to] be talking about this topic … to children." Berg Decl. Ex. 8 at 48. In any event, most of the statements taken from the students in the classroom suggest the incident had little or no effect on them. *Supra* p. 7.

For her part, Ms. Darlingh sought to reconcile with the teachers who were campaigning against her, offering "to have a conversation with one or both [of these teachers] with mediation." Berg Decl. Ex. 8 at 54. And she also submitted a "Request for GPS: Guided Problem Solving" to mediate with another coworker who had cornered her multiple times on June 3. Darlingh Decl. Ex. 2. By contrast, the main teacher involved in the June 3 incident never spoke to Ms. Darlingh about her concerns before bringing the issue into the classroom, Darlingh Decl. ¶ 25, and the other teacher declined to participate in the GPS process, Darlingh Decl. ¶ 31. Throughout the misconduct proceedings, Ms. Darlingh has also repeatedly offered to meet with anyone who was offended by her speech to "listen to them and how her words affected them," to "apologize directly" for some of her words, and "to work towards a resolution." Berg Decl. Ex. 9 at 1.

Finally, the fact that Ms. Darlingh used a vulgar word during her short, unscripted speech does not entitle the District to fire her. The Supreme Court has repeatedly stressed that "First Amendment freedoms need breathing space to survive," *see NAACP v. Button*, 371 U.S. 415, 433 (1963), since "[speech concerning public affairs is … the essence of self-government," *McGreal*,

368 F.3d at 681–82 (citations omitted). Thus, "in public debate [we] must tolerate insulting, and even outrageous, speech in order to provide adequate 'breathing space' to the freedoms protected by the First Amendment." *Snyder v. Phelps*, 562 U.S. 443, 458 (2011). "[D]ebate on public issues should be uninhibited, robust, and wide-open, and ... may well include vehement, caustic, and sometimes unpleasantly sharp attacks on government and public officials." *Rankin v. McPherson*, 483 U.S. 378, 387 (1987) (quoting *New York Times Co. v. Sullivan*, 376 U.S. 254, 270 (1964) in the context of a public-employment case). And the "use of expletives [is] a defining feature of modern American culture." *Zamecnik*, 636 F.3d at 880.

As a thought experiment, assume that at a speech at the state capitol she said "fuck capitalism" or "fuck Catholicism" rather than "fuck transgenderism," does anyone seriously think she would be fired? It was not the use of an expletive that caused her to be fired; it was the philosophy (the "ism") she was opposing that led to her termination.

Although her speech is constitutionally protected and unpunishable, Ms. Darlingh nevertheless has acknowledged that "her use of profanity went too far" and offered to "apologize directly" to "anyone who was offended by her use of profanity." Berg Decl. Ex. 9 at 1. Ms. Darlingh has made it "absolutely clear" that her "fuck transgenderism" comment, "as the context shows, [ ] was referring to policies and ideologies that she believes harm children, and not in any way referring to transgender students or individuals." Berg Decl. Ex. 9 at 2; Darlingh Decl. ¶ 55. There is no evidence that disputes this. She also emphasized that she "has and always will equally love, respect, and serve all students under her care, including transgender-identifying students." Berg Decl. Ex. 9 at 2; Darlingh Decl. ¶¶ 5, 53.

In sum, Ms. Darlingh's speech did not cause any disruption to her duties or the District's services to its students and there is no justification, much less a "particularly convincing" one, for

her government employer to punish Ms. Darlingh for her speech on an important topic of the day. The *Connick-Pickering* balance tips in favor of Ms. Darlingh's First Amendment rights.

### 3. Ms. Darlingh Did Not Violate Any District Policy by Speaking

To the extent it matters to the constitutional analysis (though a District policy cannot alter First Amendment rights), Ms. Darlingh did not violate any District Policy by speaking on her own time. Defendants' termination letter does not identify any policy that prohibits employees from speaking at a political rally on an important topic of the day. Rather, the District's policies state that "[e]mployees of the MPS are *encouraged* to participate in the political process." Berg Decl. Ex. 13 (MPS Administrative Policy 6.04(7)). The letter states that Ms. Darlingh was not "authorized to comment on the topic of gender identity," Berg Decl. Ex. 12 at 6, but the District does not identify any policy that requires employees to get pre-authorization from the District before speaking about this topic, or any other topic, and even if there were such a policy, that would be an unlawful "prior restraint," with a "heavy presumption against its constitutional validity," *see Bantam Books, Inc. v. Sullivan*, 372 U.S. 58, 70 (1963).

The termination letter relies heavily on the false assertion that Ms. Darlingh "made it clear [she] will not respect a transgender student's wishes and use their preferred name and pronouns," and that she "refuse[s] to provide transgender students the support they need." Berg Decl. Ex. 12 at 6–8. That is not true, the Defendants identify no evidence that supports it, and the conclusions are directly refuted by Ms. Darlingh's statements, which Defendants simply disregard. She explained in her response that she "would follow the parents' lead as to a student's names and pronouns, even if the student transitioned," and that she "has and always will equally love, respect, and serve all students under her care, including transgender-identifying students." Berg Decl. Ex. 9 at 2, 6. Ms. Darlingh also explained that she had never received or been trained on the District's "Gender Inclusion" guidance, and asked for clarification if Defendants believed that guidance

requires something different, indicating her willingness to follow District policies. Berg Decl. Ex. 9 at 6; Darlingh Decl. ¶ 62.

What Ms. Darlingh was attempting to communicate at the rally (in a speech that was unscripted) is that she would not be the *cause* or *initiator* of a child's social or medical transition, Darlingh Decl. ¶ 55, and Defendants have not pointed to any District Policy that requires that of her. And she told Defendants that she will follow the District's policies as to names and pronouns and will of course provide all students, even transgender-identifying students, whatever support they need, to the best of her ability. Berg Decl. Ex. 9 at 2, 6. The termination letter does not describe any examples—nor are there any—of Ms. Darlingh ever not using a student's "preferred name and pronouns" or failing to provide support to a transgender-identifying student. Darlingh Decl. ¶ 63. Thus, claiming that Ms. Darlingh has "made it clear" she will not follow the District's policies is demonstrably false and clear pretext for firing her for expressing a viewpoint that some in the District disagree with.

The termination letter lists a few policies that Defendants' contend Ms. Darlingh violated, but none of these prohibit her speech on her own time outside of work. The letter cites Administrative Policy 6.07(2)(n), Berg Decl. Ex. 8 at 102, but Ms. Darlingh did not "threaten or intimidate" anyone, much less students. No students were at the rally, and her words were not directed to anyone in particular; she was expressing her views generally on an important subject.

The termination letter also claims that Ms. Darlingh "detract[ed] from the school district's image or reputation," citing Administrative Policy 6.07(2)(p), *id.*, but such a broad and generic policy cannot override the First Amendment or the analysis under *Pickering*. *See United States v. Nat'l Treasury Emps. Union*, 513 U.S. 454, 467 (1995) ("[T]he Government must be able to satisfy a balancing test of the *Pickering* form to maintain a statutory restriction on employee speech").

The termination letter also invokes the District's vague and aspirational "Equity" policy, Berg Decl. Ex. 8 at 97, but the letter does not explain how Ms. Darlingh has violated it. Here the letter relies heavily on the assertion that Ms. Darlingh "made it known that [she] will do everything within [her] power when working at MPS to prevent a student from transitioning medically or socially," which is unsupported by evidence, false and contradicted by what she told Defendants, as explained above.

As for the District's bullying policy, Berg Decl. Ex. 8 at 100–01, Ms. Darlingh's speech was not "deliberate or intentional[ly]" meant "to cause fear, humiliation, intimidation, harm or social exclusion"—she even explained during her short speech that her motivation was to "protect" and "serve children." And there is no evidence whatsoever that it had such an effect on any "transgender students and their families." Moreover, this policy, by its own terms, only applies to "off-duty speech" if it "results in a substantial disruption of the workplace," which it did not.

Finally, the ASCA standards which the Defendants refer to, *see* Berg Decl. Ex. 8. at 90–94, are not adopted policies of the District, Ms. Darlingh is not a member of that association, and in any event, they simply require counselors to treat all students "equally and fairly with dignity and respect," which Ms. Darlingh has explained she will do and always has done, Berg Decl. Ex. 9 at 2, (and the letter does not point to any examples to suggest otherwise).

Notably, the *first time* Ms. Darlingh received any explanation for how Defendants believed her speech violated District policies was in her termination letter. Defendant King did not give Ms. Darlingh any warning, have any discussion with her, or give her any opportunity to correct any perceived violations. The misconduct letter did not provide any explanation, Berg Decl. Ex. 3, Defendants would not provide it when Ms. Darlingh asked for it, *supra* p. 9, and even during the misconduct hearing, neither Defendant King nor Defendant Freiberg explained how Ms.

Darlingh's speech had violated any policies, *supra* pp. 10–11. The District's handbook emphasizes that "generally, discipline is progressive in nature and requires communication with employees and/or their representatives" and recommends that "[a]ny particular concern related to an employee's conduct may be settled by informal discussion with the immediate supervisor." Berg Decl. Ex. 1 at 9. Yet Defendants did not follow the usual "progressive" disciplinary process, but clearly had already decided to terminate Ms. Darlingh for her speech.

### B. The Balancing of Harms and Public Interest Strongly Favor an Injunction Reinstating Ms. Darlingh.

The First Amendment violation alone constitutes irreparable harm that warrants preliminary injunctive relief reinstating Ms. Darlingh. In *Elrod v. Burns*, 427 U.S. 347 (1976), multiple deputy sheriffs who were fired or threatened with termination for their political affiliations filed a First Amendment retaliation claim and sought a preliminary injunction for, among other things, an "order[ ] reinstating [the] unlawfully dismissed employees." *Burns v. Elrod*, 509 F.2d 1133, 1135 (7th Cir. 1975). The trial court denied a preliminary injunction on the grounds that "loss of employment did not constitute a sufficient showing of irreparable injury" and then dismissed the case for failure to state a claim. *Id.* The Seventh Circuit reversed, and on "the question concerning the denial of plaintiffs' motion for a preliminary injunction," held that "injunctive relief is clearly appropriate" "[i]nasmuch as this case involves First Amendment rights of association which must be carefully guarded against infringement by public office holders." *Id.* at 1136. The United States Supreme Court affirmed, agreeing that the "loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." 427 U.S. at 373–74 (plurality op.).

Since *Elrod*, the Seventh Circuit has repeatedly reaffirmed that irreparable injury is presumed in First Amendment cases. *Higher Soc'y of Indiana*, 858 F.3d at 1116 ("[E]ven short

deprivations of First Amendment rights constitute irreparable harm."); *Am. C.L. Union of Illinois v. Alvarez*, 679 F.3d 583, 589 (7th Cir. 2012) (quoting *Elrod* for the proposition that the "loss of First Amendment freedoms … unquestionably constitutes irreparable injury"); *Christian Legal Soc'y v. Walker*, 453 F.3d 853, 859 (7th Cir. 2006) ("The loss of First Amendment freedoms is presumed to constitute an irreparable injury for which money damages are not adequate.").

Thus, in First Amendment cases, "the likelihood of success on the merits will often be the determinative factor" such that "the analysis begins and ends with [that factor]." *E.g.*, *Korte v. Sebelius*, 735 F.3d 654, 666 (7th Cir. 2013); *Higher Soc'y of Indiana*, 858 F.3d at 1116; *Vitolo v. Guzman*, 999 F.3d 353, 360, 365 (6th Cir. 2021) ("When constitutional rights are threatened or impaired, irreparable injury is presumed. … [P]laintiffs will win on the merits of their constitutional claim. And like in most constitutional cases, that is dispositive here."); Wright & Miller, 11A Fed. Prac. & Proc. § 2948.1 (3d. ed.) ("When an alleged deprivation of a constitutional right is involved, such as the right to free speech … most courts hold that no further showing of irreparable injury is necessary.").

Multiple federal circuits since *Elrod* have applied this principle in the employment context where the plaintiff(s) raised a First Amendment retaliation claim and sought a preliminary injunction for reinstatement. *E.g*, *Newsom v. Norris*, 888 F.2d 371, 378 (6th Cir. 1989) (affirming preliminary injunctive relief ordering reinstatement, and holding that "[a]n individual, who has been subjected to direct and intentional retaliation for having exercised the protected constitutional right of expression, continues to suffer irreparable injury even after termination of some tangible benefit such as employment."); *Romero Feliciano v. Torres Gaztambide*, 836 F.2d 1, 4 (1st Cir. 1987) (affirming preliminary injunctive relief for reinstatement, and holding that "[g]iven the finding that Romero was likely to succeed on the merits of his First Amendment claim there was

no abuse of discretion in finding irreparable harm."); *Johnson v. Bergland*, 586 F.2d 993, 995 (4th Cir.1978) (reversing the denial of a preliminary injunction for reinstatement, and emphasizing that "[v]iolations of first amendment rights constitute per se irreparable injury").

The Sixth Circuit also emphasized in *Newsom* that "[t]he majority of federal circuit courts, however, have concluded that an individual, who has been subjected to direct and intentional retaliation for having exercised the protected constitutional right of expression, continues to suffer irreparable injury even after termination of some tangible benefit such as employment." *Newsom*, 888 F.2d at 378 (listing cases); *see also Cate v. Oldham*, 707 F.2d 1176, 1189 (11th Cir. 1983) ("This does not mean, however, that only if a plaintiff can prove actual, current chill can he prove irreparable injury. On the contrary, direct retaliation by the state for having exercised First Amendment freedoms in the past is particularly proscribed by the First Amendment.")

To the extent that the Defendants attempt to rely on any cases from other circuits to the contrary, the critical point here is that *Elrod* was a Seventh Circuit case, and this Court is bound by *Elrod*. In this same context, the Western District of Wisconsin District Court has recognized that "a broad view of *Elrod* is still the rule in the Seventh Circuit," such that "the Seventh Circuit continues to interpret *Elrod's* waiver of the requirement to make an explicit showing of irreparable harm as applicable in *all types of First Amendment discharge cases*." *Greer v. Amesqua*, 22 F. Supp. 2d 916, 924–25 (W.D. Wis. 1998) (emphasis added). Thus, the First Amendment violation alone constitutes irreparable injury that warrants a preliminary injunction.

For similar reasons, the Seventh Circuit has also held that "injunctions protecting First Amendment freedoms are always in the public interest." *Christian Legal Soc'y v. Walker*, 453 F.3d at 859; *Preston v. Thompson*, 589 F.2d 300, 303, n. 3 (7th Cir. 1978) ("[the remedy of a

constitutional violation] certainly would serve the public interest."); *Vitolo*, 999 F.3d at 360 ("[I]t is always in the public interest to prevent violation of a party's constitutional rights.").

Even setting aside the inherent harm from the First Amendment violation, there is other, intangible and irreparable harm to Ms. Darlingh that warrants a preliminary injunction ordering reinstatement. Ms. Darlingh seeks reinstatement to *her job at Allen-Field elementary school*. She was developing rapport with many of the students there—as noted above, many described her as their favorite staff person and asked for her when she was suspended, *supra* pp. 6—and she wants to continue her work with them. Darlingh Aff. ¶ 70–72. She loved her students, and they loved her. *Id.* ¶¶ 5, 72; *supra* p. 6. Without an injunction, the District "would be free to name a successor" and Ms. Darlingh "would have no means of being reinstated if [she] should prevail at trial." *Johnson*, 586 F.2d at 995. And, given Ms. Darlingh's otherwise impeccable teaching record and her strong bonds with students, Darlingh Decl. ¶¶ 5–6, 22, 32, the public interest is benefitted by reinstating Ms. Darlingh to her position.

## II.  This Court Should Grant an Injunction Ordering Defendants to Remove the Public Property Ban.

As noted above, immediately after they suspended her, Defendants sent Ms. Darlingh a public property ban that remains in place to this day. Berg. Decl. Ex. 7. The order directs her "not to enter upon the land and/or premises of Milwaukee Public Schools," including "ALL Milwaukee Public Schools School buildings and owned land, Buildings, and [the] Central Administration Building at 5225 W Vliet Street." *Id*. The order states that "[t]he provisions of this notice shall remain in effect until officially rescinded IN WRITING by the administrator in charge." *Id*. And it threatens her with fines up of to $500 and imprisonment in jail for up to 60 days if she violates the order. *Id*.

Ms. Darlingh's voting location is the District's central administration building. Darlingh Ms. Decl. ¶ 41. During this fall's elections, out of an abundance of caution, Ms. Darlingh asked for an exception to the order to vote. Berg Decl. Ex. 14. That she had to do so is appalling, but Defendants' response is even more so. They granted her the exception, but only for the August 9th primary: "The exception to … should be understood to be limited to entry, engaging in voting activity and exit of the premises by Ms. Marissa on August 9, 2022." *Id*. Ms. Darlingh should not have to continue to request permission to vote on District property.

There are also numerous events that members of the public are invited to attend on District property, including school board meetings,[13] concerts, theater and other fine arts events,[14] sporting events,[15] and more. Ms. Darlingh wants to be able to attend these events, but is prohibited from doing so by the unlawful no-trespassing order. Darlingh Decl. ¶ 42. This infringement on Ms. Darlingh's rights to vote, to associate, and to assemble should be enjoined.

## A. Defendants' Public Property Ban Violates Ms. Darlingh's First Amendment and/or Due Process Rights.

### 1. Defendants' Actions Indicate That the Public Property Ban Was Retaliation for Ms. Darlingh's Speech in April.

Although Defendants *still* have not expressly told Ms. Darlingh the underlying factual basis for the public property ban, there is no explanation for the order except that it is retaliation for Ms. Darlingh's speech in April. It is beyond dispute now that the *entire basis* for the first letter was Ms. Darlingh's speech in April

Even if Defendants were justified in terminating Ms. Darlingh's employment for her speech—and they were not, for the reasons explained above, *supra* Part I—they certainly have no

---

[13] https://mps.milwaukee.k12.wi.us/en/District/About-MPS/School-Board/Meetings-Agendas--Minutes/Meeting-Notices.htm
[14] https://mps.milwaukee.k12.wi.us/en/Programs/Fine-Arts.htm
[15] https://mps.milwaukee.k12.wi.us/en/Programs/Athletics.htm

Case 2:22-cv-01355-SCD   Filed 12/13/22   Page 33 of 38   Document 12-1

lawful basis to continue to impose the public property ban on her for her speech now that she is no longer an employee. *See Pickering*, 391 US. at 568 (noting government has "significantly" less power to "regulat[e] [ ] the speech of the citizenry in general"). Indeed, there is no balancing test outside the employment context; the constitutional rule is that any "[p]enalties for speech protected under the First Amendment are forbidden." *Surita v. Hyde*, 665 F.3d 860, 871 (7th Cir. 2011); *Nieves v. Bartlett*, 139 S. Ct. 1715, 1722 (2019) ("[T]he First Amendment prohibits government officials from subjecting an individual to retaliatory actions for engaging in protected speech."); *Fairley v. Andrews*, 578 F.3d 518, 525 (7th Cir. 2009) ("[T]hreats of penalties also are forbidden").

The public property ban remains in place and prohibits Ms. Darlingh from entering *any* District property for any purpose, including voting, school board meetings, sporting events, concerts, plays, etc., and it applies indefinitely.

> **2. Alternatively, Defendants' Failure to Provide Notice of the Basis for, or Any Opportunity to Respond to, the Public Property Ban Violated Ms. Darlingh's Due Process Rights.**

The Fourteenth Amendment of the United States Constitution prohibits government actors from "depriv[ing] any person of life, liberty, or property, without due process of law." U.S. Const. amend. XIV. The "essential requirements of due process" are "notice" and an "opportunity to respond." *Cleveland Bd. of Educ. v. Loudermill*, 470 U.S. 532, 546 (1985); *Mathews v. Eldridge*, 424 U.S. 319, 348 (1976) (the "essence of due process"); *Goss v. Lopez*, 419 U.S. 565, 579 (1975) (due process requires, "at the very minimum," "*some* kind of notice" and "some kind of hearing").

Multiple federal circuits have recognized that citizens "have a constitutionally protected liberty interest to be in parks or on other city lands of their choosing that are open to the public generally." *Catron v. City of St. Petersburg*, 658 F.3d 1260, 1266 (11th Cir. 2011) (citing *City of Chicago v. Morales*, 527 U.S. 41 (1999)); *Vincent v. City of Sulphur*, 805 F.3d 543, 548 (5th Cir. 2015) ("Supreme Court decisions amply support the proposition that there is a general right to go

to or remain on public property for lawful purposes.") (citing *Morales Papachristou v. City of Jacksonville*, 405 U.S. 156 (1972), *Shuttlesworth v. City of Birmingham*, 382 U.S. 87 (1965), and other cases); *Kennedy v. City Of Cincinnati*, 595 F.3d 327, 335–36 (6th Cir. 2010).

Defendants provided neither notice nor a hearing, either before or after depriving Ms. Darlingh of this liberty interest. After receiving the second discipline letter and public property ban, Ms. Darlingh tried all summer to schedule the promised "emergency" hearing, *supra* pp. 12–13, but Defendants refused to schedule the hearing and then terminated her at the end of September without ever holding the hearing.[16] This flagrant due process violation warrants an injunction lifting the order. *See*, *e.g.*, *England v. Jackson Cnty. Pub. Libr.*, No. 4:21-CV-00019, 2022 WL 973042, at *12 (S.D. Ind. Mar. 31, 2022) (granting injunction of "continued enforcement of the ban from the Seymour Library"); *Anderson v. Hansen*, 489 F. Supp. 3d 836, 846 (E.D. Wis. 2020) (granting a preliminary injunction against an order banning a parent from school district property).

To establish a procedural due process violation, a plaintiff must show that she has been deprived of a liberty or property interest. *Lavite v. Dunstan*, 932 F.3d 1020, 1032-33 (7th Cir. 2019). The no entry on public property order implicates not only the liberty interest of the public to have access to public property but also several other interests.

As described above, the order also infringes Ms. Darlingh's fundamental right to vote, *e.g.*, *Shipley v. Chicago Bd. of Election Commissioners*, 947 F.3d 1056, 1061 (7th Cir. 2020) ("It is undeniable that the right to vote is a fundamental right guaranteed by the Constitution.") (citing *Burdick v. Takushi*, 504 U.S. 428, 433 (1992)); Darlingh Decl. ¶ 41, as well as her right to participate in the political process more generally by, among other things, attending and speaking

---

[16] The only "hearing" she ever received was the June 15th "hearing," but that was solely in response to the June 9th discipline letter and not the second letter or the public property ban.

at school board meetings, which are held on District property, *see supra* n. 13; Wis. Stat. 19.81(2) ("all meetings of all state and local governmental bodies shall be publicly held in places reasonably accessible to members of the public and shall be open to all citizens at all times unless otherwise expressly provided by law"); *see City of Madison, Joint Sch. Dist. No. 8 v. Wisconsin Emp. Rels. Comm'n*, 429 U.S. 167, 175 (1976) (emphasizing that "concerned citizen[s]" have a right to "express [their] views on an important decision of [their] government"); *see also Harper v. Virginia State Bd. of Elections*, 383 U.S. 663, 668 (1966).

Having a permanent ban on accessing public property against her also harms Ms. Darlingh's "good name, reputation, honor, or integrity" in the community, such that "notice and an opportunity to be heard are essential." *Bd. of Regents of State Colleges v. Roth*, 408 U.S. 564, 573 (1972); Darlingh Decl. ¶ 44.

Finally, the order interferes with Ms. Darlingh's right "to acquire useful knowledge" by attending community events held on MPS' property. *Bd. of Regents of State Colleges*, 408 U.S. at 572 (quoting *Meyer v. Nebraska*, 262 U.S. 390, 399 (1923)); *see also England*, 2022 WL 973042, at *9–*12 (finding a due process violation based on a ban from the library); Darlingh Decl. ¶ 42.

Given that there are significant liberty and/or property interests at stake, this Court would ordinarily then weigh the *Mathews v. Eldridge* factors to determine "what process is due." 424 U.S. at 334–35, 349. Here, however, Defendants afforded *no process whatsoever* with respect to the order, despite her repeated requests. The Supreme Court has been clear that due process requires, "at the very minimum," "*some* kind of notice" and "some kind of hearing." *See*, *Goss*, 419 U.S. at 579; *Cleveland Bd. of Educ.*, 470 U.S. at 546; *Mathews*, 424 U.S. at 348. Thus, this Court need not engage the *Mathews* factors, but simply hold that Defendants cannot permanently

ban a citizen from all school district property, at times when it is open to the general public, without any explanation whatsoever as to the basis for the ban or any opportunity to respond.

Even if the Court were to apply the *Mathews* factors, they all warrant *at least some notice and opportunity to respond*. The "private interests" at stake are significant, *see supra* pp. 32–33, 33–34; there is a high risk of "erroneous"—or worse, arbitrary and unjustified—"deprivation" of those rights if Defendants can impose a permanent ban on accessing public property order without even explaining their reasons for doing so; there is significant value to requiring notice to Ms. Darlingh of the basis for the order and an opportunity to respond (at the very least so she can challenge it); and it would have imposed little additional burden on the District to require Defendants to explain the justification for the order (if there is one).

### B.    Ms. Darlingh is Irreparably Harmed by the Public Property Ban.

For the same reasons explained above with respect to Ms. Darlingh's termination, *supra* Part I.B, the First Amendment violation alone is an irreparable harm that warrants a temporary injunction, and the public interest favors an injunction.

Even setting that point aside, the order banning Ms. Darlingh from entering District property for any purpose whatsoever, does ongoing, irreparable harm to her rights to access District property (when open to the general public), to vote, to participate in the political process by attending and speaking at school board meetings, and to attend community events on District property, and it does harm to her reputation in the community. Darlingh Decl. ¶¶ 40–44; *e.g. Anderson*, 489 F. Supp. 3d at 844–45 (finding irreparable harm from a similar ban).

### CONCLUSION

For the foregoing reasons, the District's retaliation against Ms. Darlingh violates the Constitution and warrants temporary injunctive relief. This Court should issue a temporary

injunction ordering Defendants to reinstate Ms. Darlingh to her former position (including back pay) and ordering them to remove their public property ban against her.

Dated: December 9, 2022

Respectfully Submitted,

WISCONSIN INSTITUTE FOR LAW & LIBERTY

Rick Esenberg (SBN 1005622)
(414) 727-6367 | rick@will-law.org

/s/ Luke N. Berg
Luke N. Berg (SBN 1095644)
(414) 727-7361 | luke@will-law.org

Cara M. Tolliver (SBN 1112818)
cara@will-law.org

Lucas T. Vebber (#1067543)
lucas@will-law.org

330 E. Kilbourn Ave., Suite 725
Milwaukee, WI 53202
Phone: (414) 727-9455
Fax: (414) 727-6385

Attorneys for Plaintiff