UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

MARISSA DARLINGH

    Plaintiff,

v.

    Case No. 22-CV-1355

ADRIA MADDALENI, et al.,

    Defendants.

## DECLARATION OF MARISSA DARLINGH

I, Marissa Darlingh, declare that, if called upon, I could and would competently testify to the following:

1. I am a citizen and resident of the United States and the State of Wisconsin, residing in Milwaukee, Wisconsin.

2. From March 4, 2021, until September 30, 2022, I was a school counselor at Allen-Field Elementary School in the Milwaukee Public School District ("District").

3. In my position, I was a "certificated" employee in the "Group C – Teacher" classification, and because I completed more than one year of work as a school counselor with the District, I was considered a non-probationary employee.

4. On April 14, 2022, the District renewed my teaching contract for the 2022-2023 school year.

5. I love and am devoted to the students I serve: I have a tattoo on my right hand that was drawn by one of my fourth graders who cannot read.

6. Outside of the circumstances giving rise to this lawsuit, I have never been subject to disciplinary action at the District, formal or informal.

7. During the weekend of April 22–24, 2022, I attended an event in Madison, Wisconsin, organized by a women's rights group and meant for "feminist action, discussion, community, and solidarity."

8. This event focused on gender identity ideology and transgender-related policies and their effects on women and women's rights and included, among other things, a panel of speakers at the Madison library, workshops, and a bike ride.

9. On Saturday, April 23, 2022, I participated in a public rally hosted by the group, on my own time, at the State Capitol, nearly 100 miles from where I work.

10. Rally participants were invited to speak during a "speaker's corner."

11. A group of activists protested our rally, attempted to shout down the women speaking during the "speaker's corner," yelled various profanities and slurs at us, and engaged in other intimidating conduct.

12. At various points, I was called a "cunt" and a "lesbian Nazi."

13. I saw multiple activists wearing a shirt that said "protect trans kids" next to an image of a knife, a message that I understood as a threat to harm me and the other women attending, given a long history of threats and attacks against women who share my views.

14. I spoke briefly during the "speaker's corner," identifying myself as an elementary school counselor in the Milwaukee Public Schools, and gave a short, unscripted speech to express my concern about the harms that certain aspects of gender identity ideology can have on children.

15. Less than a week later, on April 29, 2022, I received a letter from the Wisconsin Department of Public Instruction (DPI) indicating that DPI had opened an investigation based on

my April 23 remarks to determine whether to initiate license revocation proceedings against me for "immoral conduct."

16. Pursuant to this investigation, DPI updated its "license lookup" website to indicate that I was "Under Investigation."

17. On May 25, 2022, my attorney and I sent a response to DPI, declining to surrender my license and explaining that DPI's investigation and threat to suspend my license based on my speech violated my First Amendment rights.

18. I was concerned about the harm to my reputation and serious risk to my livelihood, so I chose to defend myself publicly, and publicized my response to DPI.

19. DPI's investigation generated interest from the media, and I spoke with multiple news organizations, including Fox News and the Milwaukee Journal Sentinel.

20. As far as I know, DPI has taken no further action to revoke my license; however, the "License Lookup" feature on DPI's website continues to lists my license status as "Under Investigation."

21. Between April and early June, I continued to do my job at the school without incident.

22. In mid-May, I led a counseling lesson for my students entitled "Emotional Bank Accounts," and as part of that lesson multiple of my students wrote me various notes. A true and accurate copy of those notes is attached to this Declaration as Exhibit 1.

23. On June 3, 2022, when I was returning from my lunch break, I passed by another teacher's classroom and saw an article about me projected on the classroom smartboard to the teacher's fifth grade students.

24. I entered her classroom briefly to ask her why she was talking about me to her class, and then I reported the incident to the school principal.

25. This teacher never spoke to me about my speech before bringing it into her classroom.

26. The principal intervened and took statements from me, the students, and a few other teachers involved.

27. Later that same day, another teacher cornered me twice—once in my office, and once as I was walking out to my car—in a manner that I perceived as aggressive and hostile, both times related to my comments on April 23.

28. In my follow-up statements to the principal, I explained that I had never brought my personal political beliefs to work and did not agree with the decisions of the two teachers to bring an outside issue into school and into their classrooms.

29. Although these two teachers appeared to be mounting a campaign to turn students against me, I offered to meet with either or both of these teachers with a mediator.

30. I also submitted a "Request for GPS: Guided Problem Solving" in an attempt to mediate with the co-worker who cornered me. A true and accurate copy of my request is attached to this Declaration as Exhibit 2.

31. Unfortunately, the District's Human Resources Department notified me that the other teacher had declined to participate. A true and accurate copy of the email I received is attached to this Declaration as Exhibit 3.

32. On June 9, 2022, I received my first ever disciplinary notice from my supervisor, Ms. King, stating that I may be subject to disciplinary action based on a failure to follow various District policies.

- 4 -
Case 2:22-cv-01355-SCD    Filed 12/13/22    Page 4 of 9    Document 13

33. Ms. King hand-delivered the letter to me, without any prior warning, and then pressured me to open it in her presence by asking, "don't you want to open it?" Ms. King seemed excited for me to open the letter.

34. Prior to this notice, Ms. King had never initiated any conversation with me about my April 23 speech or communicated with me about any policy violations, much less provided any sort opportunity to correct any perceived violations of District policy.

35. Likewise, Ms. King has never observed my work, in either an informal or formal capacity.

36. On the evening of June 13, 2022, two days before the scheduled misconduct hearing, I received an email from Therese Freiberg, the Director of the District's Department of Employee Relations, instructing me not to report to work the next day and notifying me that a second letter regarding my suspension would be forthcoming.

37. On June 14, 2022, I received a second disciplinary notice, notifying me that I was suspended immediately from my position as a school counselor.

38. My scheduled last day of work for the 2021-2022 school year was June 16, 2022.

39. Later the same day, Ms. Freiberg sent me a separate "no trespass order" prohibiting me from entering any District property until the order is rescinded in writing.

40. I have not received any written notice that the no-trespassing order has been rescinded.

41. My voting location is on District property.

42. I want the ability to access District property on the same terms as other members of the public for multiple reasons, including to attend school board meetings and other events held

- 5 -
Case 2:22-cv-01355-SCD   Filed 12/13/22   Page 5 of 9   Document 13

on District property that are open to the general public, such as sporting events, concerts, theater and fine arts events, and other community events.

43. The no-trespassing order continues to harm me by preventing me from entering District property without first asking for an exception to the order.

44. The no-trespassing order also does substantial harm to my reputation in the community, requiring me to explain to friends and acquaintances why I am unable to attend these and other types of events on District property.

45. Prior to the scheduled June 15 conference, the District did not provide any additional information as to how my conduct had allegedly violated any District policy, nor has it ever provided any basis for the no-trespass order.

46. Instead, just minutes before the June 15 conference, I received a 126-page "packet" containing 48 exhibits centering around my speech at the State Capitol on April 23.

47. The conference hearing was conducted over Zoom and, in addition to myself, attended by Ms. King, Ms. Freiberg, and my counsel.

48. Ms. King presented the packet by showing each exhibit on screen, without any comment or explanation, and allowing me to read it before moving to the next exhibit.

49. After the entire packet had been presented in this manner, Ms. King concluded her portion of the conference without any further statements or explanation as to how anything in the packet showed a violation of any District policy.

50. After Ms. King finished her presentation, Ms. Freiberg informed me that I had 10 minutes to confer with counsel and then could respond. My counsel objected to this process and asked for an opportunity to respond in writing. Ms. Freiberg and Ms. King conferred off screen and ultimately agreed to allow me to submit a written response.

- 6 -
Case 2:22-cv-01355-SCD   Filed 12/13/22   Page 6 of 9   Document 13

51. On June 27, 2022, I submitted my response to the District regarding the documents presented at the June 15 conference hearing.

52. While the District still had not explained how I had violated any District policies—much less given me any opportunity to correct any violation—my counsel and I attempted to address in detail how my speech was protected by the First Amendment and did not violate any of the District policies that the District had identified.

53. Among other things, I emphasized that I would love, respect, and serve all my students, including transgender-identifying students.

54. I further explained that my "fuck transgenderism" comment was referring to policies and ideologies that I believe harm children, and not in any way referring to transgender students or individuals.

55. When I stated that "not a single one of my students under my fucking watch will ever transition socially and sure as hell not medically," I was attempting to communicate that I would not be the *cause* or *initiator* of a child's transition, as I've explained to the District.

56. I also offered to apologize to anyone who was offended by my use of profanity during my brief remarks.

57. In addition, because the District had included it in its "packet," I directly addressed a Milwaukee Journal Sentinel article that had misquoted me when it said I would not use students' self-identified names or pronouns.

58. I explained that I had spoken to the reporter to clarify my statements and views, but the reporter misreported that I would never use students' preferred names and pronouns.

59. Instead, I explained that I would follow the parents' lead as to a student's name and pronouns (and had told this to the reporter), which I believe is consistent with the District's "Gender Inclusion Guidance" for elementary age students, though I had not seen this until recently. That Guidance indicates that parents/guardians will "most likely be involved" in conversations around gender at that age. My students at Allen-Field were all elementary age students.

60. My counsel asked the reporter to correct the article, and the reporter did, but buried the correction deep in the article.

61. From the time I was hired until the misconduct letter in June, I was never given or trained on the District's "Gender Inclusion Guidance."

62. Since I had never seen or been given this guidance before, I also asked for clarification if following the parents' lead as to names and pronouns is inconsistent with the District's policies in some way, but no one at the District has ever told me otherwise.

63. I have never *not* used a student's preferred name and pronouns.

64. During the misconduct hearing, my counsel and I asked why the hearing with respect to the second letter could not be scheduled promptly.

65. Ms. Freiberg responded that misconduct hearings are not held outside of an employee's work hours.

66. We asked whether Ms. Freiberg and Ms. King continue to work during the summer, and they confirmed that they do.

67. We then indicated that I was available any time during their work hours, even during the summer, and asked that the hearing be scheduled promptly so that, if I ultimately were terminated, I would have time to find a new job before the next school year.

- 8 -
Case 2:22-cv-01355-SCD   Filed 12/13/22   Page 8 of 9   Document 13

68. Ms. Freiberg responded that she would get back to us after the hearing.

69. My counsel followed up, but the District still would not schedule the hearing.

70. We filed a grievance in an attempt to speed up the process, but that was denied by one of Ms. Freiberg's subordinates in mid-August.

71. I want to continue my work at Allen-Field elementary school.

72. I love my students there and have developed significant rapport with many of them, and I want to continue building on the work I have already done.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on December 10, 2022

_____
Marissa Darlingh