## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF WISCONSIN

MARISSA DARLINGH,

        Plaintiff,

v.                                                  Case No. 22-CV-1355

ADRIA MADDALENI, THERESE FREIBERG,
OPHELIA KING, and MILWAUKEE BOARD
 OF SCHOOL DIRECTORS,

        Defendants.

## DEFENDANTS' BRIEF IN OPPOSITION TO PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION

## FACTS

      Marissa Darlingh ("Darlingh") was employed by Milwaukee Public Schools ("MPS") from March 4, 2021 until her termination on September 30, 2022. (Maddaleni Decl. ¶ 2). During her brief tenure with MPS, Darlingh's position was school counselor. (Maddaleni Decl. ¶ 3). MPS became aware that, in April of 2022, Darlingh attended a public gathering in Madison, Wisconsin wherein she used a public address system to deliver a short, unscripted speech to a crowd. (Maddaleni Decl. ¶ 4). The relevant text of Darlingh's speech was:

> I didn't plan on speaking and I've been screaming a lot but my name is Marissa Darlingh, I am an elementary school counselor in Milwaukee Public Schools. And I oppose gender ideology ever entering the walls of my school building. On my dead fucking body will my students be exposed to the harms of gender identity ideology. Not a single one of my students under my fucking watch will ever ever transition socially and sure as hell not medically. Absolutely not. I exist in this world to serve children. I exist to protect children. I feel like I'm disassociating right now because this is very intense very intense. I think someone else is speaking through me right now, but fuck transgenderism. Fuck it. Fuck transgenderism. Fuck these people behind us who want children to have unfettered access to hormones, wrong-sex hormones, and surgery.

(ECF 1, ¶ 31, fn. 10).

Darlingh continued to work at MPS after making this speech. (Maddaleni Decl. ¶ 5). However, on June 3, 2022, Darlingh became disruptive during the school day. (Maddaleni Decl. ¶ 6). As Darlingh was walking past a classroom, she noticed the teacher had posted her (Darlingh's) photograph on the board and the teacher was instructing students that they were not required to see Ms. Darlingh if they did not feel comfortable. (Maddaleni Decl. ¶ 7). Instead of reporting this conduct to her supervisors, Darlingh decided to enter the teacher's classroom to confront that teacher. (Maddaleni Decl. ¶ 8). Darlingh admitted that, as a result of this confrontation, several students expressed that they did not want to attend counseling sessions with Darlingh and one student even said that they do not want to be in the same room as Darlingh. (*Id.*, Ex. 1). Later that day, another employee confronted Darlingh at least two separate times to address the hateful speech Darlingh made in April, 2022. (Maddaleni Decl. ¶ 9). This disruption escalated MPS's already on-going investigation into Darlingh's conduct. (*Id.*).

MPS became aware of Darlingh's speech from emails sent by concerned members of the public. (Maddaleni Decl. ¶ 10, Ex. 2). MPS also became aware that, as a result of Darlingh's April 2022 speech, the Wisconsin Department of Public Instruction opened an investigation to determine whether to initiate educator license revocation proceedings for Darlingh's alleged immoral conduct. (Maddaleni Decl. ¶ 11, Ex 3). On April 26, 2022, MPS opened an investigation into Darlingh's conduct. (King Decl. ¶ 2). MPS complied the evidence it obtained during its investigation and presented it to Darlingh at a pre-disciplinary meeting on June 15, 2022. (King Decl. ¶ 3; *See also* ECF 1-11). During that meeting, MPS cited 48 exhibits relating to Darlingh's speech, MPS's investigation, and relevant MPS policies. (King Decl. ¶ 4; *See also* ECF 1-11). Darlingh was represented by counsel, Attorney Luke Berg at this meeting. (King Decl. ¶ 5). MPS also afforded Darlingh- and her counsel- the opportunity to respond to its

2

investigation. (King Decl. ¶ 6). While it is typically MPS's practice to require employees to respond to allegations orally during the meeting, Darlingh's counsel requested that she be allowed to respond in writing two-week later. (King Decl. ¶ 7). MPS granted this request, and Darlingh's response was received on June 27, 2022. (King Decl. ¶ 8, Ex. 1).

At the conclusion of the investigation, on September 30, 2022 MPS issued Darlingh a letter terminating her employment. (Maddaleni Decl. ¶ 12, Ex. 4). MPS cited all 48 exhibits presented during the pre-disciplinary meeting, considered Darlingh's June 27, 2022 response, and explained its disposition thoroughly. (Maddaleni Decl. ¶ 13). As described in greater detail below, MPS applied its expectations and policies to the facts gathered during the investigation and concluded that Darlingh's conduct violated several MPS policies and it terminated Darlingh's employment. (*Id.*).

## LEGAL STANDARD

"A preliminary injunction is an exercise of very far-reaching power, never to be indulged…except in a case clearly demanding it." *Cassell v. Snyders*, 990 F3d 539, 544 (7th Cir. 2021). To obtain that extraordinary relief, the Plaintiff must demonstrate, "that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 24, 129 S.Ct. 365, 172 L.Ed.2d 249 (2008). The Plaintiff must carry the burden of persuasion as to each element. *See American Dairy Queen v. Brown-Port Co.*, 621 F.2d 255, 257 (7th Cir. 1980). "The purpose of a preliminary injunction is merely to preserve the relative positions of the parties until a trial on the merits can be held." *University of Texas v. Camenisch*, 451 U.S. 390, 395, 101 S.C.t 1830, 68 L.Ed.2d. 175 (1981).

In *Hetreed v. Allstate Insurance Co.*, 135 F.3d 1155, 1158 (7th Cir. 1998), the Seventh Circuit noted, "When deciding whether to grant interlocutory relief, a judge must compare the costs of false negatives (the injury caused by wrongly denying relief to someone who ultimately prevails on the merits) against the costs of false positives (the injury by wrongly granting relief to a plaintiff who ultimately loses the case)." To that end, "False negatives in discharge cases are not particularly costly; damages and prejudgment interest make up to prevailing plaintiffs what they lose if they are unemployed in the interim. False positives, by contrast, can create substantial and irreversible costs." *Hetreed*, 135 F.3d at 1158. "Because the loss from false positives exceeds the loss from false negatives in cases of this kind, it would take a very powerful showing on the merits to justify reinstatement while the case is ongoing." *Id.*

## ARGUMENT

### I. Plaintiff Failed to Establish a Reasonable Likelihood of Success on the Merits of Her First Amendment Claim.

To establish a First Amendment retaliation claim, "[Plaintiff] had to show that: (1) [s]he engaged in constitutionally protected speech; (2) [s]he suffered a deprivation likely to deter him from exercising [her] First Amendment rights; and (3) [her] speech was a motivating factor in [her] employer's adverse action against [her]." *Cage v. Harper*, 42 F.4th 734, 741 (7th Cir. 2022). "For a public employee's speech to be protected under the First Amendment, the employee must show that: (1) [she] made the speech as a private citizen; (2) the speech addressed a matter of public concern; and (3) [her] interest in expressing that speech was not outweighed by the state's interests as an employer in 'promoting effective and efficient public service.' This last element is known as *Pickering* balancing, after *Pickering v. Board of Education,* 391 U.S. 563, 88 S.Ct. 1731, 20 L.Ed.2d 811 (1968)." *Swetlik v. Crawford*, 738 F.3d 818, 825 (7th Cir. 2013). (citations omitted). "It is also important to note, however, that

[plaintiff's] status as a government employee does not afford [her] greater First Amendment protection that a non-government employee has." *Swetlik v. Crawford*, 876 F. Supp. 2d 1077, 1082 (E.D. Wis. 2012).

### A. Darlingh Spoke as an Employee of MPS, Not as a Private Citizen.

"When public employees make statements pursuant to their official duties, the employees are not speaking as citizens for First Amendment purposes, and the Constitution does not insulate their communications from employer discipline." *Garcetti v. Ceballos*, 547 U.S. 410, 420, 126 S.Ct. 1951, 164 L.Ed.2d 689 (2006). *Garcetti* also makes clear that a public employee's speech, made pursuant to their official duties is not protected by the Frist Amendment, "no matter how important that speech may be or how it could affect the public interest." *Fehlman v. Mankowski*, 588 F.Supp.3d 917, 921 (W.D. Wis. 2022).

While "the public has a right to hear the views of public employees", *See Borough of Duryea, Pa. v. Guarnieri*, 564 U.S. 379, 397 (2011), that right is not unfettered. The Supreme Court's decision in *Garcetti* crafted a rule that balanced a publics employees' right to speak with the government's ability to function efficiently and effectively. *Garcetti*, 547 U.S. at 418-419, 126 S.Ct. 1951. "[Speech] that owes its existence to a public employee's professional responsibilities does not infringe any liberties the employee might have enjoyed as a private citizen. It simply reflects the exercise of employer control over what the employer itself has commissioned or created. *Id.* at 421-22, 126 S.Ct. 1951. *Garcetti* also, "holds that the First Amendment does not regulate how public employers manage their workforces, even when that management involves telling others what to say or avoid saying." *Adams v. Board of Educations of Harvey School District 152*, 968 F. 3d 713, 716 (7th Cir. 2020).

5

Further, the Seventh Circuit "has declined to read *Garcetti* as applying only to speech that is part of 'a public employees' ordinary daily job duties.'" *Fehlman*, 588 F.Supp.3d. at 923 (citing *Vose*, 506 F.3d at 572). Instead, this Circuit's approach holds that "it is enough if the speech related to activities that fall 'within the general ambit of [her] job.'" *Id.* (citing *Fairley v. Andrews*, 578 F.3d 518, 523 (7th Cir. 2009); See also *Kristofek v. Village of Orland Hills*, 832 F.3d 785 (7th Cir. 2016) (Speech that "ordinarily fall[s] within the scope of plaintiff's duties" is not insulated by the constitution.) "Determining what falls within the scope of an employee's duties is a practical exercise that focuses on 'the duties an employee actually is expected to perform." *Renken v. Gregory*, 541 F.3d 769, 774 (7th Cir. 2008) (citations omitted). Further, "When an employee engages in speech that is part of the employee's job duties, the employee's words are really the words of the employer. The employee is effectively the employer's spokesperson." *Janus v. AFSCME, Council 31*, 138 S.Ct. 2448, 2474, 201 L.Ed.2d 924 (2018).

Here, Darlingh's speech "owes its existence to [her] professional responsibilities," because the content of the speech is inextricably intertwined with her responsibilities as an elementary educator. *See Garcetti*, at 421-22. Namely, Darlingh is expected "support transgender and gender non-conforming students and help create a safe environment for them. (Maddaleni Decl. Ex. 3 at p. 7). Darlingh is also expected to comply with the District's commitment to equity and fostering a safe and supportive learning environment for all students. (*Id.* at p. 6). School counselors must also "[R]ecognize all students have the right to be treated equally and fairly with dignity and respect as unique individuals free from discrimination, harassment, and bullying based on their real or perceived gender identity and gender expression." (*Id.* at p. 7).

Darlingh expressly rejected MPS' expectation that school counselors treat their students fairly and instead committed to discriminating against her students on the basis of the status of

their gender. Darlingh's speech is the antithesis of MPS's anti-discrimination policy, which forms the basis for her termination. The substance of Darlingh's speech is focused solely on her job as a school counselor for MPS and wrongly advised the public that gender non-conforming students would be treated with bias, prejudice, and be excluded from learning opportunities solely on the basis of their gender non-conforming expressions. The record demonstrates Darlingh's speech was not protected because it was made as an employee of MPS, not as a private citizen.

First, Darlingh introduced herself to the crowd at the "speaker's corner" by credentialing her speech with authority as a public employee. She says, "[M]y name is Marissa Darlingh, I am an elementary school counselor in Milwaukee Public Schools." (ECF 1, ¶ 30, fn. 10). The introductory clause of Darlingh's speech plainly and boldly admits that she is speaking as a public employee; otherwise, there is no legitimate reason to make such an introduction. There is no other reasonable basis for Darlingh to make her introduction this way other than wanting the audience to know that she is speaking about her job. To be sure, Darlingh chose to credential herself this way (i.e., she was not introduced by some other speaker who addressed her credentials to speak). Further, the audience understood that she was speaking as a representative of MPS. (ECF 1, ¶31).

In the next breath, Darlingh discusses specific circumstances related to "her" school. She states, "I oppose gender ideology ever entering the walls of <u>my school building</u>. On my dead fucking body will <u>my students</u> be exposed to the harm of gender identity ideology. Not a single one of <u>my students</u> under <u>my fucking watch</u> will ever ever transition socially and sure as hell not medically. Absolutely not." (ECF 1, ¶ 30, fn. 10) (emphasis added). Darlingh's speech is unquestionably addressing the essential functions of her position as a school counselor at MPS.

There is no separating the three ideas – (1) Darlingh's opposition to gender ideology entering her workplace; (2) Darlingh's promise that while in her workplace, her students would be "exposed" to gender ideology only "on [her] dead fucking body" and (3) Darlingh's opposition to her student's social or medical transition "under [her] fucking watch"-from her job duties and the employment policies she is expected to follow.

Darlingh then expressed two ideas, "I exist in this world to serve children." "I exist to protect children." (*Id.*) In a vacuum, these words have little implication for determining whether the speech is unprotected public-employment speech, but when put in context with the rest of her speech, Darlingh has not converted her speech into constitutionally protected citizen-speech.

The final portion of Darlingh's speech expresses the prejudiced and bigoted personal beliefs she holds and connects those feelings with the functions of her job. By doing so, the entire speech falls squarely into the arena of employee-speech. Darlingh says the quiet part out loud:

> I feel like I am dissociating right now because this is very intense very intense. I think someone else is speaking through me right now, but fuck transgenderism. Fuck it. Fuck transgenderism. Fuck these people behind us who want children to have unfettered access to hormones, wrong-sex hormones, and surgery.

(*Id.*). The context of Darlingh's earlier pledge to act as a gatekeeper of "gender ideology ever entering the walls of [her] school building" is rooted in the hateful, discriminatory animus Darlingh holds for these children. Darlingh's only regret, however, is limited to an, "Acknowledg[ment] that her use of profanity went too far." (ECF 1, ¶ 101; Maddaleni Decl. Ex. 3). Darlingh makes no apologies for pledging to act on her hateful prejudices against gender non-conforming students while she is at work. There is no doubt that her speech, when read as whole, touches solely on matters within the scope of her duties as an employee of MPS. For Darlingh's speech to be protected, the Court must create a new legal rule and hold that employees may

8

rewrite their employer's legitimate anti-discrimination polices when that policy conflict with the employee's prejudicial beliefs.

If Darlingh's speech is constitutionally protected, then any employee who opposes their employer's anti-discrimination policy could commit to administering their own brand of workplace equality with impunity. But, that is not the law of this Circuit, or anywhere else. Darlingh forfeited constitutional protection when she (1) credentialed herself as an MPS school counselor; (2) pledged to disregard her employer's polices and instead carry out her own version of counselling services (a brand that excludes students on their protected status as transgender or gender non-conforming), and (3) repudiated any notion that she would provide equal access and services to her students by saying, "fuck transgenderism. Fuck it. Fuck transgenderism." Darlingh's speech was a product of her employment relationship with MPS, and she used her credentials as an MPS employee to disseminate vile and hurtful rhetoric, which was directly contrary to established MPS policy. There is no separation between Darlingh's speech and her duties as an MPS school counselor. She is not likely to succeed on this element, which favors denial of her Motion for Preliminary Injunction.

> **B.    Darlingh's Termination is Supported by *Pickering* Balancing.**

Assuming, *arguendo*, that Darlingh was speaking as a private citizen, she is still unlikely to succeed on the merits of her claim when her speech is balanced with MPS's interests. The Supreme Court recognizes that the government may impose "certain restraints on the speech of its employees" that would be "unconstitutional if applied to the general public." *City of San Diego v. Roe*, 543 U.S. 77, 80, 125 S.Ct. 521, 160 L.Ed.2d 410 (2004) (per curiam). The government has "interests as an employer in regulating the speech of its employees that differ significantly from those it possesses in connection with regulation of the speech of the citizenry

9

in general." *Pickering v. Bd. of Ed. of Twp. High Sch. Dist. 205*, 391 U.S. 563, 568, 88 S.Ct. 1731, 20 L.Ed.2d 811 (1968). "[T]he government's interest in achieving its goals as effectively and efficiently as possible is elevated from a relatively subordinate interest when it acts as sovereign to a significant one when it acts as employer." *Bd. of Cty. Comm'rs, Wabaunsee Cty., Kan. v. Umbehr*, 518 U.S. 668, 676, 116 S.Ct. 2342, 135 L.Ed.2d 843 (1996) (quoting *Waters v. Churchill*, 511 U.S. 661, 675, 114 S.Ct. 1878, 128 L.Ed.2d 686 (1994) (plurality opinion)).

In order for Darlingh's speech to be constitutionally protected, she must show that her interest "as a citizen, in commenting upon matters of public concern" outweighs MPS's interests "as an employer, in promoting the efficient of the public services it preforms through employees." *Pickering*, 391 U.S. at 568, 88 S. Ct. 1731. The *Pickering* balancing test contemplates a fact-intensive inquiry into a number of interrelated factors:

> (1) whether the speech would create problems in maintaining discipline or harmony among co-workers; (2) whether the employment relationship is one in which personal loyalty and confidence are necessary; (3) whether the speech impeded the employee's ability to perform her responsibilities; (4) the time, place, and manner of the speech; (5) the context within which the underlying dispute arose; (6) whether the matter was one on which debate was vital to informed decision-making; and (7) whether the speaker should be regarded as a member of the general public.

*Gustafson v. Jones*, 290 F.3d 895, 909 (7th Cir. 2002).

The Court need not address each of the seven factors in turn. *See Graber v. Clarke*, 763 F.3d 888, 896 (7th Cir. 2014). "Importantly, a showing of actual disruptiveness is not required; 'a government employer is allowed to consider the potential disruptiveness of the employee's speech.'" *Id.* (*Quoting Kokkinis v. Ivkovich*, 185 F. 3d 840, 846 (7th Cir. 1999) (internal citations omitted). Further, "the employer 'is not required to wait until those working relationships actually disintegrate if immediate action might prevent such disintegration." *Id.* (*Quoting Breuer v. Hart*, 909 F. 2d 1035, 1040 (7th Cir. 1990). Applicable here, when a public employee takes

"deliberate steps to link" their speech with their public employment, the employer's burden in making out is *Pickering* balancing defense is less than if the public employee spoke outside of work on matters unrelated to their job. *See Craig v. Rich Tp. High School Dist. 227*, 736 F. 3d 1110, 1118 (7th Cir. 2013) (Citing *Roe*, 543 U.S. at 80-81, 125 S. Ct. 521).

Within the *Pickering* framework, Darlingh's claim has several flaws, each are fatal to her Motion for a Preliminary Injunction. *Pickering* first asks whether the speech would create problems in maintaining discipline or harmony among co-workers. Darlingh's speech caused several disruptions, both in the school halls and in the community. In fact, Darlingh entered another teacher's classroom to confront that teacher about sharing information about Darlingh with students. (Maddaleni Decl. ¶ 7-8). Darlingh's own words admit that her confrontation caused several students to express their desire to not attend counseling sessions with Darlingh; one student also stated that they did not want to be in the same room as Darlingh. (Maddaleni Decl. ¶ 8, Ex. 1). Darlingh's conduct was enough to cause students to cease seeking out Darlingh's counseling services- a *bona fide* disruption. Additionally, another teacher confronted Darlingh no less than two times in the same day to address Darlingh's April speech. (ECF 1, ¶ 65; Maddaleni Decl. ¶ 9). If that were not enough, MPS received at least nine (9) emails from concerned citizens regarding Darlingh's speech. (Maddaleni Decl. ¶ 10, Ex. 1). There were also several protests of Darling's April, 2022 speech outside of the MPS Central Administration Building. (Maddaleni Decl. ¶ 14). Protesters also rallied outside of Darlingh's home. (*Id.*). The totality of the evidence is clear: Darlingh's speech resulted in actual, tangible disruption to both the educational environment of the Allen-Field elementary school, and the Milwaukee Public School District as a whole. Darlingh's likelihood of success on this factor is nil.

The fact that citizens alerted MPS to Darlingh's speech does not make this case a" hecklers veto" as Darlingh argues. (Pl. Br. at p. 21). The "heckler's veto" cases Darlingh cite dealt with government restriction of speech due to the audience's disorderly or violent reaction, not with *Pickering* factors in a first amendment retaliation suit. To the extent Darlingh is arguing that the "heckler's veto" cases she cites supersedes the *Pickering* balance test used in this Court, she has not cited any authority to make such a conclusion. In fact, the Seventh Circuit has rejected the "heckler's veto" being applied to case like this. *See Craig*, 736 F. 3d at 1121. ("[T]his argument does not account for the unique relationship between [the school counselor] and his students at [the school] or the nature of his speech; his students are not "outsiders seeking to heckle [the school counselor] into silence, rather they are participants in public education, without whose cooperation public education as a practical matter cannot function." (*citing Melzer v. Board of Education of City School Dist. Of City of New York*, 336 F. 3d 185, 199 (2nd Cir. 2003)).

The second *Pickering* factor asks whether the employment relationship is one in which loyalty and confidence are necessary. "An employer may have more leeway in restricting speech of an employee whose position requires contact with the public." *Craig*, 736 F. 3d at 1119. In the *Craig* case, the Seventh Circuit held that "The fact that [a school counselor] works closely with students at a public school confers upon him an inordinate amount of trust and authority." *Id.* (*Citing Edwards v. Aguillard,* 482 U.S. 578, 584, 107 S.Ct. 2573, 96 L.Ed.2d 510 (1987) ("Families entrust public schools with the education of their children ... Students in such institutions are impressionable and their attendance is involuntary."); *see also Melzer,* 336 F.3d at 198 ("[W]e note that we conduct our evaluation of appellant's rights versus governmental interest bearing in mind his position as a teacher in a public school. This position by its very

nature requires a degree of public trust not found in many other positions of public employment."). The *Craig* Court wrote, "Particularly as a guidance counselor, Craig must maintain a safe space for his students in order to ensure they remain willing to come to him for advice. If Craig fails to create the appropriate environment for his students, they will not approach him and he cannot do his job." *Id.* at 1119-20.

Just as in *Craig*, Darlingh deliberately linked her speech with her employment as a school counselor at Milwaukee Public Schools. Darlingh's introduction to the crowd was, "[M]y name is Marissa Darlingh, I am an elementary school counselor in Milwaukee Public Schools." (ECF 1, ¶30, fn. 10). Darlingh then discussed specific actions she would take as a school counselor at Milwaukee Public Schools. (*Id.*). Darlingh's position is one that requires trust not only from parents and administrators but also from students. Darlingh breached the trust MPS vested to her; she is disqualified her from being a school guidance counselor. Darlingh cannot be trusted to effectively, efficiently, safely, openly, and compassionately deliver school counseling services because she has promised to discriminate against children on the basis of their gender. The same way a school counselor who is openly racist, anti-Semitic, misogynistic, or ableist would breach the trust inherent in their public school employment, Darlingh falls squarely within that camp. MPS's termination of Darlingh reflects that breach of trust.

The third *Pickering* factor asks whether the speech impeded the employee's ability to perform her responsibilities. This factor, like all other *Pickering* factors requires the court to look at what the employer's concerns "really were." *Harnischfeger v. U.S.*, 943 F. 3d 1105, 1116 (7th Cir. 2019). MPS articulated its reasons as to why Darlingh's speech interfered with her ability to perform the responsibilities of an MPS school counselor:

1.    MPS described its expectations of school counselors by writing:

> School counselors have an ethical obligation to treat all students they
> serve with dignity and respect. Additionally, school counselors are to
> foster and affirm all students and their identity and psychosocial
> development, support all students and their development, provide
> culturally responsive instruction, appraisal and advisement to students, and
> provide culturally responsive counseling to students.

(Maddaleni Decl. ¶ 12, Ex. 4, p. 5).

2.      MPS explained that Darlingh's speech was threatening, intimidating, and abusive

toward students and the public, a violation of District policy. (*Id.*, p. 6). MPS

wrote, "you [Darlingh] make it very clear that you [Darlingh] will do everything

within your power to prevent a student in your building from transitioning or even

expressing who they truly are." (*Id.*).

3.      MPS cited its policy prohibiting employees from engaging in activity that

significantly detracts from the school district's image or reputation, and

explained:

> When you got up to speak, the first thing you did was state your name and
> identified yourself as an elementary school counselor in Milwaukee Public
> Schools. That was the lens in which your comments were given and
> received. As an MPS employee, you were a reflection of the district and at
> no point were you authorized to comment on the topic of gender identity
> or character the care provided by the District to our students. Your
> comments run counter to the district's commitment to equity and fostering
> a safe and supportive learning environment for all students.

(*Id.*).

4.      MPS cited its policy requiring equity in MPS:

> In the policy, the board identifies one of it guiding principles to be 'a
> school system shall developed in which all students receive the support
> and resources that they need to be successful.' Your [ [Darlingh's]
> behavior is contrary to this very fundamental guiding principle. You have
> made clear you refuse to provide transgender students the support they
> need-as required by you by District policy.

(*Id.* at p. 7). In light of Darlingh's comments, including "fuck transgenderism," MPS continued to explain how her speech violated its policy goals:

> One such goal is, 'MPS will provide every student with equitable access to high-quality and culturally relevant instruction, curriculum, support, facilities, technology, and other educational resources that respect that individual's identities, backgrounds, abilities, and experiences.' The comments you [Darlingh] made at the rally and during public media interviews since then, clearly demonstrate that you refuse to respect the identities of transgender and nonbinary students. In fact, you have shown contempt towards transgender individuals, and an inability to support or abide by the district's equity goals.

(*Id.*).

5.      MPS cited its anti-bullying and harassment policy by explaining:

> The district has adopted a bullying policy (for students and staff) in which bullying is defined as 'deliberate or intentional behavior using words or actions intended to cause fear, humiliation, intimidation, harm, or social exclusion.' Additionally, the policy covers off duty/out-of-school speech or behavior that results in a substantial disruption to the learning environment. Your comments at the rally and subsequent to that, were pointed and intimidating to transgender students and their families. The threats you made publicly and intentionally do isolate transgender students and discourage them from expressing their true selves at school.

(*Id.*).

6.      MPS articulated and applied the American School Counselor Associations' School Counselor and Transgender/Gender-nonconforming Youth standards:

> School counselors recognize all students have the right to be treated equally and fairly with dignity and respect as unique individuals free from discrimination, harassment, and bullying based on their real or perceived gender identity and gender expression. School counselors work to safeguard the well-being of transgender and gender-nonconforming youth…. You [Darlingh] have made it clear that you will not respect a transgender student's wishes and use their preferred name or pronoun. Also, your threats to actively prevent a transgender student from transitioning are harmful to transgender students and are in direct violation of the school counselor standards.

(*Id.*).

Darlingh committed to discriminating against transgender and gender non-conforming students "on [her] fucking watch," coupled with her contempt for transgender individuals (i.e., "fuck transgenderism. Fuck it. Fuck transgenderism"). MPS's concern "really were" that Darlingh's biases, prejudices, and deeply rooted beliefs conflict with competent, caring, and professional school counselors. *See Harnischfeger*, *Supra*. It is unfathomable that an elementary counseling professional would openly commit to discriminating against the children in their care, but that is the circumstance Darlingh created. Darling's termination occurred because Darlingh decided that it is okay to discriminate against students, so long as they are transgender. Unfortunately for Darlingh- despite, "her views about the effect of certain ideologies and policies on children.," (Pl. Br. at p. 19) - the law of this Circuit prohibits sex-stereotyping discrimination. *See Whitaker By Whitaker v. Kenosha Unified School Dist. No. 1 Bd. Of Educ.*, 858 F. 3d 1034, 1049-50 (approval for causes of action for transgender sex-stereotyping claims under both Title VII and Title IX). MPS's termination reflects the progress made in affording equal treatment to all.

In analyzing this *Pickering* factor, a sticking point in *Craig* was that the school counselor's misogynistic writings would deter female students from seeking advice; "Indeed, some students may forego receiving the school's counseling services entirely rather than take the risk that Craig would not view them as a person but instead as an object" *Craig,* at 1120. The same is true here. Darlingh is expected to view each student as a person and to provide them with counselling in a nondiscriminatory way. To be sure, Darlingh did much more than "merely expressing her views about the effect of certain ideologies and policies on children." (Pl. Br. at p. 19). Instead, Darlingh committed to gatekeeping gender non-conforming ideology from entering the walls of the Milwaukee Public School building where she worked, and promised to never

16

ever allow a student to transition socially or medically under her "fucking watch". (ECF 1, ¶30, fn. 10). Darlingh cemented her commitment by explaining "On my dead fucking body will my students be exposed to the harms of gender ideology." (*Id.*).

MPS students *actually* felt the impact of Darlingh's words. Darlingh's letter to her principal describing the June 3, 2022 disturbance in the classroom as causing children to express their desire not to attend counseling sessions with Darlingh; one even expressed not wanting to be in the same room as Darlingh. (Maddaleni Decl. ¶ 8, Ex. 1). That fact cannot be squared with Darling's argument in her brief that "most of the statements taken form the students in the classroom suggest the incident had little or no effect on them." (Pl. Br. at p. 22). Darlingh also tells the Court, "Ms. Darlingh's speech did not impede [her] ability to perform her responsibilities." (*Id.* at. P.19). Both representations are a bold-face lie, and Darlingh knows it. The same day she caused the classroom disturbance, Darlingh drafted a letter to her principal describing the incident. Darlingh's letter advises her principal, "I told the students we had counseling scheduled and asked 'do you want to do it?' Several students shouted 'no.' One student said 'I don't even want to be in the same room as her,' referring to me [Darlingh] and walked out." (Maddaleni Decl. ¶ 8, Ex. 1). Darlingh's brief omits her testimony in an apparent attempt to minimize the impact her behavior on the students. To argue her confrontation had little effect on the students or her ability to perform her job is entirely inconsistent with Darlingh's own description of the events. Even at this early stage of litigation, Darlingh's credibility is in serious doubt. It is hard to image a more ineffective school counselor than one who has lost the confidence of their students; in fact, *Craig*, explains that exact circumstance demonstrates "[s]he cannot do [her] job." 736 F.3d at 1120. It is clear that Darlingh's speech-

committing to discrimination against transgender and gender non-conforming students- and her disruptive behavior resulted in her inability to effectively counsel elementary students.

As to the fourth Pickering factor, the time (a Saturday) and place (at a protest on the steps of the Capitol building), of the speech, while arguably reasonable, does not countervail the substantial harm caused by the manner of Darlingh's speech. *See Lalowski*, 789 F. 3d at 792 ("Because he confronted protesters at the time and place they chose to protest, the time and place of his speech were reasonable. However, the manner in which he spoke cannot be justified."). Like *Lalowski*, the words of Darlingh's speech were abusive and degrading, falling well below the standard of conduct the public expects from school guidance counselors. The manner of Darlingh's speech is further tipped in MPS's favor because she used nearly the entire speech to discuss specific details of her job duties as an MPS employee.

The context of the dispute (*Pickering* factor 5) leading to Darlingh's termination also tips in MPS's favor. While MPS was investigating Darlingh's April speech Darlingh caused a disruption of a school classroom and at least two other disturbances with co-workers in school that same day. These disturbances, coupled with MPS's ongoing investigation, led to MPS issuing Darlingh a disciplinary warning letter, scheduling a pre-disciplinary meeting, allowing Darlingh to tender a written response, and then, after considering the totality of the circumstances, terminating her employment. The dispute was handled in accord with MPS's process for handling discipline and Darlingh was afforded the same opportunity to respond as all other employees. Darlingh's likelihood of success on this factor is minimal.

The sixth *Pickering* factor- whether the matter was one on which debate was vital to informed decision making- while arguably favoring Darlingh, is the only *Pickering* test factor

that cuts against MPS. Standing alone, however, it does nothing to rebut the substantial interest MPS had in light of all other *Pickering* factors.

Darlingh's choice to use her speech to talk about her job as, "an elementary school counselor in Milwaukee Public Schools," erodes the argument that Darlingh's speech should be regarded as being made by a member of the general public. (*Pickering* factor 7). *See Lalowski*, *Supra*. ("Because Lalowski represented himself as an off-duty police officer, rather than as a mere private citizen, we cannot say that he was speaking as a member of the general public."). The entire topic of Darlingh's short speech was to lament against MPS's policies requiring Darlingh to treat transgender and gender non-conforming students fairly and equally. The public understood Darlingh to be speaking on behalf of MPS as well. (ECF 1, ¶ 43-46; ECF 1-11 p. 14-34; (Maddaleni Decl. ¶ 10, Ex. 2). These members of the public connected the speech with Darlingh's employment and were able to immediately contact Darlingh's employer to complain about the rogue employee. It is irrelevant that the members of the public who contacted MPS to complain about Darling's speech were not MPS students, MPS parents, or MPS staff. It is also not relevant that these members of the public had no prior interactions with Darlingh before hearing her speech. Her speech was received by these citizens as speech on behalf of MPS. The public hearing her speech that day regarded Darlingh as an employee making a speech, not a private citizen.

The balance of the *Pickering* factors underscores the warning in *Hetreed* about the substantial and irreversible costs of a false positives in granting a preliminary injunction to an employee who ultimately loses her case. MPS's detailed description of the harm caused by Darlingh's speech demonstrates why her requested relief must be denied. As a point of fact, Darlingh was not, as she argues, terminated for saying "fuck transgenderism." (*See* Pl. Br. at p.

22-23). Darlingh was fired because she openly and repeatedly stated that she will use her position as a school counselor to actively discriminate against students who are transgender or gender non-conforming. To illustrate the balancing of interests, take an employee who openly expresses their intention to discriminate against students on the basis of religion (e.g., a school counselor opposing student's praying the Quran says "I oppose Islamic ideology ever entering the walls of my school building"), race (e.g., a school counselor opposing integration says, "on my dead fucking body will my students be exposed to harms of race mixing"), disability (e.g., a school counselor opposed to counseling a nonverbal students says, "Not a single one of my students under my fucking watch will ever ever get adjust socially and sure as hell not medically"), or sexual orientation (e.g., a school counselor opposed to gay students says, "on my dead fucking body will my students ever be exposed to harms of the gay agenda.)". In each of these ugly scenarios, the public school employee expressing these ideas would surely lose their job, and for good reason: the constitution does not require MPS to employ bigots. MPS also need not wait for Darlingh to actually discriminate against a transgender or gender non-conforming child before it takes action. *See Geer v. Amesqua*, 212 F. 3d 358, 372 (7th Cir. 2000). The balancing of interests- especially at the early preliminary injunction stage- favors MPS in nearly every way. In light of the weight of credible evidence supporting MPS's decision to terminate Darlingh under the *Pickering* framework, Darlingh has not established that she is likely to succeed on the merits her First Amendment Claims. Thus, her request for a preliminary injunction must be denied.

## II. Plaintiff Failed to Establish Irreparable Injury and Absence of an Adequate Remedy at Law.

The determination of, "[W]hat constitutes irreparable injury in a case depends upon the particular facts of the case." *Lasco v. Northern*, 733 F.2d 477, 481 (7th Cir. 1984) (citing *Oburn*

*v. Shapp*, 521 F.2d 142, 151 (3rd Cir. 1975). In the context of public employment, the Seventh Circuit holds, "loss of wages, employee benefits, and opportunities for promotion during a period of suspension do not constitute irreparable injury and do not warrant the granting of a preliminary injunction." *Lasco*, 733 F.2d at 481 (Citing *Ciechon v. City of Chicago*, 634 F.2d 1055, 1057-58 (7th Cir. 1980). When an injury is occasioned by discharge from employment it is usually not considered they type of harm that justifies injunctive relief. *See Sampson v. Murray*, 415 U.S. 61, 91-92, 94 S.Ct. 937, 952-53, 36 L.Ed.2d 166 (1974). "The Court observed in *Sampson* that any diminution of income can be redressed by damages (plus prejudgment interest) at the conclusion of the case." *Shegog v. Board of Educ. Of City of Chicago*, 194 F.3d 836, 839 (7th Cir. 1999). Further, "the defamation implicit in a discharge for cause may be cured by a favorable decision at the end of the case more effectively than by interlocutory relief (which, although it comes sooner, is tentative and therefore does less to rehabilitate a reputation). *Shegog*, 194 F.3d at 839 (citing *Sampson, Supra*).

Plaintiff incorrectly relies on *Elrod v. Burns*, 427 U.S. 247 (976) to argue that irreparable injuries are presumed in First Amendment retaliation cases and that the likelihood of success is the determinative factor upon which the Court should focus. (ECF 12-1, p. 27-28). "*Elrod* is distinguishable because it involved ongoing or threatened First Amendment violations and did not address reinstatement. The same is true of *Higher Soc'y of Indiana v. Tippecanoe Cty., Indiana* 858 F.3d 1113 (7th Cir. 2017); *Korte v. Sebelius,* 735 F.3d 654, 666 (7th Cir. 2013); and *Am. Civil Liberties Union of Ill. v. Alvarez*, 679 F.3d 583 (7th Cir. 2012)—all deal with ongoing or threatened future First Amendment violations." *McWilliams v. Frankton-Lapel Community Schools*, No. 1:20-CV-01419-JPH-TAB, 2020 WL 4734794, at *4 (S.D. Ind. Aug. 14, 2020). Plaintiff is wrong in arguing "the First Amendment violation alone constitutes

irreparable injury that warrants a preliminary injunction." (Pl. Br. at p. 29). As Judge Hanlon explained in *McWilliams*, in deciding cases involving First Amendment retaliation claims, the "Seventh Circuit has been clear that district courts may not issue a preliminary injunction without a showing of irreparable harm and no adequate remedy at law unless a specific exception applies." 2020 WL 4734794, at *4 (S.D. Ind. Aug. 14, 2020).

Darlingh has failed to demonstrate irreparable harm or an inadequate remedy at law on her first amendment claim. *Lasco, Ciechon*, and *Sampson* directly contradict Darlingh's argument that no adequate remedy exists to redress reinstatement, loss of wages, and benefits. Any additional injury (e.g., defamation inherent in unjustified termination) are redressed "more effectively" at the end of the case- not with a preliminary injunction. *Shegog, Supra*. Further, aside from the "inherent harm from the first amendment violation" (Pl. Br. at p. 30)- distinguished above-  Darlingh has not shown any other intangible and irreparable harm to warrant a preliminary injunction. Darlingh identifies her bond and rapport with students, as somehow entitling her to reinstatement at the *Allen-Field elementary school*. (*Id.*) (emphasis added). Darlingh's argument is a brook too broad for leaping. First, as Ms. Darlingh knows, MPS's handbook dispels any notion work assignments are vested rights. The handbook states, "Employees may be assigned or reassigned to a position within their classification or certification at the District's discretion." (Maddaleni Decl. ¶ 15, Ex. 5). Second, Darlingh's argument that reassignment upon reinstatement would constitute an irreparable injury is contrary to decades of Supreme Court and Seventh Circuit case law. *See e.g. Board of Regents of State Colleges v. Roth*, 408 U.S. 564, 577, 92 S.Ct. 2701, 33 L.Ed.2d 548 (1972) ("To have a property interest in a benefit, a person clearly must have more than an abstract need or desire for it. He must have more than a unilateral expectation of it. He must, instead, have a legitimate claim of

entitlement to it"); *Bordelon v. Chicago School Reform Bd. Of Trustees*, 233 F.3d 524, 530 (7th Cir. 2000) (principal's reassignment to central office, where employee received his regular pay and benefits, did not constitute any direct or indirect pecuniary loss); *Miller v. Crystal Lake Park Dist.*, 47 F.3d 865, 86 (7th Cir. 1995) ("A legitimate entitlement is one that is legally enforceable- one based on statues or regulations containing mandatory language that links specified substantive predicates to proscribed outcomes.") (Internal citations omitted). Darlingh's citation to the subjective feelings of her students, and her personal desire to remain at the Allen-Field Elementary School is exactly what *Roth* rejects as a cognizable injury. To be sure, Darlingh works for MPS, not the Allen-Field Elementary School. Darlingh cannot conjure an irreparable injury simply by citing her unilateral expectation to resentment at the school of her choosing. Darlingh's complained-of injury is nothing more than her abstract desire, it is not a legally enforceable right; thus, this "injury" does not rise to the level required for the requisite threshold showing needed for an injunction. Under the circumstances of this case, an injunction is unwarranted and must be denied.

## III. The Balancing of Equities and Public Interest Favor the Status Quo.

During the balancing phase, the Court must consider, "the irreparable harm the non-moving party will suffer if preliminary relief is granted, balancing that harm against the irreparable harm to the moving party if relief is denied." *Cassell*, 990 F. 3d at 545. "[The Party] moving for a preliminary injunction assumes the burden of demonstrating either a combination of probable success and the possibility of irreparable injury or that serious questions are raised and the balance of hardships tips sharply in his favor." *Roland Machinery Co. v. Dresser Industries, Inc.*, 749 F. 2d 380, 388 (7th Cir. 1984) (Citations omitted). "Further, the Court must address the public interest, "meaning the consequences of granting or denying the injunction to non-parties." *Cassell*, at 545.

Darlingh has not advanced a convincing demonstration of irreparable harm. As explained above, this circuit distinguishes Frist Amendment irreparable injuries from First Amendment retaliation injuries in the employment context, which are compensable. *Supra,* II (A). Recovery of lost wages, employee benefits, opportunities for promotion from Darlingh's termination are not irreparable injuries. *See Ciechon*, 634 F.2d at 1057. *See also E. St. Louis Laborers' Local 100 v. Bellon Wrecking & Salvage Co.*, 414 F. 3d 700, 704 (7th Cir. 2005) ("A permeant loss of employment, standing alone, does not equate to irreparable harm."). Just as the court in *McWilliams* held, "[Darlingh] alleges that a Frist Amendment violation that occurred in the past. She has not argued or shown that she faced ongoing or threatened future actions that would interfere with her First Amendment rights. Nor does she identify a specific exception to the irreparable harm and no adequate remedy at law requirements." 2020 WL 4734794, at *6 (S.D. Ind. Aug. 14, 2020). Thus, the balance of harm shifts to Darlingh to carry a significant burden in establishing the need for an injunction. She has not done so; the Court must deny the injunction.

MPS's decision was careful, reasonable, and necessary to the efficient operation of its school district. Aside from the illusion of an automatic irreparable injury born from Darlingh's termination, Darlingh has not articulated what irreparable injury she actually suffers. Instead, she clarifies that the irreparable injury she suffered was the "First Amendment violation alone…" (Pl. Br. at p. 29). That alleged injury does not satisfy Darlingh's burden in demonstrating a combination of probable success on the merits coupled with the possibility of irreparable injury. Nor has Darlingh raised serious questions that tip the scale in her favor. MPS, on the other hand has raised major problems with erroneously returning Darlingh to her position in the school. Should Darlingh be prematurely returned to her position before a resolution of the merits MPS is reasonable in expecting that additional disruptions will continue within the school. MPS's

commitment to anti-discrimination in the school setting is a significant weight on the balancing scale because an error by the Court has real-life impact on students at MPS. Darlingh's comments about keeping gender ideology out of the walls of her school building, saying that only over her "dead fucking body will my students be exposed to the harms of gender identity ideology," and promising that no students "under my fucking watch" will ever transition socially or medically are as poignant today as they were in April of 2022. To illustrate, Darlingh went on Fox News' "The Ingraham Angle," a nationally syndicated cable pundit news show and was asked by the host, "Would you change anything you said or how you said it now that the State is coming after you?" Darlingh responds, "no." (Lewis Decl. ¶ 2). Darlingh shows no signs that she could reassume the role of a school guidance counselor and provide counseling to students in a fair and equitable way, free from discrimination on the basis their status of being transgender or gender non-conforming. Additionally, Darlingh's conduct of entering another teachers' classroom to confront the teacher demonstrates that it is reasonable to believe that Darlingh's Court-ordered return would disruptive the school. Likewise, the public interests in MPS fostering a safe, inclusive environment far outweighs the illusion of irreparable harm argued in Darlingh's brief. The Court should refrain from exercising its "far-reaching power" to issue a preliminary injunction because Darlingh's case does not "clearly demand it." *See Cassell*, at 544.

IV. **Darlingh's Due Process Claims Fail to Establish a Need for Preliminary Injunction.**

Darlingh must again make the ordinary threshold showing of a need for a preliminary injunction, explained above. *See Winter*, *Supra*. Darlingh is unable to do so. To prevail on a claim of procedural Due Process, Darlingh must. "show (1) that [s]he was deprived of a protected liberty or property interest, and (2) that [s]he did not receive the process that was due to justify the deprivation of that interest." *Armato v. Grounds*, 766 F.3d 713, 721-22 (7th Cir.

2014). Here, the basis of Darlingh's request for Preliminary Injunction for a Due Process violation revolves around a "property ban." (*See* Pl. Br. at p. 30-35). On January 6, 2023, MPS notified Darlingh that it had lifted the Notice of No Trespassing. (Maddaleni Decl. ¶ 16, Ex. 6). Further, unless there are new disturbances caused by Darlingh's presence at MPS own facilities or property in the future, MPS has no intention of reenact the Notice of No Trespassing. (Maddaleni Decl. ¶ 16). Thus, there is no "property ban" for the Court to lift with a preliminary injunction. Nor is there real or immediate future harm. *See Shipley v. Chicago Bd. Of Election Commissioners*, 947 F.3d 1056, 1064 (7th Cir. 2020). As such, Darlingh's request related to the "property ban" must be denied as moot.

## CONCLUSION

For the reasons explained above, Darlingh's request for a Preliminary Injunction must be denied.

Dated and signed at Milwaukee, Wisconsin this 13th day of January, 2023.

TEARMAN SPENCER
City Attorney

s/James D. Lewis
JAMES D. LEWIS
Assistant City Attorney
State Bar No. 1113730
*Attorneys for Defendants*

**ADDRESS:**
200 East Wells Street
CH 800
Milwaukee, WI 53202
(414) 286-2601 – Telephone
(414) 286-8550 – Facsimile
Email: jalewis@milwaukee.gov

1071-2022-1572/283325

26