# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF WISCONSIN

MARISSA DARLINGH,

        Plaintiff,

v.                                          Case No. 22-CV-1355

ADRIA MADDALENI, THERESE FREIBERG,
OPHELIA KING, and MILWAUKEE BOARD
 OF SCHOOL DIRECTORS,

        Defendants.

---

## DEFENDANTS' BRIEF IN SUPPORT OF MOTION TO DISMISS

---

## SUMMARY OF ALLEGATIONS[1]

From March 4, 2021 to September 30, 2022, Plaintiff, Marissa Darlingh, worked as a guidance counselor in the Milwaukee Public School District ("MPS") [ECF 1, ¶ 9]. On April, 23 2022, Darlingh attended an event, called "Sisters 4 Sisters". [ECF 1, ¶ 14, 17, 23]. This event was held in Madison at the State Capitol on a Saturday. [ECF 1, ¶ 1, 17]. The event featured a "speaker's corner," which provided a platform for attendees to use a public address system to make short and unscripted speeches. [ECF 1, ¶ 18, fn. 4]. Other members of the public attended the Sisters 4 Sisters event and counter protested the messages being communicated at the "speaker's corner." [ECF 1, ¶ 19, 21]. Darlingh was one of the Sisters 4 Sister attendees who spontaneously delivered a speech at the "speaker's corner." [ECF 1, ¶ 26, 30 fn. 10].

The Complaint alleges Darlingh's speech reads:

---

[1] While the facts in the Complaint must be relied up in bringing this Motion to Dismiss, Defendant's do not admit any of the allegations as true and reserves the right to contest and respond to each and every allegation in the future.

> I didn't plan on speaking and I've been screaming a lot but my name is Marissa Darlingh, I am an elementary school counselor in Milwaukee Public Schools. And I oppose gender ideology ever entering the walls of my school building. On my dead fucking body will my students be exposed to the harms of gender identity ideology. Not a single one of my students under my fucking watch will ever ever transition socially and sure as hell not medically. Absolutely not. I exist in this world to serve children. I exist to protect children. I feel like I am disassociating right now because this is very intense very intense. I think someone else is speaking through me right now, but fuck transgenderism. Fuck it. Fuck transgenderism. Fuck these people behind us who want children to have unfettered access to hormones, wrong-sex hormones, and surgery.

[ECF 1, ¶ 30, fn. 10]. Protesters who heard Darlingh's speech at the "speakers corner" were able to identify Darlingh's employer as MPS and those individuals immediately notified MPS that Darlingh had made the speech. [ECF 1, ¶ 31]. The protesters described being able to identify Marissa Darlingh as a school guidance counselor at Allen-Field Elementary. [ECF 1-11, p. 30]. Additionally, in response to her April 23, 2022, speech, the Wisconsin Department of Public Instruction ("DPI") opened an investigation to determine whether to initiate education license revocation proceedings against Darlingh. [ECF 1, ¶ 32, ECF1-2]. MPS learned of Darlingh's speech and began investigating Darlingh's conduct. [ECF 1, ¶ 43]. Darlingh was permitted to continue her employment during MPS's investigation. [ECF 1, ¶ 53].

However, on June 3, 2022, Darlingh entered into a 5th grade classroom to confront the teacher because Darlingh saw her name and picture on the smartboard as she walked by. [ECF 1, ¶ 56-57]. Darlingh's Complaint cites a "packet" containing, *inter alia*, "exhibits…related to the incident on June 3." [ECF 1, ¶ 90, 91; ECF 1-11). Among the documents cited in Exhibit 11 of the Complaint is a handwritten "Statement of Marissa Darling Dated June 3, 2022." [ECF 1-11, p. 1, 53-55). Darlingh's letter identifies the classroom as belonging to "Chappelle." [ECF 1-11, p. 53]. Raven Chappelle identifies as gender non-conforming. [ECF 1-11, p. 56]. Darlingh's handwritten letter states:

> Additionally, when I had gone to Chappelle's classroom I told the students we had counseling scheduled and asked, "do you want to do it?" Several students shouted, "no." One student said "I don't even want to be in the same room as her" referring to me, and walked out.

[ECF 1-11, p. 53]. Darlingh's principle sent the 5th grade teacher home for the day. [ECF 1, ¶ 60]. Another teacher in the school twice approached Darlingh regarding the speech Darlingh delivered at the "speaker's corner" in April. [ECF 1, ¶ 65].

On June 9, 2022, Darlingh was issued a letter from MPS, which stated Darlingh had violated several of MPS's workplace policies and notified her that a conference was scheduled for June 15, 2022. [ECF 1, ¶ 68, 70]. On June 14, 2022, MPS issued a second letter to Darlingh, which (1) stated that Darlingh had violated several MPS workplace rules, (2) suspended Darlingh's employment with MPS, (3) notified Darlingh that a meeting would be scheduled in Fall 2022-2023 to address the letter and (4) advised Darlingh that she was directed, "not to have any contact with school staff, students, or parents until further notice.". [ECF 1, ¶ 81, 85-86].

On June 15, 2022, MPS held a meeting with Darlingh and her attorney, Luke Berg. [ECF 1, ¶ 90, 92]. MPS presented evidence to Darlingh and her counsel. [ECF 1, ¶ 93]. When finished with its presentation of evidence, MPS allowed Darlingh and her attorney a period of time to caucus and respond orally. [ECF 1, ¶ 96]. Darlingh refused to participate in MPS's process and instead requested an opportunity to respond in writing. [ECF 1, ¶ 97]. MPS agreed to allow Darlingh to respond in writing, due two weeks later. [ECF 1, ¶ 98]. Darlingh tendered her response to MPS on June 27, 2022. [ECF 1, ¶ 99]. Darlingh asserted that her speech was protected by the First Amendment and did not violate any MPS policy. [ECF 1, ¶ 100]. Darlingh also asserted that although her speech was protected and unpunishable, she "acknowledged that her use of profanity went too far." [ECF 1, ¶ 101]. Darlingh's response letter also inquired as to why MPS did not hold a second meeting was not scheduled. [ECF 1, ¶ 109]. MPS responded,

indicating that its policy is to schedule misconduct meetings during the employee's working hours and that the meeting would be scheduled next Fall. [ECF 1, ¶ 110, 115]. MPS also advised that it would move forward with issuing a written disposition in the current misconduct (relating to the first letter). [ECF 1, ¶ 118].

On September 30, 2022, MPS terminated Darlingh. [ECF 1, ¶ 123]. As grounds therefore, MPS advised Darlingh that, "School counselors are expected to lead, advocate, collaborate, and consult with other stakeholders to create systemic change ad to ensure equitable outcomes through the school counseling program." [ECF 1-15, p. 5]. Further, MPS's termination letter states, "As described in the ASCA Student Standards, school counselors are to 'advocate for policies, practices, and guidelines that dismantle bias and promote equity for all.'" [*Id.*] MPS rejected Darlingh's assertion that she was speaking as a private citizen when she spoke on April 23, 2022:

> When you got up to speak, the first thing you did was state your name and identified yourself as an elementary school counselor in Milwaukee Public Schools. That was the lens in which your comments were given and received. As an MPS employee, you were a reflection of the district and at no point were you authorized to comment on the topic of gender identity or characterize the care provide[d] by the District to our students. Your comments run counter to the district's commitment to equity and foster a safe and supportive learning environment for all students…. In fact, you have shown contempt towards transgender individuals and an inability to support or abide by the district's equity goals.

[*Id.* at p. 6]. MPS's termination letter also described the American School Counselor Associations' adopted specific standards as it relates to transgender and gender nonconforming students:

> [S]chool counselors recognize all students have the right to be treated equally and fairly with dignity and respect as unique individuals free from discrimination, harassment, and bullying based on their real or perceived gender identity and gender expression. School counselors

4

work to safeguard the well-being of transgender and gender non-conforming youth."

[*Id.* at p. 7]. MPS applied that standard to Darlingh's case and wrote:

> "It is the expectation of MPS that school counselors support transgender and gender nonconforming students and help create a safe environment for them…[Y]our threats to actively prevent a transgender student from transitioning are harmful to transgender students and are in direct violation of the school counselor standards."

[*Id.* at p. 8]. MPS's termination letter concluded:

> Your comments are directly opposite to District initiatives and polices promoting the health and wellbeing of our students. Furthermore, you made the comments publicly as a school counselor and unauthorized representative of the District publicly denying the care to students that the District has committed to providing. You not only harmed students and families, you negatively impacted the district's image as a school district that values equity and is committed to providing a safe, inclusive, and supportive learning environment for all students.

[*Id.*].

Darlingh then filed this lawsuit, alleging Darlingh's termination was retaliatory for her protected first amendment speech. [ECF 1, ¶ 128-155]. Count One of the Complaint alleges:

1.   She spoke as a private citizen when speaking on April 23, 2022. [ECF 1, ¶ 131];

2.   That her speech was not part of her duties as a school counselor. [ECF 1, ¶ 133];

3.   That her speech addressed matters of public concern. [ECF 1, ¶ 135,137]; and

4.   That the primary motivating factor in MPS's decision to terminate Darlingh was her speech on April 23, 2022. [ECF 1, ¶ 140].

For the reasons described below, Count One of Darlingh's Complaint fails to state a claim upon which relief can be granted.

5

## LEGAL STANDARDS

### A.     Motion to Dismiss Under Fed. R. Civ. P. 12(b)(6).

To survive dismissal under Federal Rule of Civil Procedure 12(b)(6), "a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678, 129 S.Ct. 1937, 1949, 173 L.Ed.2d 868 (2009) (citing *Bell Atl. Corp v. Twombly*, 550 U.S. 544, 570, 127 S.Ct. 1955, 1974, 167 L.Ed.2d 929 (2007)). On a motion to dismiss, the Court takes "[plaintiff's] allegations as true and draws all reasonable inferences in her favor." *Page v. Alliant Credit Union*, 52 F.4th 340, 346 (7th Cir. 2022) (Citations omitted).   In examining a pleading under Fed. R. Civ. P. 12(b)(6), the court conducts a two-stage inquiry. Frist, the Court should disregard all legal conclusions from the pleading, and second, as to the remaining factual allegation, the Court should test the sufficiency of the facts pled to determine whether they provide the necessary "factual enhancement" to push the claim across the line from a mere possibility of entitlement to relief into the plausibility of entitlement to relief. *Twombly*, 550 U.S. at 556; *Iqbal*, 556 U.S. at 678-79. If the Complaints fails to "nudge their claims across the line from conceivable to plausible," it "must be dismissed." *Twombly*, 550 U.S. at 557.

While it is true that "the Federal Rules of Civil Procedure do not require that a complaint describe the alleged wrongdoing with any particularity," "But if a plaintiff does plead particulars, and they show that [s]he has no claim, then [s]he is out of luck- [s]he has plead [her]self out of court. [S]he is not saved by having plead a legal conclusion that if consistent with the facts would establish [her] right to relief, for [s]he has shown that it is inconsistent with the facts." *Thomas v. Farley*, 31 F.3d 557, 558-59 (7th Cir. 1994) (citations omitted).

"In considering a motion to dismiss under Rule 12(b)(6), district courts are free to consider any facts set forth in the complaint that undermine the plaintiff's claim." *Bogie v. Rosenberg*, 705 F.3d 603, 608 (7th Cir. 2013) (internal citations omitted). "The freedom includes exhibits attached to the complaint, Fed.R.Civ.P. 10(c), or documents referenced in the pleading if they are central to the claim." *Bogie*, 705 F.3d at 608. (Citations omitted) "When an exhibit incontrovertibly contradicts the allegations in the complaint, the exhibit ordinarily controls, even when considering a motion to dismiss." *Id.*

Further, when a Defendant serves a motion to dismiss under Rule 12(b), whether or not it goes to all the claims in the complaint, the time for answering the remaining portions of the pleading are enlarged. *See Brocksopp Engineering, Inc. v. Bach-Simpson Ltd.*, 136 F.R.D. 485, 486 (E.D. Wis. 1991).

## ARGUMENT

**I.** **Count One Fails to State a Claim Upon Which Relief Can Be Granted Because Darlingh's Speech Was Not Protected by The Frist Amendment.**

To establish a First Amendment retaliation claim, "[Plaintiff] had to show that: (1) [s]he engaged in constitutionally protected speech; (2) [s]he suffered a deprivation likely to deter him from exercising [her] First Amendment rights; and (3) [her] speech was a motivating factor in [her] employer's adverse action against [her]." *Cage v. Harper*, 42 F.4th 734, 741 (7th Cir. 2022). "For a public employee's speech to be protected under the First Amendment, the employee must show that: (1) [she] made the speech as a private citizen; (2) the speech addressed a matter of public concern; and (3) [her] interest in expressing that speech was not outweighed by the state's interests as an employer in 'promoting effective and efficient public service.' This last element is known as *Pickering* balancing, after *Pickering v. Board of Education*, 391 U.S. 563, 88 S.Ct. 1731, 20 L.Ed.2d 811 (1968)." *Swetlik v. Crawford*, 738 F.3d

7

818, 825 (7th Cir. 2013). (citations omitted). "It is also important to note, however, that [plaintiff's] status as a government employee does not afford [her] greater First Amendment protection that a non-government employee has." *Swetlik v. Crawford*, 876 F. Supp. 2d 1077, 1082 (E.D. Wis. 2012).

"When public employees make statements pursuant to their official duties, the employees are not speaking as citizens for First Amendment purposes, and the Constitution does not insulate their communications from employer discipline." *Garcetti*, 547 U.S. at 420. *Garcetti* also makes clear that a public employee's speech, made pursuant to their official duties is not protected by the Frist Amendment, "no matter how important that speech may be or how it could affect the public interest." *Fehlman v. Mankowski*, 588 F.Supp.3d 917, 921 (W.D. Wis. 2022).

While "the public has a right to hear the views of public employees", *See Borough of Duryea, Pa. v. Guarnieri*, 564 U.S. 379, 397 (2011), that right is not unfettered. The Supreme Court's decision in *Garcetti* crafted a rule that balanced a publics employees' right to speak with the government's ability to function efficiently and effectively. *Garcetti*, 547 U.S. at 418-419, 126 S.Ct. 1951. The Court wrote, "[Speech] that owes its existence to a public employee's professional responsibilities does not infringe any liberties the employee might have enjoyed as a private citizen. It simply reflects the exercise of employer control over what the employer itself has commissioned or created. *Id.* at 421-22, 126 S.Ct. 1951. *Garcetti* also, "holds that the First Amendment does not regulate how public employers manage their workforces, even when that management involves telling others what to say or avoid saying." *Adams v. Board of Educations of Harvey School District 152*, 968 F. 3d 713, 716 (7th Cir. 2020).

Further, the Seventh Circuit "has declined to read *Garcetti* as applying only to speech that is part of 'a public employees' ordinary daily job duties.'" *Fehlman*, 588 F.Supp.3d. at 923

8

(citing *Vose*, 506 F.3d at 572). Instead, this Circuit's approach holds that "it is enough if the speech related to activities that fall 'within the general ambit of [her] job.'" *Id.* (citing *Fairley v. Andrews*, 578 F.3d 518, 523 (7th Cir. 2009); See also *Kristofek v. Village of Orland Hills*, 832 F.3d 785 (7th Cir. 2016) (Speech that "ordinarily fall[s] within the scope of plaintiff's duties" is not insulated by the constitution.) "Determining what falls within the scope of an employee's duties is a practical exercise that focuses on 'the duties an employee actually is expected to perform." *Renken v. Gregory*, 541 F.3d 769, 774 (7th Cir. 2008) (citations omitted). Further, "When an employee engages in speech that is part of the employee's job duties, the employee's words are really the words of the employer. The employee is effectively the employer's spokesperson." *Janus v. AFSCME, Council 31*, 138 S.Ct. 2448, 2474, 201 L.Ed.2d 924 (2018).

Here, Darlingh's speech "owes its existence to [her] professional responsibilities," because the content of the speech is inextricably intertwined with her responsibilities as an elementary educator. Namely, Darlingh is expected "support transgender and gender non-conforming students and help create a safe environment for them. [ECF 1-15, p. 7]. Darlingh is also expected to comply with the District's commitment to equity and fostering a safe and supportive learning environment for all students. [*Id.* at p. 6]. School counselors must also "[R]ecognize all students have the right to be treated equally and fairly with dignity and respect as unique individuals free from discrimination, harassment, and bullying based on their real or perceived gender identity and gender expression." [*Id.* at, p. 7].

Darlingh's speech expressly rejects MPS' expectation that she treat her students fairly and is a public repudiation of her official duties. In short, Darlingh's speech is the antithesis of MPS's expectations of school counselors. The substance of Darlingh's speech is focused solely on her job as an MPS counselor and wrongly advised the public that gender non-conforming

9

students would be treated with bias, prejudice, and be excluded from learning opportunities solely on the basis of their gender non-conforming expressions. The allegations plead in the Complaint demonstrate that Darlingh was speaking as a public employee, not a private citizen. In parsing Darlingh's speech she has, as Judge Posner put it, pled herself out of court. *See Thomas*, *Supra.*

First, Darlingh introduced herself to the crowd at the "speaker's corner" by credentialing her speech with authority as a public employee. She says, "[M]y name is Marissa Darlingh, I am an elementary school counselor in Milwaukee Public Schools." [ECF 1, ¶ 30, fn. 10]. The introductory clause of Darlingh's speech plainly and boldly admits that she is speaking as a public employee; otherwise, there is no legitimate reason to make such an introduction. There is no other reasonable basis for Darlingh to make her introduction this way other than wanting the audience to know that she is speaking about her job. To be sure, Darlingh chose to credential herself this way (i.e., she was not introduced by some other speaker who addressed her credentials to speak). Further, the audience understood that she was speaking as a representative of MPS. [ECF 1, ¶31].

In the next breath, Darlingh addresses specific circumstances related to "her" school. She states, "I oppose gender ideology ever entering the walls of <u>my school building</u>." [ECF 1, ¶ 30, fn. 10] (Emphasis added). Darlingh then says, "On my dead fucking body will <u>my students</u> be exposed to the harm of gender identity ideology." [*Id.*] (Emphasis added). Next, Darlingh states, "Not a single one of <u>my students</u> under <u>my fucking watch</u> will ever ever transition socially and sure as hell not medically. Absolutely not." [*Id.*] (emphasis added). Darlingh's speech is addressing her employer's expectations related to her job performance as a school counselor. There is no separating the three ideas – (1) Darlingh's opposition to gender ideology entering her

workplace; (2) Darlingh's promise that while in her workplace, her students would be "exposed" to gender ideology only "on [her] dead fucking body" and (3) Darlingh's opposition to her student's social or medical transition "under [her] fucking watch"-from her job duties and responsibilities' her employer expects her to perform.

Darlingh then expressed two ideas, "I exist in this world to serve children." "I exist to protect children." In a vacuum, these words have little implication for determining whether the speech is unprotected public-employment speech, but when put in context with the rest of her speech, Darlingh has not converted her speech into constitutionally protected citizen-speech.

The final portion of Darlingh's speech expresses the prejudiced and bigoted personal beliefs she holds and connects those feelings with the functions of her job. By doing so, the entire speech falls squarely into the arena of punishable employee-speech. Darlingh says the quiet part out loud:

> I feel like I am dissociating right now because this is very intense very intense. I think someone else is speaking through me right now, but fuck transgenderism. Fuck it. Fuck transgenderism. Fuck these people behind us who want children to have unfettered access to hormones, wrong-sex hormones, and surgery.

[*Id.*] The context of Darlingh's earlier pledge to act as a gatekeeper of "gender ideology ever entering the walls of [her] school building" is clearly rooted in the hateful, discriminatory and bigoted animus Darlingh holds deeply within herself. Darlingh's regret, however, is limited only to an, "Acknowledg[ment] that her use of profanity went too far." [ECF 1, ¶ 101]. Darlingh makes no apologies for pledging to act on her hateful prejudices against gender non-conforming students while she is at work. There is no doubt that her speech, when read as whole, touches solely on matters within the scope of her duties as an employee of MPS. For Darlingh's speech to be protected, the Court must create a new legal rule and hold that employees may rewrite their

employer's legitimate anti-discrimination polices when that policy conflict with the employee's prejudicial beliefs.

If Darlingh's speech is constitutionally protected, then any employee who opposes their employer's anti-discrimination policy could commit to administering their own brand of workplace equality with impunity. But, that is not the law of this Circuit, or anywhere else. Darlingh forfeited constitutional protection when she (1) credentialed herself as an MPS school counselor; (2) pledged to disregard her employer's polices and instead carry out her own version of counselling services (a brand that excludes students on their protected status as transgender or gender non-conforming), and (3) repudiated any notion that she would provide equal access and services to her students by saying, "fuck transgenderism. Fuck it. Fuck transgenderism." Darlingh's speech was a product of her employment relationship with MPS, and she used her credentials as an MPS employee to disseminate vile and hurtful rhetoric, which was directly contrary to established MPS policy. There is no separation between Darlingh's speech and her duties as an MPS school counselor.

## II.     Darlingh's Termination is Supported by *Pickering* Balancing.

The Supreme Court recognizes that the government may impose "certain restraints on the speech of its employees" that would be "unconstitutional if applied to the general public." *City of San Diego v. Roe*, 543 U.S. 77, 80, 125 S.Ct. 521, 160 L.Ed.2d 410 (2004) (per curiam). The government has "interests as an employer in regulating the speech of its employees that differ significantly from those it possesses in connection with regulation of the speech of the citizenry in general." *Pickering v. Bd. of Ed. of Twp. High Sch. Dist. 205*, 391 U.S. 563, 568, 88 S.Ct. 1731, 20 L.Ed.2d 811 (1968). "[T]he government's interest in achieving its goals as effectively and efficiently as possible is elevated from a relatively subordinate interest when it acts as

sovereign to a significant one when it acts as employer." *Bd. of Cty. Comm'rs, Wabaunsee Cty., Kan. v. Umbehr*, 518 U.S. 668, 676, 116 S.Ct. 2342, 135 L.Ed.2d 843 (1996) (quoting *Waters v. Churchill*, 511 U.S. 661, 675, 114 S.Ct. 1878, 128 L.Ed.2d 686 (1994) (plurality opinion)).

In order for Darlingh's speech to be constitutionally protected, she must show that her interest "as a citizen, in commenting upon matters of public concern" outweighs MPS's interests "as an employer, in promoting the efficient of the public services it preforms through employees." *Pickering*, 391 U.S. at 568, 88 S. Ct. 1731. The *Pickering* balancing test contemplates a fact-intensive inquiry into a number of interrelated factors:

> (1) whether the speech would create problems in maintaining discipline or harmony among co-workers; (2) whether the employment relationship is one in which personal loyalty and confidence are necessary; (3) whether the speech impeded the employee's ability to perform her responsibilities; (4) the time, place, and manner of the speech; (5) the context within which the underlying dispute arose; (6) whether the matter was one on which debate was vital to informed decision-making; and (7) whether the speaker should be regarded as a member of the general public.

*Gustafson v. Jones*, 290 F.3d 895, 909 (7th Cir. 2002).

The Court need not address each of the seven factors in turn. *See Graber v. Clarke*, 763 F.3d 888, 896 (7th Cir. 2014). "Importantly, a showing of actual disruptiveness is not required; 'a government employer is allowed to consider the potential disruptiveness of the employee's speech.'" *Id.* (*Quoting Kokkinis v. Ivkovich*, 185 F. 3d 840, 846 (7th Cir. 1999) (internal citations omitted). Further, "the employer 'is not required to wait until those working relationships actually disintegrate if immediate action might prevent such disintegration." *Id.* (*Quoting Breuer v. Hart*, 909 F. 2d 1035, 1040 (7th Cir. 1990). Applicable here, when a public employee takes "deliberate steps to link" their speech with their public employment, the employer's burden in making out is *Pickering* balancing defense is less than if the public employee spoke outside of

13

work on matters unrelated to their job. *See Craig v. Rich Tp. High School Dist. 227*, 736 F. 3d 1110, 1118 (7th Cir. 2013) (Citing *Roe*, 543 U.S. at 80-81, 125 S. Ct. 521).

*Pickering* first asks whether the speech would create problems in maintaining discipline or harmony among co-workers. Darlingh's speech caused several disruptions, both in the school halls and in the community. In fact, Darlingh entered another teacher's classroom to confront that teacher about sharing information about Darlingh with students. [ECF 1-11, p. 52-54] Darlingh's own words admit that her confrontation caused several students to express their desire to <u>not attend counseling sessions with Darlingh;</u> one student also stated that they did not want to be in the same room as Darlingh. [*Id*]. Darlingh's conduct was enough to cause students to cease seeking out Darlingh's counseling services- a *bona fide* disruption. Additionally, another teacher confronted Darlingh no less than two times in the same day to address Darlingh's April speech. [ECF 1, ¶ 65] If that were not enough, MPS received at least nine (9) emails from concerned citizens regarding Darlingh's speech. [ECF 1-11, p. 10-34]. The totality of the evidence is clear: Darlingh's speech resulted in actual, tangible disruption to both the educational environment of the Allen-Field elementary school, and the Milwaukee Public School District as a whole.

The second *Pickering* factor asks whether the employment relationship is one in which loyalty and confidence are necessary. "An employer may have more leeway in restricting speech of an employee whose position requires contact with the public." *Craig*, 736 F. 3d at 1119. In the *Craig* case, the Seventh Circuit held that "The fact that Craig [a school counselor] works closely with students at a public school confers upon him an inordinate amount of trust and authority." *Id.* (*Citing Edwards v. Aguillard,* 482 U.S. 578, 584, 107 S.Ct. 2573, 96 L.Ed.2d 510 (1987) ("Families entrust public schools with the education of their children ... Students in such institutions are impressionable and their attendance is involuntary."); *see also Melzer,* 336 F.3d

at 198 ("[W]e note that we conduct our evaluation of appellant's rights versus governmental interest bearing in mind his position as a teacher in a public school. This position by its very nature requires a degree of public trust not found in many other positions of public employment."). The *Craig* Court wrote, "Particularly as a guidance counselor, Craig must maintain a safe space for his students in order to ensure they remain willing to come to him for advice. If Craig fails to create the appropriate environment for his students, they will not approach him and he cannot do his job." *Id.* at 1119-20.

Just as in *Craig*, Darlingh deliberately linked her speech with her employment as a school counselor at Milwaukee Public Schools. Darlingh's introduction to the crowd was, "[M]y name is Marissa Darlingh, I am an elementary school counselor in Milwaukee Public Schools." [ECF 1, ¶30, fn. 10]. Darlingh then discussed specific actions she would take as a school counselor at Milwaukee Public Schools. (*Id.*). Darlingh's position is one that requires trust not only from parents and administrators but also from students. Darlingh breached the trust MPS vested to her; she is disqualified her from being a school guidance counselor. Darlingh cannot be trusted to effectively, efficiently, safely, openly, and compassionately deliver school counseling services because she has promised to discriminate against children on the basis of their gender. The same way a school counselor who is openly racist, anti-Semitic, misogynistic, or ableist would breach the trust inherent in their public school employment, Darlingh falls squarely within that camp.

The third *Pickering* factor asks whether the speech impeded the employee's ability to perform her responsibilities. This factor, like all other *Pickering* factors requires the court to look at what the employer's concerns "really were." *Harnischfeger v. U.S.*, 943 F. 3d 1105, 1116 (7th Cir. 2019). MPS articulated its reasons as to why Darlingh's speech interfered with her ability to perform the responsibilities of an MPS school counselor:

1. MPS described its expectations of school counselors by writing:

   School counselors have an ethical obligation to treat all students they serve with dignity and respect. Additionally, school counselors are to foster and affirm all students and their identity and psychosocial development, support all students and their development, provide culturally responsive instruction, appraisal and advisement to students, and provide culturally responsive counseling to students.

   [ECF 1-15, p. 5].

2. MPS explained that Darlingh's speech was threatening, intimidating, and abusive toward students and the public, a violation of District policy. (*Id.*, p. 6). MPS wrote, "you [Darlingh] make it very clear that you [Darlingh] will do everything within your power to prevent a student in your building from transitioning or even expressing who they truly are." (*Id.*).

3. MPS cited its policy prohibiting employees from engaging in activity that significantly detracts from the school district's image or reputation, and explained:

   When you got up to speak, the first thing you did was state your name and identified yourself as an elementary school counselor in Milwaukee Public Schools. That was the lens in which your comments were given and received. As an MPS employee, you were a reflection of the district and at no point were you authorized to comment on the topic of gender identity or character the care provided by the District to our students. Your comments run counter to the district's commitment to equity and fostering a safe and supportive learning environment for all students.

   (*Id.*).

4. MPS cited its policy requiring equity in MPS:

   In the policy, the board identifies one of it guiding principles to be 'a school system shall developed in which all students receive the support and resources that they need to be successful.' Your [ [Darlingh's] behavior is contrary to this very fundamental guiding principle. You have

16

made clear you refuse to provide transgender students the support they need-as required by you by District policy.

(*Id.* at p. 7). In light of Darlingh's comments, including "fuck transgenderism," MPS continued to explain how her speech violated its policy goals:

> One such goal is, 'MPS will provide every student with equitable access to high-quality and culturally relevant instruction, curriculum, support, facilities, technology, and other educational resources that respect that individual's identities, backgrounds, abilities, and experiences.' The comments you [Darlingh] made at the rally and during public media interviews since then, clearly demonstrate that you refuse to respect the identities of transgender and nonbinary students. In fact, you have shown contempt towards transgender individuals, and an inability to support or abide by the district's equity goals.

(*Id.*).

5.      MPS cited its anti-bullying and harassment policy by explaining:

> The district has adopted a bullying policy (for students and staff) in which bullying is defined as 'deliberate or intentional behavior using words or actions intended to cause fear, humiliation, intimidation, harm, or social exclusion.' Additionally, the policy covers off duty/out-of-school speech or behavior that results in a substantial disruption to the learning environment. Your comments at the rally and subsequent to that, were pointed and intimidating to transgender students and their families. The threats you made publicly and intentionally do isolate transgender students and discourage them from expressing their true selves at school.

(*Id.*).

6.      MPS articulated and applied the American School Counselor Associations' School Counselor and Transgender/Gender-nonconforming Youth standards:

> School counselors recognize all students have the right to be treated equally and fairly with dignity and respect as unique individuals free from discrimination, harassment, and bullying based on their real or perceived gender identity and gender expression. School counselors work to safeguard the well-being of transgender and gender-nonconforming youth…. You [Darlingh] have made it clear that you will not respect a transgender student's wishes and use their preferred name or pronoun. Also, your threats to actively prevent a transgender student from transitioning are harmful to transgender students and are in direct violation of the school counselor standards.

17

(*Id.*).

Darlingh committed to discriminating against transgender and gender non-conforming students "on [her] fucking watch," coupled with her contempt for transgender individuals (i.e., "fuck transgenderism. Fuck it. Fuck transgenderism"). MPS's concern "really were" that Darlingh's biases, prejudices, and deeply rooted beliefs conflict with competent, caring, and professional school counselors. *See Harnischfeger*, *Supra*.  It is unfathomable that an elementary counseling professional would openly commit to discriminating against the children in their care, but that is the circumstance Darlingh created. Darling's termination occurred because Darlingh decided that it is okay to discriminate against students, so long as they are transgender. Unfortunately for Darlingh- despite, "her views about the effect of certain ideologies and policies on children.," (Pl. Br. at p. 19) - the law of this Circuit prohibits sex-stereotyping discrimination. *See Whitaker By Whitaker v. Kenosha Unified School Dist. No. 1 Bd. Of Educ.*, 858 F. 3d 1034, 1049-50 (approval for causes of action for transgender sex-stereotyping claims under both Title VII and Title IX).

In analyzing this *Pickering* factor, a sticking point in *Craig* was that the school counselor's misogynistic writings would deter female students from seeking advice; "Indeed, some students may forego receiving the school's counseling services entirely rather than take the risk that Craig would not view them as a person but instead as an object" *Craig,* at 1120. The same is true here. Darlingh is expected to view each student as a person and to provide them with counselling in a nondiscriminatory way. [*See generally*, ECF 1-15] Instead, Darlingh committed to gatekeeping gender non-conforming ideology from entering the walls of the Milwaukee Public School building where she worked, and promised to never ever allow a student to transition socially or medically under her "fucking watch". (ECF 1, ¶30, fn. 10). Darlingh cemented her

18

commitment by explaining "On my dead fucking body will my students be exposed to the harms of gender ideology." (*Id.*).

MPS students *actually* felt the impact of Darlingh's words. Darlingh's letter to her principal describing the June 3, 2022 disturbance in the classroom as causing children to express their desire not to attend counseling sessions with Darlingh; one even expressed not wanting to be in the same room as Darlingh. [ECF 1-11, p. 53]. That fact cannot be squared with Darling's Complaint, which states that "Most of the statements taken form the students in the classroom suggest the incident had little or no effect on them." [ECF 1, ¶64] That is a bold-face lie, and Darlingh knows it. The same day she caused the classroom disturbance, Darlingh drafted a letter to her principal describing the incident. Darlingh's letter advises her principal, "I told the students we had counseling scheduled and asked 'do you want to do it?' Several students shouted 'no.' One student said 'I don't even want to be in the same room as her,' referring to me [Darlingh] and walked out." [ECF 1-11, p. 53] To argue her confrontation had little effect on the students or her ability to perform her job is entirely inconsistent with Darlingh's own description of the events. Even at this early stage of litigation, Darlingh's credibility is in serious doubt.  It is hard to image a more ineffective school counselor than one who has lost the confidence of their students; in fact, *Craig*, explains that exact circumstance demonstrates "[s]he cannot do [her] job." 736 F.3d at 1120. It is clear that Darlingh's speech- committing to discrimination against transgender and gender non-conforming students- and her disruptive behavior resulted in her inability to effectively counsel elementary students.

As to the fourth Pickering factor, the time (a Saturday) and place (at a protest on the steps of the Capitol building), of the speech, while arguably reasonable, does not countervail the substantial harm caused by the manner of Darlingh's speech. *See Lalowski*, 789 F. 3d at 792

("Because he confronted protesters at the time and place they chose to protest, the time and place of his speech were reasonable. However, the manner in which he spoke cannot be justified."). Like *Lalowski*, the words of Darlingh's speech were abusive and degrading, which MPS explained fell well below the standard of conduct the public expects from school guidance counselors. [ECF 1-15].

The context of the dispute (*Pickering* factor 5) leading to Darlingh's termination also tips the balance in MPS's favor. While MPS was investigating Darlingh's April speech Darlingh caused a disruption of a school classroom and at least two other disturbances with co-workers in school that same day. [ECF 1-11, p. 4; ECF 1, ¶ 56-57, 65]. The disruption caused students to not want to have counseling sessions with Darlingh. [ECF 1-11, p. 53]. In this context, MPS issued its pre-disciplinary letter and ultimately terminated Darlingh. [ECF 1-11, p. 3; ECF 1-15].

The sixth *Pickering* factor- whether the matter was one on which debate was vital to informed decision making- while arguably favoring Darlingh, is the only *Pickering* test factor that cuts against MPS. Standing alone, however, it does nothing to rebut the substantial interest MPS had in light of all other *Pickering* factors.

Darlingh's choice to use her speech to talk about her job as, "an elementary school counselor in Milwaukee Public Schools," [ECF 1, ¶ 30, fn. 10] erodes the argument that Darlingh's speech should be regarded as being made by a member of the general public. (*Pickering* factor 7). *See Lalowski*, *Supra*. ("Because Lalowski represented himself as an off-duty police officer, rather than as a mere private citizen, we cannot say that he was speaking as a member of the general public."). After identifying herself as an MPS school counselor, the entire topic of Darlingh's short speech was to lament against MPS's policies requiring Darlingh to treat transgender and gender non-conforming students fairly and equally. The public

understood Darlingh to be speaking on behalf of MPS as well. [ECF 1, ¶ 43-46; ECF 1-11 p. 14-34]. Her speech was received by these citizens as speech on behalf of MPS. The public hearing her speech that day regarded Darlingh as an employee making a speech, not a private citizen.

Darlingh was fired because she openly and repeatedly stated that she will use her position as a school counselor to actively discriminate against students who are transgender or gender non-conforming. To illustrate the balancing of interests, take an employee who openly expresses their intention to discriminate against students on the basis of religion (e.g., a school counselor opposing student's praying the Quran says "I oppose Islamic ideology ever entering the walls of my school building"), race (e.g., a school counselor opposing integration says, "on my dead fucking body will my students be exposed to harms of race mixing"), disability (e.g., a school counselor opposed to counseling a nonverbal students says, "Not a single one of my students under my fucking watch will ever ever get adjust socially and sure as hell not medically"), or sexual orientation (e.g., a school counselor opposed to gay students says, "on my dead fucking body will my students ever be exposed to harms of the gay agenda.)". In each of these ugly scenarios, the public school employee expressing these ideas would surely lose their job, and for good reason: the constitution does not require MPS to employ bigots. MPS also need not wait for Darlingh to actually discriminate against a transgender or gender non-conforming child before it takes action. *See Geer v. Amesqua*, 212 F. 3d 358, 372 (7th Cir. 2000). The balancing of interests- especially at the early preliminary injunction stage- favors MPS in nearly every way. In light of the weight of credible evidence supporting MPS's decision to terminate Darlingh under the *Pickering* framework, Darlingh has not established that she is likely to succeed on the merits her First Amendment Claims.

## **CONCLUSION**

Count one of Darlingh's Complaint fails to state a claim upon which relief can be granted. A such the Court should dismiss that claim, strike all pleadings related thereto, and Grant leave to Defendants to file an Answer to all remaining allegations.

Dated and signed at Milwaukee, Wisconsin this 13th day of January, 2023.

TEARMAN SPENCER
City Attorney
s/James D. Lewis
JAMES D. LEWIS
Assistant City Attorney
State Bar No. 1113730
*Attorneys for Defendants*

**ADDRESS:**
200 East Wells Street
CH 800
Milwaukee, WI 53202
(414) 286-2601 – Telephone
(414) 286-8550 – Facsimile
Email: jalewis@milwaukee.gov

1071-2022-1572/283324