UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

---

MARISSA DARLINGH,

    Plaintiff,

  v.

ADRIA MADDALENI, THERESE FREIBERG,
OPHELIA KING, and MILWAUKEE BOARD OF
SCHOOL DIRECTORS,

    Defendants.

Case No. 22-CV-1355

---

### PLAINTIFF'S COMBINED REPLY BRIEF IN
### SUPPORT OF MOTION FOR PRELIMINARY INJUNCTION AND
### RESPONSE TO DEFENDANTS' MOTION TO DISMISS

---

WISCONSIN INSTITUTE FOR
LAW & LIBERTY

Rick Esenberg
Luke N. Berg
Cara M. Tolliver
Lucas T. Vebber

330 E. Kilbourn Ave., Suite 725
Milwaukee, WI 53202
Phone: (414) 727-9455
Fax: (414) 727-6385

rick@will-law.org
luke@will-law.org
cara@will-law.org
lucas@will-law.org

*Attorneys for Plaintiff*

# TABLE OF CONTENTS

ARGUMENT ...........................................................................................................................1

    I.   Ms. Darlingh Clearly Spoke as a Private Citizen on a Matter of Public Concern ...............1

    II.  *Pickering* Balancing Strongly Supports Ms. Darlingh's Right to Speak, on Her Own Time, on a Topic That Is of Immense Importance to the Health and Wellbeing of Children ..........................................................................................................................4

    III. Ms. Darlingh Never "Committed to Discriminating Against Her Students"—In Fact She Has Repeatedly Said the Exact Opposite. ...................................................................11

    IV. Defendants Have No Answer to the Many Cases Holding That Irreparable Injury Is Presumed in First Amendment Retaliation Claims ............................................................14

    V.  An Injunction Is Also Warranted to Prevent Defendants From Reinstating the No-Trespassing Order. ........................................................................................................16

CONCLUSION ......................................................................................................................17

# ARGUMENT

In their response to Ms. Darlingh's preliminary injunction motion, Defendants concede that they fired Ms. Darlingh for her speech in April. And they do not dispute any of the relevant background facts in Ms. Darlingh's brief (which mirror those in the complaint). Other than block quoting the termination letter, Resp. Br. 13–15, Defendants also do not make any effort to argue or show how Ms. Darlingh violated any District policy by speaking at a public rally on her own time, whereas she explained in detail how she did not violate any policy. Pl's Br. 24–27. Instead, on the merits, Defendants make three main arguments: (1) that she was speaking as an employee, even though it was on her own time, outside of her job duties; (2) that the *Pickering* balancing supports her termination, even though the cases they cite are not remotely comparable and the differences only serve to highlight the First Amendment violation; and (3) that she has "committed to discriminating against her students," *e.g.*, Resp. Br. 6, even though she never said anything like that and in fact repeatedly said the exact opposite. Because Defendants make the exact same arguments (almost verbatim) in their motion to dismiss and in their response to Ms. Darlingh's injunction motion,[1] she submits this brief as a combined response/reply to both, noting the few places where the different posture matters. *Infra* nn. 3, 5. This Court should grant Ms. Darlingh's preliminary injunction motion and deny Defendants' motion to dismiss.

## I. Ms. Darlingh Clearly Spoke as a Private Citizen on a Matter of Public Concern

In her opening brief, Ms. Darlingh explained how she easily meets the first half of the two-step inquiry under the *Pickering* line of cases. Pl's Br. 15–17. She gave a short speech on a Saturday, on her own time, at a public rally, in an entirely different city from where she works,

---

[1] The argument section of Defendants' Motion to Dismiss Brief (pp. 7–21), is, for the most part, identical to the corresponding sections in their Preliminary Injunction Response Brief (pp. 4–20). Since their Preliminary Injunction Response Brief contains a few additional sentences here and there, this Brief cites to that, noting the one place where the differences matter.

about the harms of gender identity ideology to children. *Id*. If that is not private-citizen speech on a matter of public concern, nothing is.

In their response, Defendants do not dispute the context of Ms. Darlingh's speech (on a Saturday, off-hours, etc.). Resp. Br. 18. Nor do they dispute that she spoke on a topic of public concern. Pl's Br. 16–17. Indeed, they concede that the subject she spoke about is "one on which debate was vital to informed decision making," Resp. Br. at 18–19.

Defendants argue solely that Ms. Darlingh spoke as an employee rather than a private citizen, Resp. Br. 5–9, but they are clearly wrong under well-established precedent. As a preliminary matter, Defendants misconstrue the legal test for this inquiry. As Ms. Darlingh explained, the Supreme Court clarified in *Lane v. Franks* that "[t]he critical question under *Garcetti* is whether the speech at issue is itself ordinarily within the scope of an employee's duties, not whether it merely concerns those duties." 573 U.S. 228, 239–40 (2014) "[S]peech that simply relates to public employment or concerns information learned in the course of public employment … does not transform that speech into employee—rather than citizen—speech." *Id*.

Defendants do not cite or discuss *Lane*, instead citing mostly pre-*Lane* cases. Nevertheless, one of the few post-*Lane* cases Defendants do cite cuts against them, holding that the employee *was speaking as a private citizen* (and thus his speech was protected) even though his statements (reporting misconduct to two other officers and the FBI) "bore some relation to the subject matter of his job." *Kristofek v. Vill. of Orland Hills*, 832 F.3d 785, 792–93 (7th Cir. 2016). "For the speech to lack constitutional protection," the Court explained, "it must constitute government employees' work product that has been 'commissioned or created' by the employer." *Id*. (cleaned up). Clearly, Ms. Darlingh's speech was not that.

Even putting that point aside, none of the cases Defendants cite are remotely analogous or support any argument that Ms. Darlingh's speech was made in her capacity as an employee, rather than a private citizen. In *Garcetti* itself, as summarized by one of the cases Defendants cite, "[t]he memo at issue … was part of the plaintiff's everyday duties; it was literally the employee's work product and thus readily viewed as the government's own speech that it had the right to control." *Fehlman v. Mankowski*, 588 F. Supp. 3d 917, 923 (W.D. Wis. 2022). However, Ms. Darlingh's speech was not "part of [her] everyday duties" or "literally [her] work product" as an employee—she spoke on a Saturday, on her own time, in an entirely different city from where she works, which Defendants do not dispute. Similarly, in *Fehlman*, the court characterized the speech at issue as "an employee's on-the-job discussions with a supervisor about the management of the office." *Id.* at 924. Ms. Darlingh's speech was not "on the job," and her comments were neither made "with," "about," or "to" a supervisor, nor with respect to any particular policy of the Milwaukee Public School system (though Ms. Darlingh *would* have a right to speak about a school policy, as recognized in *Lane* and *Pickering*, *see* 573 U.S. at 240).

*Fairley v. Andrews*, 578 F.3d 518, 520 (7th Cir. 2009), another case Defendants cite, involved an "internal complaint" by prison guards who "reported what they deemed illegal conduct by co-workers." *Id.* at 520, 522. Citing *Garcetti*, the Court held that "what one guard says about another through the grievance system is part of the job" and not protected by the First Amendment. *Id.* at 523. In contrast, Ms. Darlingh's speech was not an "internal complaint," did not implicate "the grievance system," and was not made to or about any of her coworkers. She was commenting generally—to the public, not internally—on her views about the harms of "gender identity ideology" to young children.

Defendants make two main arguments for why they believe Ms. Darlingh spoke as an employee, rather than a private citizen. First, they emphasize that she identified herself as a school counselor. Resp. Br 7. However, as Ms. Darlingh explained, the teacher in *Pickering* had also identified himself, Pl's Br. 15–16, and both *Pickering* and *Lane* highlighted this as a reason *to protect the speech*, not as a factor against protection: "It bears emphasis that our precedents dating back to *Pickering* have recognized that speech by public employees on subject matter related to their employment holds special value precisely because those employees gain knowledge of matters of public concern through their employment." *Lane*, 573 U.S. at 240. Defendants have no response to this.

Second, Defendants emphasize that Ms. Darlingh spoke, in part, about "gender ideology" in school. Resp. Br. 8. Again, *Lane* has squarely held that "the mere fact that a citizen's speech concerns information acquired by virtue of his public employment does not transform that speech into employee—rather than citizen—speech." 573 U.S. at 240. The Court phrased it multiple ways in the next paragraph to remove any doubt: public employees can speak "on subject matter related to their employment," can express "opinions … [about] the operation of the schools," and can "comment on … government policies that are of interest to the public at large." *Id*.

Finally, as they do elsewhere in their brief, Defendants grossly mischaracterize Ms. Darlingh's speech in an attempt to show that she "committed to discriminating against her students" in violation of District Policy. *E.g.*, Resp. Br. 6. This is not even a remotely fair characterization of what she said, as explained in more detail below. *Infra* Part III.

**II.**  ***Pickering* Balancing Strongly Supports Ms. Darlingh's Right to Speak, on Her Own Time, on a Topic That Is of Immense Importance to the Health and Wellbeing of Children.**

In her brief, Ms. Darlingh explained that the *Pickering* balancing factors cut heavily in her favor. Pl's Br. 17–24. In their response, Defendants misconstrue the legal test in various ways and

- 4 -
Case 2:22-cv-01355-SCD   Filed 01/30/23   Page 6 of 20   Document 29

rely heavily on cases that are obviously incomparable. Indeed, the differences between those cases and this one only serve to highlight the First Amendment violation in this case.

Defendants rely heavily on *Craig v. Rich Twp. High Sch. Dist. 227*, 736 F.3d 1110, 1115 (7th Cir. 2013) for various points (some addressed in more detail below), Resp. Br. 11, 12, 13, 16, 17, but that case is not remotely comparable to this case. The "speech" at issue there involved a male, high school guidance counselor's self-published book that was filled with "hypersexualized content," including a "description of his own sexual exploits," "[self-] confess[ions] [of] 'a weakness for cleavage' and other portions of a woman's anatomy," encouragements "[to] his female readers to engage in 'a certain level of promiscuity before marriage,'" and to be "submissive" to their male partners, and "a comparative analysis of the female genitalia of various races which goes into an excruciating degree of graphic detail." *Id*. at 1114–15, 1117, 1119. The Court held that parts of the book touched on matters of public concern, but barely so, such that the Court gave "minimal weight [to] Craig's speech interest," emphasizing that this "is not the sort of topic of expression that Defendants would require a compelling interest to restrict." *Id*. at 1120–1121. And, given that the counselor's job required him to work with high school girls (including his role as the girls basketball coach), the Court could "easily see how female students may feel uncomfortable seeking advice from Craig given his professed inability to refrain from sexualizing females." *Id*. By stark contrast, Ms. Darlingh's speech not only addressed a matter of immense public concern, it also had nothing to do with obscene proclivities and was not directed at any other person, but instead to a *topic*.

Defendants also rely on *Lalowski v. City of Des Plaines*, 789 F.3d 784 (7th Cir. 2015), for the proposition that Ms. Darlingh should not be "regarded as … a member of the general public," Resp. Br. 19, but the circumstances in that case do not support any analogy to this one. There, a

police officer confronted some abortion protesters, initially "while on duty." *Id*. at 793. He left and returned when he was off duty, but it was just "a half hour later," so the Court held that the second, off-duty encounter "was a mere continuation and escalation of the earlier, on-duty confrontation." *Id*. It was this sequence of events that led the Court to conclude that the officer was not "speaking as a member of the general public." *Id*. There is nothing like that here.

Defendants also compare Ms. Darlingh's speech to that in *Lalowski*, Resp. Br. 18, but the case is not remotely similar on that front either. In *Lalowski*, the officer "aggressively lambasted, ridiculed, and touched the protesters" in a way that was "abusive and degrading." *Id.* at 792. Among other things, he called one protester a "fat fucking cow," a "sinner of gluttony," "sarcastically asked her whether she was hiding food somewhere," and at one point "got down on all fours to demonstrate aerobic exercises she could do to lose weight"; he also "'poked' her in both arms and rubbed her arms 'in a creepy, sexual way.'" *Id*. 788. He "accused the demonstrators of using intimidation tactics like the Taliban, compared their use of the aborted-fetus signs to using an image of a priest 'bending over' a small boy to protest sexual abuse within the Catholic church, called demonstrator Wanda Glitz a 'psycho' and a 'man hater,' called Paula Emmerth a 'fat cow' several times, [and] called Paula's sister Teresa Emmerth 'fatty.'" *Id*. He was there for an "hour and twenty minutes" "hurling profanity and insults at the demonstrators." *Id*. at 788; 791. As in *Craig*, the Court found that *some* of these statements touched upon issues of public concern (though most did not), but barely so. *Id* at 791. Ms. Darlingh's brief speech to call attention to a matter of public concern is not at all comparable to the display in *Lalowski*, and unlike the officer's speech, addressed a serious and immensely important topic, as Defendants concede.

*Lalowski* is further distinguishable because in that case, neither the employer nor the Court relied solely on this one event, but instead also considered the officer's disciplinary history, which

included two prior abusive interactions with members of the public—one in which he called a woman "a 'slut' and a 'whore,' and push[ed] her to the ground," and another where he "use[d] profane language toward a private citizen." *Id*. at 789, 792. Ms. Darlingh, by contrast, has never been subject to disciplinary action, formal or informal, Pl's Br. 2; Defendants do not claim otherwise. And, contrary to the District's Policy, Defendants did not provide any warning or have any conversation with Ms. Darlingh before initiating her termination—they did not even explain their basis for her termination until the termination letter. Pl's Br. 8–9, 10–11, 26–27.

Defendants also cite *Lalowski* for the proposition that the mere "potential" for disruption is sufficient, rather than "a showing of actual disruptiveness" due to the speech.[2] Resp. Br. 10. That is not the test in this case. The relaxed standard for potential disruption only applies in the law enforcement context, where "close working relationships are essential to fulfilling public responsibilities." *Connick v. Myers*, 461 U.S. 138, 151–52 (1983). *Lalowski* itself emphasized the "particularly urgent need for close teamwork among those involved in the 'high stakes' field of law enforcement." 789 F.3d at 792. The Seventh Circuit has since made the point explicitly: "With respect to the first two factors, the disruptive nature of an employee's speech is so important in the context of law enforcement that a government employer is allowed to consider both the actual *and* the potential disruptiveness." *Kristofek*, 832 F.3d at 796 (emphasis in original). Outside that limited context, the Seventh Circuit has repeatedly recognized that government employers need "evidence of actual disruption, or at least the articulation of a reasonable belief in future disruption plus evidence of its reasonableness at the time." *Harnishfeger v. United States*, 943 F.3d 1105, 1121 (7th Cir. 2019).

---

[2] Defendants appear to cite *Graber v. Clarke*, 763 F.3d 888 (7th Cir. 2014) for the proposition, but that is just a typo. The quotes in their brief are from *Lalowski*, not *Graber*.

Moreover, even in the law enforcement context, the Supreme Court, after recognizing that the potential for disruption to working relationships is sometimes enough in that unique context, immediately "caution[ed] that a stronger showing may be necessary if the employee's speech more substantially involved matters of public concern." *Connick*, 461 U.S. 138 at 152. Here, Ms. Darlingh's speech addressed a topic of immense public concern, Pl's Br. 16–17, as Defendants concede, Resp. Br. 18–19, so Defendants "must offer particularly convincing reasons to suppress it." *Kristofek*, 832 F.3d at 796.

Defendants argue that teachers are in similar positions of trust and authority, Resp. Br. 12–13, citing to *Craig* (discussed above) and a Second Circuit case involving a "self-described pedophile [who] admit[ted] to being sexually attracted to young males," and whose "speech" at issue was "advoca[ting] changes in the law that would accommodate his professed desire to have sexual relationships with such children." *Melzer v. Bd. of Educ. of City Sch. Dist. of City of New York*, 336 F.3d 185, 199 (2d Cir. 2003). Teachers, of course, require more public trust than some jobs, such that speech by a teacher indicating that teacher's desire to have sex with minors (as in both *Craig* and *Melzer*) would cut heavily in favor of termination; but there is nothing remotely like that in this case. More relevant here, other cases, including *Pickering* itself, have recognized that teaching positions generally do not require the same kind of "personal loyalty and confidence" as law enforcement jobs. Pl's Br. 18–19.

Defendants do not dispute that Ms. Darlingh continued to do her job, without incident, for a month and a half after her speech. Pl's. Br. 5–6. The primary "disruption" they point to occurred over a month later when a coworker who disagreed with what Ms. Darlingh said attempted to manufacture a disruption by presenting an article about Ms. Darlingh to rally students against

her—a classic "heckler's veto," Pl's Br. 21–22. Even the school principal recognized this was entirely inappropriate, and Defendants do not argue otherwise.

Defendants briefly suggest that the "heckler's veto" principle does not apply in the school context, citing *Craig* and *Melzer*, Resp. Br. 12, but neither case said that. Indeed, *Melzer* acknowledged as a "truism" that "community reaction cannot dictate whether an employee's constitutional rights are protected" and that "allowing the public, with the government's help, to shout down unpopular ideas that stir anger is generally not permitted under our jurisprudence." 336 F.3d at 199. Both cases ultimately did not *apply* the heckler's veto doctrine because the disruptions came, not from someone who merely disagreed with the speech—a traditional "heckler"—but from parents and students who, rightfully, were unwilling to engage a male counselor who was a "self described pedophile" and publicly advocated for legalizing sex with minors, *Melzer*, 336 F.3d at 189, or one who published a "hypersexualized" book in which he "professed [an] inability to refrain from sexualizing females." *Craig*, 736 F.3d at 1120.

Here, by stark contrast, the primary "disruption" Defendants point to was caused, not by any parents or students, but by two other teachers who disagreed with what Ms. Darlingh said—classic "hecklers." Ms. Darlingh, for her part, did everything she could to ameliorate any disruption (even though she did not cause the disruption), by immediately offering to meet with these teachers to mediate and requesting a "guided problem solving" session. Pl's Br. 22. Neither of the teachers who caused the disruption ever spoke with Ms. Darlingh about their concerns until the day one of them brought the issue into her class and the other "confronted" Ms. Darlingh (showing that they were the initiators of the disruption), Resp. Br. 2, and they further refused to participate in any mediating discussion, Pl's Br. 22; Defendants do not dispute these points. If two teachers who disagree with what a coworker said on her own time can manufacture a "disruption" sufficient to

fire their coworker, then public employees have no meaningful First Amendment protection whatsoever. The whole point of the "heckler's veto" doctrine is to prevent dissenters from having the power to override someone else's First Amendment rights.

Defendants heavily emphasize that, just minutes after this teacher used classroom time to persuade her minor students to oppose and fear Ms. Darlingh (which the principal recognized, and Defendants do not dispute, was entirely inappropriate, Pl's Br. 22), a few of the students in the room said that they did not want to attend counseling with Ms. Darlingh that day. Resp. Br. 2, 11, 17. That a few elementary-age students were persuaded by their adult teacher, in the moment, not to see Ms. Darlingh, is not particularly surprising. But Defendants do not offer any evidence, either before or after this single moment, of any students not wanting to meet with Ms. Darlingh as a result of her speech. And the statements taken from the students later that day, after the immediate moment had passed, suggest that most had already forgotten about it. Pl's Br. 7. Even if there were (or are) any students who continued to have reservations about meeting with Ms. Darlingh—and again, Defendants have not offered any evidence that there are or were—Ms. Darlingh has offered to meet with any to apologize for her use of profanity, to listen, and to make clear that she "has and always will equally love, respect, and serve all students under her care, including transgender-identifying students." Dkt. 14-9:1–2. By contrast, there is substantial, undisputed evidence—some gathered *by Defendants* after her speech—that Ms. Darlingh was a favorite teacher of many students. Pl's Br. 6.

Defendants point to a few other things, but none show any substantial disruption that overrides Ms. Darlingh's First Amendment rights. The nine or so emails sent to the District in April did not cause any "disruption" in the school; Defendants do not argue otherwise. Pl's Br. 20; Resp. Br. 11. They also do not dispute that these emails did not come from any students or parents

of students. Resp. Br. 19. Almost all came from people at the event who disagreed with Ms. Darlingh's speech but had no relationship or interaction with the District—classic hecklers.

Finally, Defendants assert briefly and generically, in two sentences in their brief and one sentence in an affidavit, that there were "protests" in June of 2022.[3] Resp. Br. 11; Maddaleni Decl. ¶ 14. But they do not describe what these "protests" involved, how many people participated, who participated, or how often they occurred—the single paragraph in the affidavit suggests the "protests" happened on only one day. *Id*. In light of the heckler's veto doctrine, Defendants cannot simply wave the specter of "protests" without providing any details. There is simply no evidence that Ms. Darlingh's speech caused any significant disruption to her job duties as a counselor or to her school's operation. The only "disruptions" came from hecklers who disagreed with Ms. Darlingh and wanted her to be fired, and the disruption *these hecklers* caused was minimal at best.

### III. Ms. Darlingh Never "Committed to Discriminating Against Her Students"—In Fact She Has Repeatedly Said the Exact Opposite.

Throughout their brief, Defendants repeatedly mischaracterize Ms. Darlingh's speech as "committ[ing] to discriminating against her students." Resp. Br. 6; *id*. at 7 (to "exclude[ ] [students] from learning opportunities solely on the basis of their gender non-conforming expressions,"); *id*. at 8 ("pledging to act on her hateful prejudices against gender non-conforming students"); *Id*. at 9 ("pledged to disregard her employer's policies and instead … exclude[ ] students on their protected status as transgender."); *id*. at 13 ("promis[ing] to discriminate against children."); *id*. at 14 ("refus[ing] to provide transgender students the support they need") (block quoting the termination letter); *id* at 16 ("Darlingh committed to discriminating against transgender

---

[3] Since this (and only this) comes from outside the pleadings, this Court cannot rely on this for purposes of the motion to dismiss.

and gender non-conforming students."); *id*. at 20 (she "stated that she will use her position as a school counselor to actively discriminate against students.").

Ms. Darlingh said nothing of the sort, and, in fact, has said the exact opposite, repeatedly. What Ms. Darlingh did say was that she "oppose[s] gender ideology" in her school and would not "expose [her students] to the harms of gender identity ideology." Resp. Br. 1. This comment is about what is appropriate to teach children—not how she treats her students—and Defendants do not point to any District policy that requires Ms. Darlingh to teach "gender ideology" to her young students. Regardless, Ms. Darlingh is entitled to have and to express an opinion on the important public matter of what schools should be teaching young, impressionable children. *See Lane*, 573 U.S. at 240 ("[I]t is essential that [public employees] be able to speak out freely on such questions without fear of retaliatory dismissal.") (quoting *Pickering*).

Defendants also point to her statement, "Not a single one of my students under my fucking watch will ever ever transition socially and sure as hell not medically" as an example of her "commit[ing] to discriminating against her students." Resp. Br. 6, 7. As she explained to Defendants, she was communicating that "she will not be the cause of a student's transition—by promoting it, encouraging it, or initiating it," Dkt. 14-9:6, and again, Defendants do not point to any District Policy that requires her to take the lead in a child's social or medical transition. She told Defendants directly and explicitly that she "will follow the parents' lead as to each student's name and pronouns." Dkt. 14-9:6. As Ms. Darlingh pointed out in her opening brief, Defendants have "not describe[d] any examples—nor are there any—of Ms. Darlingh ever not using a student's 'preferred name and pronouns' or failing to provide support to a transgender-identifying student." Pl's Br. 25. Defendants do not disagree, effectively conceding the point.

- 12 -
Case 2:22-cv-01355-SCD   Filed 01/30/23   Page 14 of 20   Document 29

Finally, Ms. Darlingh's "fuck transgenderism" comment was clearly referring to an "ideology"—an "ism"—that she believes harms children. Indeed she even said her motivation for speaking was to "protect" and "serve" children. Resp. Br. 1. In her response to the District, Ms. Darlingh addressed that statement "up front" and explained that "she was referring to policies and ideologies that she believes harm children, and not in any way referring to transgender students or individuals." Dkt. 14-9:2.

If there were any doubt that Ms. Darlingh has never "committed to discriminating against her students," Ms. Darlingh has stated, repeatedly, both to the Defendants, Dkt. 14-9:2, 8, and publicly,[4] that she "has and always will equally love, respect, and serve all students under her care, including transgender-identifying students." *E.g.*, Dkt. 14-9:2. She has also offered to "meet with any staff or students," to make that clear. *See* Dkt. 14-9:1.

Even more egregiously, Defendants, in their brief, call Ms. Darlingh a "bigot," Resp. Br. 20, and accuse her of "hold[ing]" "hateful, discriminatory animus" "for these children," Resp. Br. 8. Again, that is simply false. Defendants have no evidence or examples of that whatsoever, and the evidence they gathered directly refutes that accusation: the four students Ms. King interviewed all agreed that they felt comfortable to "be whom they want to be," and two said Ms. Darlingh was one of their favorite teachers in the school. Dkt. 14-8:8.

Therefore, Defendants' assertion that Ms. Darlingh "committed to discriminating against" or "exclud[ing] [transgender-identifying] students" "from learning opportunities" or otherwise violated District policies is not just demonstrably false, *she has said the exact opposite*. Had Defendants followed their usual disciplinary process, or simply had a conversation or informal

---

[4] *See* May 25, 2022 Letter from Ms. Darlingh to DPI at 2 ("Ms. Darlingh always has and will love and professionally serve every child in her charge"), https://will-law.org/wp-content/uploads/2022/05/Darlingh-Letter-to-DPI-FINAL-1.pdf; Compl. ¶ 40 and n.12; Pl's Br. 5.

meeting with Ms. Darlingh, she could and would have made that very clear. Instead, Defendants immediately initiated termination proceedings and ignored everything she said during those proceedings, because they were determined to fire her, in violation of the First Amendment.

IV. **Defendants Have No Answer to the Many Cases Holding That Irreparable Injury Is Presumed in First Amendment Retaliation Claims**[5]

In her brief, Ms. Darlingh explained that, because this is a First Amendment retaliation case, if this Court agrees that Ms. Darlingh is likely to succeed on her First Amendment claim, irreparable injury is presumed, and a preliminary injunction ordering reinstatement is warranted. Pl's Br. 27–30.

In their brief, Defendants primarily respond to arguments Ms. Darlingh did not make. They cite various run-of-the-mill employment cases for the proposition that the loss of income is not, by itself, an irreparable harm. Resp. Br. 20–21. This proposition is neither in dispute nor is it Ms. Darlingh's argument. Notably, the cases they cite did not involve a First Amendment violation (or even any allegation of one, except for one case): *Sampson v. Murray* involved an administrative procedure claim, 415 U.S. 61, 64 (1974); *Shegog v. Bd. of Educ. of City of Chicago* involved a claim under tenure statutes, 194 F.3d 836, 837 (7th Cir. 1999); and *Ciechon v. City of Chicago* involved a due process claim where the appropriate remedy was a prompt hearing, 634 F.2d 1055, 1060 (7th Cir. 1980).[6]

Relatedly, Defendants cite *Hetreed v. Allstate Ins. Co.*, 135 F.3d 1155 (7th Cir. 1998), Resp. Br. 4, for the proposition that preliminary injunctions for reinstatement are disfavored

---

[5] Parts IV and V do not apply to the motion to dismiss.

[6] *Lasco v. Northern* did involve allegations of a First Amendment violation, but the Court found that the plaintiff "failed to show that the layoff has resulted from the exercise by him of constitutionally protected activities." 733 F.2d 477, 480 (7th Cir. 1984). Thus, when it came to irreparable harm, the only argument the Court considered was the loss of income. *Id*. at 481.

(though not unobtainable) in run-of-the-mill employment cases, but again, that case was a sex discrimination claim against a private employer, not a First Amendment claim.

Ms. Darlingh cited cases from the First, Fourth, Sixth, and Seventh Circuits (*Elrod* itself), and the Western District of Wisconsin, holding that in First Amendment employment-retaliation cases, irreparable injury is presumed, and reinstatement is the usual remedy, even in a preliminary injunction posture. Pl's Br. 27–29. Defendants have no meaningful response to these cases. They half-heartedly assert, without support, that *Elrod*'s presumption of irreparable injury for First Amendment violations does not apply to employment-retaliation claims, Resp. Br. 24, even though *Elrod* itself was an employment retaliation case, Pl's Br. 27.

The only case Defendants cite to counter all the cases Ms. Darlingh cited is a single district court case from the Southern District of Indiana. *McWilliams v. Frankton-Lapel Cmty. Sch.*, No. 120CV01419JPHTAB, 2020 WL 4734794 (S.D. Ind. Aug. 14, 2020). The Court in that case relied on its view that *Elrod* "did not address reinstatement." *Id*. at 4*. However, as Ms. Darlingh explained, that is not true. In *Elrod*, "the individual plaintiffs, with one exception … were fired." They sought a preliminary injunction for, among other things, "reinstatement for unlawfully dismissed employees," and the Seventh Circuit, when addressing the "preliminary injunction" question, held that "injunctive relief is clearly appropriate in these cases" since "plaintiffs have made a sufficient showing of probability of success on the merits." *Burns v. Elrod*, 509 F.2d 1133, 1134, 1135, 1136 (7th Cir. 1975). In light of that holding, the Western District of Wisconsin has recognized that *Elrod*'s presumption of irreparable injury is the rule in "all types of First Amendment discharge cases." *Greer v. Amesqua*, 22 F. Supp. 2d 916, 925 (W.D. Wis. 1998). So have multiple other federal circuits.

The *McWilliams* court also relied on its view that a termination in violation of constitutional rights does not cause *ongoing* irreparable harm. As Ms. Darlingh noted, "The majority of federal circuit courts, however, have concluded that an individual, who has been subjected to direct and intentional retaliation for having exercised the protected constitutional right of expression, continues to suffer irreparable injury even after termination of some tangible benefit such as employment." Pl's Br. 29 (citing *Newsom v. Norris*, 888 F.2d 371, 378 (6th Cir. 1989) (listing cases)). Defendants have no response to this.

As explained above, Defendants clearly violated Ms. Darlingh's First Amendment rights, so an injunction for reinstatement is warranted.

## V. An Injunction Is Also Warranted to Prevent Defendants From Reinstating the No-Trespassing Order.

Illustrating the degree to which Defendants were willing to go to retaliate against Ms. Darlingh, they imposed a no-trespassing order against her but would not tell her what it was for and would not schedule the hearing for illogical reasons—a clear Due Process violation. Pl's Br. 32–35. The history strongly suggests that the no-trespassing order, like the termination, was based on Ms. Darlingh's speech; and so the no-trespassing order was also a First Amendment violation. Pl's Br. 31–32. Defendants do not even attempt to defend this. Instead, shortly before their response was due to this Court, they sent a letter rescinding the order. Dkt. 23-6. Yet in their briefing, Defendants reserve the right to reinstate the order if there are "new disturbances"— though they still do not explain what "disturbances" warranted the order in the first place. They argue, in one paragraph, based on their last minute change of heart, that Ms. Darlingh's injunction request with respect to the no-trespassing order is now "moot."

The Supreme Court has long held that "voluntary cessation [of an unlawful practice] does not moot a case unless it is absolutely clear that the allegedly wrongful behavior could not

reasonably be expected to recur." *W. Virginia v. Env't Prot. Agency*, 142 S. Ct. 2587, 2607 (2022) (citations omitted); *Trinity Lutheran Church of Columbia, Inc. v. Comer*, 137 S. Ct. 2012, 2019 n.1 (2017); *Elim Romanian Pentecostal Church v. Pritzker*, 962 F.3d 341, 345 (7th Cir. 2020). "The party asserting mootness bears the 'heavy' burden of proof on this 'stringent' standard." *Freedom From Religion Found., Inc. v. Concord Cmty. Sch.*, 885 F.3d 1038, 1051 (7th Cir. 2018) (quoting *Friends of the Earth, Inc. v. Laidlaw Env't Servs. (TOC), Inc.*, 528 U.S. 167, 189 (2000).

Defendants have not come close to meeting this "heavy" burden—they even hedge and reserve the right to reinstate the no-trespassing order based on nebulous "disturbances," when they still refuse to tell Ms. Darlingh or this Court the basis for the prior order. With respect to the order, this Court should, at the very least, grant an injunction: (1) prohibiting Defendants from re-imposing a no-trespassing order against Ms. Darlingh for her speech; and (2) prohibiting Defendants from re-imposing a no-trespassing order without telling her what it is based upon.

## CONCLUSION

This Court should grant Ms. Darlingh's preliminary injunction motion and deny Defendants' motion to dismiss.

Dated: January 27, 2023

Respectfully Submitted,

WISCONSIN INSTITUTE FOR LAW & LIBERTY

Rick Esenberg (#1005622)
(414) 727-6367 | rick@will-law.org

/s/ Luke N. Berg
Luke N. Berg (#1095644)
(414) 727-7361 | luke@will-law.org

Cara M. Tolliver (#1112818)
cara@will-law.org

Lucas T. Vebber (#1067543)
lucas@will-law.org

330 E. Kilbourn Ave., Suite 725
Milwaukee, WI 53202
Phone: (414) 727-9455
Fax: (414) 727-6385

Attorneys for Plaintiff