## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF WISCONSIN

---

MARISSA DARLINGH,

    **Plaintiff,**

    v.                                         **Case No. 22-CV-1355-SCD**

ADRIA MADDALENI, THERESE FREIBERG,
OPHELIA KING, and MILWAUKEE BOARD
OF SCHOOL DIRECTORS

    **Defendants.**

---

## DECISION AND ORDER DENYING PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION AND GRANTING DEFENDANTS' MOTION TO DISMISS

---

This case probes the tension between a public employee's right to speak her mind and an employer's right to terminate the employee when her speech runs afoul of its policies. Plaintiff Marissa Darlingh, a guidance counselor at Allen-Field Elementary School in Milwaukee, spoke at a rally in Madison, Wisconsin in April 2022. In her speech, Darlingh identified herself as a school counselor for Milwaukee Public Schools and then made a number of controversial comments about transgenderism in her school and classroom. When MPS learned about the speech, which it viewed as discriminatory and antagonistic towards transgender students, it initiated disciplinary proceedings and ultimately fired her. Darlingh now alleges that the school and its administrators violated her First Amendment right to free speech and Fourteenth Amendment right to due process under the law; she seeks a preliminary injunction to reinstate her to her position. The defendants have opposed the preliminary injunction and have also filed a motion to dismiss her First Amendment claim.

## I.    The Rally

Plaintiff Marissa Darlingh worked as a guidance counselor at Allen-Field Elementary School, a Milwaukee-area public school. ECF No. 1 at ¶ 2. On April 23, 2022, Darlingh attended a rally called "Sisters 4 Sisters" at the Wisconsin Capitol building in Madison, Wisconsin. *Id*. ¶ 14. This event primarily served as a platform for speeches and discussions regarding gender identity and women's rights. *Id*. ¶ 16. One key focus of this event was a criticism of transgender identity ideology.[2] The highly controversial nature of this debate attracted protestors and counter-protestors, and emotions ran high. *Id*. ¶¶ 19-20. Some attendees who, like Darlingh, oppose transgender ideology in grade schools, received threats and were called names like "lesbian Nazis" and "TERFs" (a common acronym used by those supporting transgender identity normalization against those that oppose it, which stands for "trans-exclusionary radical feminists"). *Id*. ¶¶ 19-25.

The event also hosted a "speaker's corner" which allowed attendees to give unscheduled speeches. *Id*. ¶ 18. Darlingh gave one of these unscheduled speeches, the material portion of which is reproduced below:

> "I didn't plan on speaking and I've been screaming a lot but my name is Marissa Darlingh, I am an elementary school counselor in Milwaukee Public Schools. And I oppose gender ideology ever entering the walls of my school building. On my dead fucking body will my students be exposed to the harms of gender identity

---

[1] Facts in this section (unless otherwise noted) are drawn from the Complaint and accompanying exhibits. *See* ECF No. 1 – 1-17. Because I am addressing a motion to dismiss, I am required to take as true all allegations in the Complaint.

[2] The YouTube livestream recording of the rally cited in footnote 2 of the Complaint contains the following statements in the event-sponsored description: "The transgender movement would have us believe that sex does not exist as a material reality and should be replaced by the utterly incoherent concept of 'gender identity' . . . If you care about women, free speech, civil rights, or the state of our democracy, join these four brave women as they explain what gender ideology is doing to women—and what we might do to fight back." *See* https://www.youtube.com/watch?v=CvE2Na8la9s, *as cited in* ECF No. 1 ¶ 15, n. 2. As such, it is fair to conclude that criticism of gender identity ideology was at the heart of the event.

ideology. Not a single one of my students under my fucking watch will ever ever transition socially and sure as hell not medically. Absolutely not. I exist in this world to serve children. I exist to protect children. I feel like I'm disassociating right now because this is very intense very intense. I think someone else is speaking through me right now, but fuck transgenderism. Fuck it. Fuck transgenderism. Fuck these people behind us who want children to have unfettered access to hormones, wrong-sex hormones, and surgery."

*Id*. ¶¶ 26-30. This speech was recorded and posted to YouTube. *Id*. ¶ 30, n. 10. In response to seeing this speech, several members of the public contacted various officials for Milwaukee Public Schools (MPS), demanding that MPS terminate Darlingh.

## I. The DPI Investigation

Shortly after the rally, Darlingh received a letter from the Wisconsin Department of Public Instruction (DPI) informing Darlingh of its impending investigation into alleged immoral conduct (her speech at the rally) that could result in the revocation of her educator license. *Id*. ¶ 32. The letter instructed Darlingh to respond within thirty days, and it also gave Darlingh the option to voluntarily surrender her license and stop the investigation from proceeding. *Id*. ¶¶ 35, 37. Darlingh responded within the designated timeframe, declined to surrender her license, and asserted that the investigation violated her First Amendment right to free speech. *Id*. ¶¶ 39. Darlingh further took to several media outlets, including the Milwaukee Journal Sentinel and Fox News to publicly defend the rally speech. *Id*. ¶ 41. Because Milwaukee Public Schools began its own investigation that resulted in Darlingh's termination, DPI did not take further action against Darlingh, and her license is still listed as "Under Investigation." *Id*. ¶ 42.

## II.    The MPS Investigation and the Incidents on June 3rd

Within a week of Darlingh's speech at the Capitol, Darlingh's supervisor Ophelia King also began an investigation into Darlingh's conduct after receiving nine emails from members of the public regarding the speech. *Id.* ¶¶ 5, 43-44. The senders of these emails did not have any apparent ties to the school, and Darlingh contends that they were sent as part of a campaign organized by counter-protestors at the rally to get her fired. *Id.* ¶¶ 43-47.

As part of her investigation into Darlingh, King interviewed several students, none of whom reported problems with Darlingh, and several of whom spoke highly positively of Darlingh and her performance as an educator. *Id.* ¶¶ 49-51. There is no record of any employee misconduct or issues arising out of Darlingh's speech until June 3, 2022.

On June 3, 2022, following the release of a Milwaukee Journal Sentinel[3] article about Darlingh, an Allen-Field Elementary School teacher named Chappelle informed a fifth-grade classroom about Darlingh's speaker's corner speech and told the students "'they have a right not to see [Darlingh] for counseling services.'" *Id.* ¶¶ 56, 64. Darlingh, who had been walking by the classroom while Chapelle was speaking, saw her name and picture projected on the board and entered the classroom to confront Chapelle in front of the students. *Id.* ¶ 57. Darlingh informed the principal, who admonished Chapelle for discussing the subject of a pending investigation with her students and sent her home for the day. *Id.* ¶¶ 58-60. *See also* ECF No. 1-11 at 48 (the school principal's summary of events based on collected statements). Following this incident, Darlingh asked the students in Chapelle's class whether they wanted to proceed with regularly scheduled counseling that afternoon, and "several students shouted

---

[3] Rory Linnane, *MPS counselor under investigation after saying no transgender students will transition under her watch,* Milwaukee Journal Sentinel (June 1, 2022), https://www.jsonline.com/story/news/education/2022/06/01/mps-counselor-under-investigation-comments-transgender-students/9947268002/. *See also,* ECF No. 1-11 at 35-38.

'no.' One student said 'I don't even want to be in the same room as her.'" *Id.* at 53, (Darlingh's

incident report to the principal). The principal collected statements from the teachers involved

and the students who witnessed the interaction. ECF No. 1 at ¶ 61. Most students reported

not remembering or understanding the altercation, but the incident did seem to make an

impression on some students.[4] *Id.* ¶ 64.

Later that day, Darlingh had a dispute with a second teacher. *Id.* ¶ 65. The teacher took

issue with the content of Darlingh's speaker's corner speech and "cornered Ms. Darlingh

twice (once in her office, and once as she was walking out to her car), in a way that Ms.

Darlingh perceived as aggressive and hostile, both times related to her speech in April." *Id.*

Darlingh requested a mediation with this coworker through the District's Human Resources

Department, but the other teacher declined to participate. *Id.* ¶¶ 66-67.

In a separate incident report from that day, Darlingh reported to the principal:

> "While checking in at my scheduled time with a student, he let
> me know that lots of kids were gossipping [sic] about me at 5th
> grade recess. He wasn't sure of what all was being said, because
> in his words it was 'a lot.' He expressed concern over the 5th
> grade monolingual classes being pitted against each other over
> their opinion of me. He was also worried that the students I work
> with closely, including himself, might be subject to retaliation
> from students who have been influenced to turn against me."[5]

ECF No. 1-11 at 55.

---

[4] *See e.g.*, ECF No. 1-11 at 67, "Miss Marisa a meany;"*id.* at 71, "We seen that Ms. Marissa would not let trans
studens transpher and the teacher said that we had a opinion to have consoling or not"; *id.* at 72, "We saw
pictures about the protest a long time ago about LGBTQ . . . and Miss Marissa came and said 'Are you talking
about me?!' and the teacher said 'yes' nicely and Ms Marrissa got mad and said the teacher 'can't teach us this!'";
*id.* at 74, "We were leaning about how Ms. Marrisa done't like transgender kids and then Ms. Marissa looked in
the door." (all errors in originals).
[5] Darlingh does not mention this incident in the Complaint-in-chief, but it is included in the exhibits to her
complaint and signed by her.

### III. Disciplinary Letters

On June 9, 2022, King gave Darlingh a letter informing her of potential disciplinary action related to District rules and policies Darlingh allegedly violated. *Id*. ¶ 68. These policies included various non-discrimination and anti-bullying policies, as well as several employee code of conduct provisions. ECF No. 1-6. While the letter did not specify exactly what the problematic conduct was, one of the policies Darlingh allegedly violated is listed in the letter as "Violation of School Counselor & Transgender/Gender Non-Conforming Youth standards," suggesting that it pertained to her speaker's corner speech. *Id*. The letter further instructed Darlingh to confer with school officials over Zoom on June 15, 2022. *Id*. Darlingh's attorney reached out to the school administration on June 13th to ask what Darlingh had done to violate school policies, and the District's Department of Employment Relations responded that a packet of materials would be provided to Darlingh on the day of the conference to review prior to the meeting. ECF No. 1 ¶¶ 78-79.

Later that day, defendant Therese Freiberg, the head of the Department of Employment Relations, emailed Darlingh, instructing her not to report for work the following day and alerting her to her suspension pending the results of a second investigatory conference. *Id*. ¶ 80. A second letter arrived the next day and further outlined the details of Darlingh's suspension. *Id*. ¶ 81. The letter provided that Darlingh's suspension would be paid for the remainder of the school year—three days—but unpaid through the conclusion of the investigation. *Id*. ¶¶ 82-84. This letter also instructed Darlingh not to enter any MPS buildings or contact any school staff, students, or parents. *Id*. ¶ 86. Freiberg sent a separate no-trespass order, signed by Chief Human Resources Officer and defendant Adria Maddaleni, prohibiting

Darlingh from entering the land or premises of all MPS property until the District rescinded the order in writing. *Id*. ¶¶ 87-88.

### IV. June 15th Hearing and Aftermath

The day of the hearing, Darlingh and her attorney received a 126-page packet containing the text of the policies Darlingh allegedly violated, the communications between her and the school, emails from the public regarding Darlingh's speaker's corner speech, media coverage of the speech and DPI investigation, and student and teacher statements about Darlingh generally and about the June 3rd incident between Darlingh and Chappelle. *Id*. ¶¶ 90-91, ECF No. 1-11. During the Zoom hearing, King displayed the packet on the screen page by page and did not elaborate on the exhibits displayed. *Id*. ¶ 93. Freiburg, presiding over the hearing, then allowed Darlingh and counsel ten minutes to confer off camera before responding to the packet orally. Counsel for Darlingh requested to instead respond in writing, and Freiberg granted Darlingh two weeks to submit a written response. *Id*. ¶¶ 96-98.

Darlingh submitted her written response on June 27, 2023. *Id*. ¶ 99. The response primarily argued that Darlingh's speaker's corner speech was protected by the First Amendment because it was on her own time in a different city and did not violate any policies. *Id*. ¶ 100. Darlingh conceded that her use of profanity went too far and offered to apologize to anyone who was offended by it. *Id*. ¶ 101. Darlingh also claimed that her speech only "referr[ed] to policies and ideologies that she believes harm children and not [did]not in any way refer[] to transgender students or individuals." *Id*. ¶ 102. She also stated that she "has and always will equally love, respect, and serve all students under her care, including transgender-identifying students." *Id*. ¶ 103. Further, she protested that the news coverage of the speech misstated her position; Darlingh claimed that she never stated that she would not use students'

preferred pronouns. *Id*. ¶¶ 104-105. Darlingh clarified that she "would follow the parents' lead as to a student's names and pronouns." *Id*. ¶ 106.

MPS did not schedule the second misconduct hearing at the time. *Id*. ¶ 109. Freiberg and King informed Darlingh that they would not schedule a hearing until the Fall because it was not District practice to schedule a disciplinary hearing over the summer. This was despite the fact that both defendants worked over the summer and Darlingh expressed her desire to meet as soon as possible to allow her time to search for a different job if the District did terminate her employment. *Id*. ¶¶110-112. Darlingh's attorney protested the delay and followed up several times over the summer to inquire about the timing of the hearing, and MPS reiterated that it did not hold disciplinary hearings over the summer. *Id*. ¶¶ 112-122. Darlingh submitted a grievance through the District's grievance procedure in an attempt to speed up the process, and MPS denied the grievance. Id. ¶ 119.

On September 30, 2022, approximately one month after the school year began, Freiberg sent Darlingh a letter notifying her of the termination of her employment as a result of the first disciplinary hearing. *Id*. ¶ 123. The letter informed Darlingh that based on her speaker's corner speech and the disrespect for transgender students that it evinced, Darlingh had violated various student policies related to anti-discrimination measures and bullying. *Id*. ¶¶ 124-125. This letter also notified Darlingh that the second disciplinary hearing was canceled.

## V.    Posture of the Case

Darlingh filed this lawsuit November 16, 2022, alleging that MPS violated Darlingh's First Amendment right to free speech and Fourteenth Amendment right to due process. *See id*., *generally*. Darlingh argues that MPS violated her right to free speech by terminating her in

retaliation for speaking at the rally and further discussing the issue with various media outlets. *Id.* ¶¶ 128-155. She further alleges that the MPS no-trespass order against her violated her First Amendment rights for the same reason. *Id.* Next, she alleges that MPS's conduct in suspending and terminating her employment without just cause violated the Fourteenth Amendment because it deprived her of a property right to employment without due process of law. Darlingh also alleges that the no-trespass order violated her right to due process because it gave her no opportunity to respond. *Id.* ¶¶ 156-168.

On December 13, 2022, Darlingh moved for a preliminary injunction reinstating her employment and lifting the no-trespass order. *See* ECF No. 11. Darlingh filed a brief in support of this motion, ECF No. 12, and defendants filed a brief in opposition to an injunction reinstating Darlingh's employment on the merits and in opposition to the no-trespass order as moot because the order had already been lifted. *See* ECF No. 21. Shortly thereafter, defendants filed a motion to dismiss count one of Darlingh's Complaint for failure to state a claim and filed a brief in support. *See* ECF Nos. 25, 26.

## APPLICABLE LEGAL STANDARD

To obtain a motion for preliminary injunction, a plaintiff must demonstrate that (1) she is likely to succeed on the merits of her claim, (2) she is likely to suffer irreparable harm in the absence of an injunction, (3) that the balance of equities favors the plaintiff, and (4) the injunction is in the public interest. *Winter v. Natural Res. Defense Council, Inc.*, 555 U.S. 7, 20 (2008) (citation omitted). The first step requires a plaintiff demonstrate that the "'claim has some likelihood of success of the merits' . . . not merely a 'better than negligible' chance." *Mays v. Dart*, 974 F.3d 810, 822 (7th Cir. 2020) (quoting *Eli Lilly and Co. v. Arla Foods, Inc.*, 893 F.3d 375, 381 (7th Cir. 2018)). "If plaintiffs fail to establish their likelihood of success on the

merits, [the court] need not address the remaining preliminary injunction elements." *Lukaszczyk v. Cook Cnty.*, 47 F.4th 587, 598 (7th Cir. 2022).

The defendant's motion to dismiss under Rule 12(b)(6) on the other hand requires a showing not just that the plaintiff is unlikely to succeed on her claim, but that she *cannot plausibly* succeed on her claim. *See Zemeckis v. Global Credit & Collect. Corp.*, 679 F.3d 632, 634–35 (7th Cir. 2012) ("To survive a motion to dismiss, a complaint must 'state a claim to relief that is plausible on its face.'" (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)). A complaint satisfies this pleading standard when its "'factual allegations . . . raise a right to relief above the speculative level.'" *Kaminski v. Elite Staffing, Inc.*, 23 F.4th 774, 776 (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007)). A plaintiff "need not plead detailed factual allegations to survive a motion to dismiss," but "she still must provide more than mere labels and conclusions or a formulaic recitation of the elements of a cause of action for her complaint to be considered adequate." *Bell v. City of Chicago*, 835 F.3d 736, 738 (7th Cir. 2016)). "To analyze the sufficiency of a complaint [courts] must construe it in the light most favorable to the plaintiff, accept well-pleaded facts as true, and draw all inferences in the plaintiff's favor." *Carlson v. CSX Transp., Inc.*, 758 F.3d 819, 826 (7th Cir. 2014) (citing *Tamayo v. Blagojevich*, 526 F.3d 1074, 1081 (7th Cir. 2008)). "In addition to the allegations set forth in the Complaint itself, [I] may consider 'documents that are attached to the complaint, documents that are central to the complaint and are referred to in it, and information that is properly subject to judicial notice.'" *O'Brien v. Vill. of Lincolnshire*, 955 F.3d 616, 621 (7th Cir. 2020).

## DISCUSSION

### I.  First Amendment Retaliation

Darlingh seeks a preliminary injunction reinstating her to her former position as guidance counselor at Allen-Field Elementary. As justification, she argues that she is likely to succeed on the merits of her First Amendment retaliation claim, that the deprivation of her First Amendment rights constitutes an irreparable injury warranting an injunction, that the balance of harms favors her reinstatement, and that her reinstatement is in the public interest. Defendants argue that Darlingh's First Amendment claim should be dismissed. Because both the motion for preliminary injunction and the motion to dismiss depend on whether Darlingh has stated a prima facie claim for First Amendment retaliation, I will address these issues together.

To state a claim under the First Amendment, the plaintiff must demonstrate that "(1) she engaged in constitutionally protected speech; (2) she suffered a deprivation because of her employer's action; and (3) her protected speech was a but-for cause of her employer's action." *Milliman v. Cnty. of McHenry*, 893 F.3d 422, 430 (7th Cir. 2018) (internal citations omitted). The only element at issue here is whether Darlingh's speech at the speaker's corner was protected by the First Amendment. Whether the First Amendment protects particular speech is a question of law and not fact. As such, and because the parties do not dispute what Darlingh said and the context in which she said it, I can determine at this early stage of the case whether or not Darlingh's speech was constitutionally protected.

"For a public employee's speech to be protected under the First Amendment, the employee must show that (1) he made the speech as a private citizen, (2) the speech addressed a matter of public concern, and (3) his interest in expressing that speech was not outweighed by the state's interests as an employer in promoting effective and efficient public service."

*Swetlik v. Crawford,* 738 F.3d 818, 825 (7th Cir. 2013) (citation and internal quotation marks omitted).

### A. Whether Darlingh spoke as a private citizen

The first question is whether Darlingh was speaking as an employee or as a private citizen. The Supreme Court has held that "when public employees make statements pursuant to their official duties, the employees are not speaking as citizens for First Amendment purposes, and the Constitution does not insulate their communications from employer discipline." *Garcetti v. Ceballos,* 547 U.S. 410, 421 (2006). The *Garcetti* case involved a deputy district attorney who entertained serious concerns about the accuracy of a warrant application he encountered in the course of his daily duties. *Id.* at 414. When he raised the matter with higher-ups in his office, they proved unreceptive and hostile to his concerns, and eventually they transferred him and denied him a promotion. After he alleged retaliation against his First Amendment rights, the Supreme Court rejected his claim, finding that "his expressions were made pursuant to his duties as a calendar deputy" and not as a private citizen. *Id.* at 421. "Restricting speech that owes its existence to a public employee's professional responsibilities does not infringe any liberties the employee might have enjoyed as a private citizen. It simply reflects the exercise of employer control over what the employer itself has commissioned or created." *Id.* at 421-22.

Darlingh argues that she clearly spoke as a private citizen because although her speech was *related* to her employment, it was not part of her official duties. She emphasizes that she spoke on a weekend, in a different city, on her own time. Darlingh further argues that the fact that she identified herself as a school counselor doesn't mean she was speaking as an employee; instead, it actually affords her opinion special value because, as the *Pickering* court

stated, "teachers are, as a class, the members of a community most likely to have informed and definite opinions about school policies." 391 U.S. at 572.

The defendants suggest Darlingh was speaking as an employee because she identified herself as an MPS counselor, and her speech touched on what she would do (or not do) at her *job*. For example, she said things like "I oppose gender ideology ever entering the walls of my school building" and "my students [will not] be exposed to the harm of gender identity ideology." But it's not enough that the speech merely concerned Darlingh's job. *Garcetti,* 547 U.S. at 421 ("The memo concerned the subject matter of Ceballos' employment, but this, too, is nondispositive. The First Amendment protects some expressions related to the speaker's job.") As the *Garcetti* court emphasized, the reason employee speech is not protected is that such speech "owes its existence to" the employee's official duties and has essentially been "commissioned or created" by the employer itself. *Id.* at 421-22. Here, by contrast, no one could reasonably believe that MPS "commissioned or created" Darlingh's speech. Nowhere do the defendants point to any expectation that speaking at rallies (or anywhere) was part of the plaintiff's job duties as a school guidance counselor. The mere fact that her speech touched on her job, and was even *about* her job, does not render it *part of* her job, and that's what *Garcetti* insulates from protection.

### B. Whether the speech touched on a matter of public concern

Even if the employee is speaking as a private citizen, the speech must touch on a matter of concern before it receives constitutional protection. Courts have explained that matters of public concern are those relating to "legitimate news interest," or "a subject of general interest and of value and concern to the public at the time of publication." *Kubiak v. City of Chicago*, 810 F.3d 476, 482 (7th Cir. 2016) (internal citations omitted). "Whether an employee's speech

addresses a matter of public concern must be determined by the content, form, and context of a given statement, as revealed by the whole of the record." *Connick v. Myers*, 461 U.S. 138, 147 (1983). Of the three *Connick* factors, "content is the most important, but the subject matter of the speech is not determinative." *Kubiak*, 810 F. 3d at 481. Instead, I "must focus on the '*particular content* (as opposed to the subject matter of the speech. . .)'" *Id.* (quoting *Bivens*, 591 F.3d at 561) (emphasis added). For example, an employee's speech could generically touch on the subject matter of a major political question like war. But if the employee limits his topic to his personal desire to avoid being drafted, any semblance of "public concern" dissipates. Put another way, "[i]f the speech concerns a subject of public interest but the *expression* addresses only the personal effect upon the employee, then as a matter of law the speech is not of public concern." *Marshall v. Porter Cnty. Plan Comm'n*, 32 F.3d 1215, 1219 (7th Cir. 1994) (emphasis in original).

Several patterns have emerged through the application of this standard. Courts have deemed some grievances mostly personal. For example, a public employee's report of internal workplace conflicts or a personal grievance against a coworker is not "of public concern." *See, e.g.*, *Connick*, 461 U.S. 138 (finding that an employee's unauthorized survey into general employee satisfaction was not of public concern); *Kubiak*, 810 F.3d at 483 (finding that an employee's report of being threatened by a coworker was not of public concern). Similarly, although a complaint regarding second-hand smoke may theoretically involve a matter of "widespread public interest," the Seventh Circuit viewed an employee's grievance as "entirely personal" because "he spoke solely in terms of his own sensitivity to smoke" and "did not purport to speak on behalf of anyone but himself." *Smith v. Fruin,* 28 F.3d 646, 651 (7th Cir. 1994).

In contrast with these more picayune internal grievances, an employee's criticism of public officials or government policies *is* "of public concern." *See, e.g.*, *Swetlik*, 738 F.3d at 827 (finding that police officer's report that police chief had asked him to disobey procedure was of public interest because it "implicated the effectiveness and integrity of the chief,"); *Lane*, 573 U.S. at 241 (finding that an employee's testimony in the criminal prosecution of a former employee for theft was of public concern because "corruption in a public program and misuse of state funds [] obviously involves a matter of significant public concern."); *Wainscott v. Henry*, 315 F.3d 844, 849 (7th Cir. 2003) (a city employee's complaint to a coworker that "'the city administration did not know what is was doing from one day to the next,'" was of public concern); *Pickering*, 391 U.S. 563 (a teacher's letter to the editor in a local newspaper criticizing the allocation of school funding was of public concern).

Here, the content of Darlingh's speech contains elements of both personal and public concern. On the one hand, she was expressing a generalized political message opposed to "gender ideology" and "people who want children to have unfettered access to hormones . . . and surgery." These are obviously matters of public concern. On the other hand, however, the defendants point out that her exhortation was largely cabined to her own specific role as a guidance counselor. For example, Darlingh said (1) "**I** am an elementary school counselor;" (2) "**I** oppose gender ideology ever entering the walls of **my school** building;" (3) "**On my dead [] body** will **my students** be exposed to the harms of gender identity ideology;" (4) "Not a single one of **my students** under **my [] watch** will ever ever transition;" (5) "**I** exist in this world to serve children. **I** exist to protect children." ECF No. 1 at ¶ 31, n. 10 (emphasis added). Although it's true that the bulk of Darlingh's speech addressed what she would do in her own work environment, it must be remembered that her work environment was a *public* school

funded by taxpayers. The school presumably employed dozens of other employees and educated hundreds of local children. More importantly, Darlingh's concerns were not *personal* grievances about her work environment—for example, her desire to avoid inhaling second-hand smoke, *Fruin,* 28 F.3d at 651, or to avoid harassment by a co-worker, *Kubiak*, 810 F.3d at 483. Instead, she spoke about what she would do to serve *other people* (public-school children) by protecting them from gender ideology. As such, although the content of her speech has some elements of private speech, it speaks to matters that would affect members of her school's community—parents, students and co-workers.

The public *context* and *form* of Darlingh's speech are also highly suggestive of public concern. By contrast, in *Fruin,* for example, the employee relied upon private grievances to supervisors to complain about inhaling second-hand smoke. *Id.* Similarly, in *Kubiak,* the plaintiff reported alleged misconduct to her supervisors. The courts in both cases found that the private nature in which the plaintiffs aired their grievances was indicative of unprotected speech. "Kubiak reported the incident to her superiors . . . and to the IAD. The fact that Kubiak's complaints about Zala were directed up the chain of command suggests that Kubiak's speech did not address a matter of public concern." 810 F.3d at 483. Here, by contrast, Darlingh spoke at a "speaker's corner" at a rally, the quintessential forum for airing matters of public interest. The rally occurred at the state capitol, a common locus for the voicing of public grievances. *Id.* (noting that the speaker's motive matters). *See also Davis v. City of E. Orange,* No. CIV A 05-3720(JLL), 2008 WL 4328218, at *6 (D.N.J. Sept. 17, 2008) ("the form of Plaintiff's [speech]—speech a public rally—also supports Plaintiff's position that his expression went beyond the scope of a personal gripe.") In short, Darlingh's entire effort

was directed at speaking about a matter she believed would interest those who were gathered at the rally. I conclude, therefore, that her speech did address matters of public concern.

**C.** *Pickering* **Balance**

Finally, once an employee demonstrates that she was speaking as a private citizen on a matter of public concern, she must establish that her "interest in expressing that speech was not outweighed by the state's interests as an employer in promoting effective and efficient public service." *Swetlik,* 738 F.3d at 825; *Pickering*, 391 U.S. at 568. This balancing test recognizes that the government is both a government and an employer, and as an employer "the State has interests as an employer in regulating the speech of its employees that differ significantly from those it possesses in connection with regulation of the speech of the citizenry in general." *Pickering,* 391 U.S. at 568. What might be protected speech for a member of the public could be *un*protected if uttered by a school employee. "The problem in any case is to arrive at a balance between the interests of the teacher, as a citizen, in commenting upon matters of public concern and the interest of the State, as an employer, in promoting the efficiency of the public services it performs through its employees." *Id*. In balancing the two parties' interests, I must consider the following factors:

> "(1) whether the speech would create problems in maintaining discipline or harmony among co-workers; (2) whether the employment relationship is one in which personal loyalty and confidence are necessary; (3) whether the speech impeded the employee's ability to perform her responsibilities; (4) the time, place and manner of the speech; (5) the context in which the underlying dispute arose; (6) whether the matter was one on which debate was vital to informed decision-making; and (7) whether the speaker should be regarded as a member of the general public."

*Kristofek v. Vill. of Orland Hills*, 832 F.3d 785, 796 (7th Cir. 2016).

At the outset, it's clear that factors four through six favor Darlingh. The speech took place over a weekend at a political rally in a different city, and the dispute arose out of Darlingh's statements made on her own time. It's also undeniable that debate related to gender identity education is essential and that the opinions of school guidance counselors on questions involving children and gender identity are crucial to "informed decision-making." *Id.* Those three factors all attenuate the employer's interest in regulating her speech.

However, these factors are strongly outweighed by the fact that Darlingh's speech fatally undermined her ability to do her job as it was defined by her employer (factor three). In her eight-page termination letter, Chief Human Resources Officer Adria Maddaleni cited these several school policies and explained the district's termination decision. For example, Maddaleni stated that Darlingh's speech involved vulgarity and words that could be construed as threatening and intimidating to students. "You make it very clear," she explained, "that you will do everything within your power to prevent a student in your building from transitioning or even expressing who they truly are." ECF No. 1-15 at 6. This violated the district's policy against threatening or harassing language. Maddaleni also cited the American School Counselor Association's standards, which state that "school counselors recognize all students have the right to be treated equally and fairly with dignity and respect as unique individuals free from discrimination, harassment, and bullying based on their real or perceived gender identity and gender expression." *Id.* Darlingh's statement that she would "actively prevent a transgender student from transitioning are harmful to transgender students and are in direct violation of the school counselor standards." *Id.* at 8. In sum, Maddaleni stated that "[c]onsidering your threats to actively prevent transgender MPS students from transitioning medically or socially and your subsequent comments standing by those threats, you have

made clear you will not adhere to the district's policies. You will not provide students the support they need, which is required of you as a school counselor and an MPS employee." *Id.*

It was hardly unreasonable for an employer like MPS to interpret Darlingh's speech to mean not merely that Darlingh thought MPS policy was wrong, but that Darlingh *would not follow* MPS policy. In many cases employees have some leeway in criticizing their employers, especially when they shed light on misconduct. However, if they cross the line and suggest that they will not follow their employers' policies, a court is bound to conclude that "the speech impeded the employee's ability to perform her responsibilities." *Kristofek*, 832 F.3d at 796. Just as a citizen is entitled to think what she wants, an employer is entitled to create a job, define that job's responsibilities, and set policies. To allow an employee to openly refuse to follow those responsibilities, or to redefine the job altogether, would create chaos by requiring employers to tolerate insubordination. "Although such a refusal is 'speech,' which implicates First Amendment interests, it is also insubordination, and as such it may serve as the basis for a lawful dismissal." *Connick,* 461 U.S. at 163 n. 3 (Brennan, J., dissenting).

*Domiano v. Vill. of River Grove* provides a sound example. 904 F.2d 1142, 1146 (7th Cir. 1990). There, a village discharged its fire chief after he criticized a recently enacted ordinance. The Seventh Circuit rejected the chief's First Amendment claim largely because he didn't limit his comments to criticism. Instead, he told the chairman of the fire and police commission and the village president that he would not enforce the ordinance. He also encouraged other members of the department to ignore the ordinance because it was "ridiculous." *Id.* at 1145. This went well beyond public discourse and strayed into the field of insubordination. "[B]y elevating his individual philosophy regarding patient transportation, however well-founded,

above the policy reflected by the repealing ordinance enacted by the elected representatives of the citizens of River Grove, Domiano undermined department discipline and harmony and ignored the directive of River Grove's policy makers." *Id.* at 1146. The chief's speech, in short, constituted insubordination: "Domiano's concern for the safe transport of patients was commendable and his disagreement with the ordinance was certainly protected speech; his adamant refusal to follow the ordinance, however, was insubordination justifying dismissal." *Id.* The same holds true here. The words Darlingh chose suggested not just that she disagreed with transgender ideology permeating the schools but that she would "elevat[e] [her] individual philosophy" above the policies imposed by her employer. *Id.*

A second factor favoring the defendants is that Darlingh's speech would (and did) create problems in maintaining discipline or harmony among co-workers (factor one). *Kristofek*, 832 F.3d at 796. "Interference with work, personnel relationships, or the speaker's job performance can detract from the public employer's function." *Craig v. Rich Twp. High Sch. Dist. 227*, 736 F.3d 1110, 1119 (7th Cir. 2013). Crucially, the disruption in question is not merely conjectural—her speech led to actual disruption in the workplace on June 3, 2022 when Darlingh confronted another teacher who was discussing her speech with students.[6] Darlingh also informed the principal that one of her students reported that his class was gossiping about the incident between Darlingh and Chappelle and that he feared social

---

[6] Darlingh also tries to characterize Chappelle's mention of her speaker's corner speech to the class (as well as the concerned emails from members of the public) as a classic "heckler's veto," in which individuals objecting to a viewpoint attempt to create a disruption to silence speech with which they disagree. However, Darlingh does not cite to any authority suggesting that the heckler's veto doctrine applies in an employment context or that it could invalidate the *Pickering* balance's tendency to favor an employer just because a disruption involved some "hecklers." Further, regardless of the way in which Darlingh's speech came to the school's, students', or parents' attention, once the content of the speech became widely known, it caused substantial disruption to the educational environment, and the school was properly entitled to consider the incident with Chappelle in its decision to terminate Darlingh's employment. Finally, there is no indication that Chappelle knew Darlingh was outside of her classroom at the time. Given that, it's hard to see how she might have been creating a disruption.

retribution for continued counseling with her. These incidents suggest that Darlingh's speech fomented discord in the workplace among both coworkers and students.

Moreover, disruption could be expected to follow not just from the content of Darlingh's speech but by her liberal use of profanity as well. Grade school students are impressionable, and school districts play a role in setting a positive example. As the termination letter indicates, "Not only are the vulgar words you used inappropriate (which you admit to), the statements are threatening and intimidating." ECF 1-15 at 6. The Supreme Court has recognized, "[s]urely it is a highly appropriate function of public school education to prohibit the use of vulgar and offensive terms in public discourse." *Bethel Sch. Dist. No. 403 v. Fraser*, 478 U.S. 675, 683 (1986). As such, "it was perfectly appropriate for the school to disassociate itself to make the point to the pupils that vulgar speech and lewd conduct is wholly inconsistent with the 'fundamental values' of public school education." *Id.* at 685-86.

Another key factor favoring the defendants is that Darlingh's position as a guidance counselor relies on trust and close personal relationships (factor two). The Seventh Circuit has found that the role of educators, and especially guidance counselors, involves a great deal of personal loyalty and confidence. *See Craig*, 736 F.3d 1110 ("[t]he fact that [the plaintiff] works closely with students at a public school as a counselor confers upon him an inordinate amount of trust and authority."). In *Craig*, the Seventh Circuit found that the *Pickering* balance heavily favored the school when it terminated a guidance counselor after he published a book of questionable relationship advice. *Id*. The book included descriptions of his "weakness" for particular parts of female anatomy as well as sexist asides, including a suggestion that women tend to "act based on emotion alone." *Id*. at 1120. The court found it likely that once the gist of the book became common knowledge at the school, female students would be highly

uncomfortable going to Craig for counseling. The court determined that where a guidance counselor fails to foster a safe and accepting learning environment, students "will not approach him and he cannot do his job." *Id*. at 1120. This case implicates similar issues of lost trust and confidence between a school counselor and at least some segment of the student body. Just as the Seventh Circuit found female students would likely have been uncomfortable approaching Craig after he published degrading and hypersexualized language about women, students who are transgender or gender-questioning at Allen-Field would likely be uncomfortable approaching Darlingh after her highly publicized statements hostile towards transgenderism.[7]

Finally, the seventh Pickering factor—whether Darlingh was speaking as a member of the "general public"—also favors the defendants. This factor differs from the earlier question of whether Darlingh was speaking as an employee or a citizen. *See Lalowski v. City of Des Plaines*, 789 F.3d 784, 792-793 (7th Cir. 2015) (finding that even though some of an off-duty police officer's statements at a protest were made as a private citizen on a matter of public concern, in the *Pickering* balance, "he [could] not be regarded as a member of the general public" in part because "he made sure demonstrators remembered him as a police officer . . . so they would show him respect."). Similarly, even though Darlingh might have been speaking as a private citizen for the purposes of the first prong of the test, she spoke as a school counselor for the purposes of the *Pickering* balance. During her speech, Darlingh focused entirely on her job as a school counselor and relied on her position to lend her platform an air of credibility.

---

[7] Darlingh objects to defendants' comparison of this case to *Craig* because she believes that her speech was on a matter of greater public importance and was addressed at a topic rather than a person. This distinction does not affect the degree of trust and loyalty in the position of a guidance counselor because the content of the speech and importance of the subject go towards different *Pickering* balancing factors.

None of the above discussion is intended to suggest that it was unreasonable for a guidance counselor to question the district's policies. Ultimately, however, because the speech opposing those policies was laced with profanity and suggestive of insubordination, the *Pickering* balance strongly favors the school district's interest in maintaining efficiency and effectiveness in its operation. I find, therefore, that Darlingh's speaker's corner speech was not constitutionally protected. Because Darlingh is not likely to succeed on the merits, the motion for a preliminary injunction will therefore be denied. And because I was able to resolve the question of the plaintiff's speech by referring only to uncontested documents attached to the complaint, the defendants' motion to dismiss will be granted. *Jefferson v. Ambroz,* 90 F.3d 1291, 1296 (7th Cir. 1996) (dismissal based on *Pickering* balance appropriate at pleadings stage).

## II.     Injunction Lifting No-trespass Order

Despite the fact that defendants have lifted the no-trespass order and stated that they have "no intention of reenact [sic] the Notice of No Trespassing" "unless there are new disturbances caused by Darlingh's presence at MPS own [sic] facilities or property in the future" (ECF No. 21 at 26), Darlingh nonetheless requests that I grant an injunction to preempt any effort by defendants to reinstate the order. Darlingh argues that I should grant an injunction "(1) prohibiting Defendants from reimposing a no-trespassing order against Ms. Darlingh for her speech; and (2) prohibiting Defendants from re-imposing a no-trespassing order without telling her what it is based upon." ECF No. 17. As previously explained, Darlingh's speaker's corner speech was not protected First Amendment speech, so the motion for a preliminary injunction fails on First Amendment grounds. I do not need to assess whether she is likely to succeed on her Fourteenth Amendment claim because I can (and do) deny the injunction on other grounds.

As previously discussed, to obtain a preliminary injunction, in addition to demonstrating the likelihood of success on the merits of a claim, a plaintiff must also demonstrate a likelihood of irreparable harm in the absence of an injunction. Defendants have lifted the no-trespass order, and any hypothetical order issued in the future would be a different legal order than the one issued in the past. Darlingh cannot obtain a preliminary injunction based on the specter of potential harm raised by a hypothetical order that defendants *have not issued*. Nor can I rule on the permissibility of state action that *has not occurred* such as to find Darlingh likely to succeed on a claim against such hypothetical state action.[8] Should the defendants issue a no-trespass order during the pendency of this case, Darlingh can move for an injunction then. However, without knowing the reason why the defendants might issue such an order or the breadth of that order, I cannot categorically prohibit them from doing so.

## CONCLUSION

For the foregoing reasons, I **DENY** the plaintiff's motion for preliminary injunction reinstating her to her former position, ECF No. 11. I also **DENY AS MOOT** the plaintiff's motion seeking an injunction lifting the no-trespass order, ECF No. 11. Finally, I **GRANT** the defendant's motion to dismiss the plaintiff's First Amendment claim, ECF No. 25. The plaintiff's Fourteenth Amendment claim still stands.

---

[8] Darlingh's string citation of cases does not aid her case. For one, she does not actually explain these cases. More importantly, none of the cited cases directly addresses a *preliminary injunction*'s mootness, just the concept of mootness generally. The one case cited that even mentions a preliminary injunction does so in the court's mention of its previous decision to uphold a district court's denial of a preliminary injunction. *See Elim Romanian Pentecostal Church v. Pritzker*, 962 F.3d 341, 343-344 (7th Cir. 2020). Darlingh urges that "[t]he Supreme Court has long held that 'voluntary cessation of an unlawful practice does not moot a case unless it is absolutely clear that the allegedly wrongful behavior could not reasonably be expected to recur.'" ECF No. 29 at 16-17 (quoting *W. Virginia v. Env't Prot. Agency*, 142 S. Ct. 2587, 2607 (2022) (internal citations omitted)). And I agree; the case is not moot. But the motion for preliminary injunction is. Darlingh will have her opportunity to argue that issuing the no-trespass order violated her right to due process, but she cannot reasonably argue that she is likely to suffer irreparable harm from an order that is not currently in place.

**SO ORDERED** this 13th day of March, 2023.

_____
STEPHEN C. DRIES
United States Magistrate Judge