In the

# United States Court of Appeals

## for the Seventh Circuit

CERTIFIED COPY

A True Copy
Teste:

Deputy Clerk
of the United States
Court of Appeals for the
Seventh Circuit

———————————

No. 23-1610

MARISSA DARLINGH,

*Plaintiff-Appellant,*

*v.*

ADRIA MADDALENI, et al.,

*Defendants-Appellees.*

———————————

Appeal from the United States District Court
for the Eastern District of Wisconsin.
No. 22-CV-1355 — **Stephen C. Dries**, *Magistrate Judge.*

———————————

ARGUED DECEMBER 8, 2023 — DECIDED JULY 2, 2025

———————————

Before SYKES, *Chief Judge*, and RIPPLE and ROVNER, *Circuit Judges*.

SYKES, *Chief Judge*. Marissa Darlingh was employed as a guidance counselor at an elementary school in the Milwaukee Public School District. In April 2022 she attended a rally at the state capitol in Madison featuring "radical feminist" critiques of the transgender-rights movement. There she delivered an impromptu, profanity-laden speech denouncing gender ideology and transgenderism and their impact on

children. Among other things, she identified herself as a counselor in the Milwaukee Public Schools and vowed—in expletive-punctuated terms—that "not a single" student at her school "will ever, ever transition" on her watch.

After a video of Darlingh's speech appeared on YouTube, school officials opened an investigation and eventually fired her for violating several employment policies, including rules against abusive and intimidating language and bullying. The termination letter also explained that Darlingh's speech impaired her ability to perform her role as a school counselor, damaged the district's reputation, and undermined its mission to provide an equitable and supportive learning environment for all students.

Darlingh sued three school officials and the school board alleging that she was unlawfully fired in retaliation for exercising her First Amendment right to freedom of speech. (She also raised a due-process claim but it has no bearing on this appeal.) A magistrate judge, presiding with the parties' consent, applied the *Pickering* balancing test, *see Pickering v. Board of Education of Township High School District 205*, 391 U.S. 563 (1968), and concluded that the school district's interests as a public employer outweighed Darlingh's speech rights in these circumstances. The judge denied her request for a preliminary injunction and dismissed the claim.

We affirm. Though Darlingh spoke on an issue of public concern in a traditional free-speech setting—a right she did not surrender when she accepted public employment—the school district reasonably concluded that her speech was incompatible with her role as a school counselor. It's not hard to see why: she made a strident public pledge to perform her counseling duties in an exceedingly rigid way that

conflicted with the school district's obligation to ensure a supportive educational environment and promote student and parental trust. That took Darlingh's speech outside the scope of the First Amendment's protection as applied in the public-employment context.

## I. Background

In March 2021 Marissa Darlingh began working as a school counselor at the Allen-Field Elementary School in the Milwaukee Public School District. In April 2022 a group of self-described "radical feminists" held a multiday "Sisters 4 Sisters" gathering in Madison, Wisconsin, the state's capital city. Billed as a "weekend of radical feminist action, discussion, community, and solidarity," the event was aimed in part at raising concerns about gender ideology and the transgender movement's effect on women's rights.

The "Sisters 4 Sisters" gathering, which ran from April 22 to 24, served as a platform for discussions, workshops, and speeches related to these topics. The main event was a rally in front of the state capitol on Saturday, April 23. Darlingh attended. The rally attracted both supporters and counter-protestors. Signs and banners abounded; some were quite crude and a few were threatening. The rally was raucous: vulgarities flowed freely, there was a lot of yelling, and emotions ran high.

Event organizers set up a designated spot at the rally for people to deliver speeches. Dubbed the "speaker's corner," the spot was located on the steps of the capitol building and was outfitted with a broadcast system to amplify the speakers. Anyone could address the crowd, and many people delivered impromptu speeches.

Darlingh was one of them. She approached the microphone and delivered the following spontaneous speech:

> I didn't plan on speaking and I've been screaming a lot but my name is Marissa Darlingh, I am an elementary school counselor in Milwaukee Public Schools. And I oppose gender ideology ever entering the walls of my school building. On my dead fucking body will my students be exposed to the harms of gender identity ideology. Not a single one of my students under my fucking watch will ever, ever transition socially and sure as hell not medically. Absolutely not. I exist in this world to serve children. I exist to protect children. I feel like I'm disassociating right now because this is very intense, very intense. I think someone else is speaking through me right now, but fuck transgenderism. Fuck it. Fuck transgenderism. Fuck these people behind us who want children to have unfettered access to hormones, wrong-sex hormones, and surgery.

Darlingh's speech was recorded and posted on YouTube.

On April 26 Ophelia King, the manager of counseling services for the Milwaukee Public School District and Darlingh's direct supervisor, opened an investigation. Separately, on April 29 Darlingh received a letter from the Wisconsin Department of Public Instruction notifying her that it was investigating whether to revoke her state educator's license for "immoral conduct." The letter cited her speech at the rally in Madison. The Department gave her 30 days to respond and offered her the option of surrendering her

license. On May 25 Darlingh's attorneys responded on her behalf, rejecting the Department's "offer" and stating that the threat to revoke Darlingh's license based on her speech at the rally violated her First Amendment right to freedom of speech.

Darlingh's counsel released the May 25 response to the public, sparking considerable interest in the dispute among local and national news media and commentators. Up to that point, Darlingh performed her job without incident while the school district's investigation proceeded.

On June 1, the *Milwaukee Journal Sentinel* published an article about Darlingh's speech and the investigation by state regulators. Darlingh had given an interview to the newspaper, and the article reported that she stood by her comments in the speech. On June 2 Darlingh appeared on the Fox News program *The Ingraham Angle*, a prime-time opinion show. The host asked Darlingh, "[W]ould you change anything about what you said or how you said it, now that the State is coming after you?" Darlingh responded, "No, I wouldn't."

The next day a teacher at Darlingh's school discussed the *Journal Sentinel* article with a class of fifth graders, including some who were scheduled for counseling sessions with Darlingh later that day. The teacher, Raven Chappelle, showed the class the *Journal Sentinel* article and told the students that they "had a right not to see" Darlingh for counseling services. Darlingh happened to be walking by Chappelle's classroom at that precise moment and saw the newspaper article projected on the board. She entered the classroom and confronted Chappelle, demanding to know why she was talking about her.

The confrontation did not escalate. Darlingh quickly left the classroom and told the principal what Chappelle had done. The principal immediately intervened, admonished Chappelle, and sent her home for the day. When Darlingh asked the students in Chappelle's class if they wanted to proceed with their regularly scheduled counseling that day, some said no. Later, as part of the school-district's investigation, the principal collected statements from students who were in Chappelle's class that day. Most suggested that the incident had little effect on them. Many reported not remembering or understanding the situation, but a few recalled the episode in a way that cast a negative light on Darlingh.

On June 9 Ophelia King—the school district's manager of counseling services—hand-delivered a letter to Darlingh summoning her to a disciplinary conference over Zoom on June 15. The letter identified several policies Darlingh was alleged to have violated but was otherwise not specific.

Two days before the scheduled Zoom meeting, Darlingh received an email from Therese Freiberg, the district's director of employee relations, instructing her not to report to work the next day and advising her that a second, formal disciplinary letter placing her on suspension would arrive soon. The second letter arrived the next day and notified Darlingh that she was suspended effective immediately and would be paid for only the first three days of the suspension, which coincided with the last scheduled workday of the school year. Like the first letter, this one listed several policies that Darlingh was accused of violating but did not explain how she violated them. The letter noted that a formal disciplinary conference would be held in the fall of

the 2022–2023 school year. In the meantime, Darlingh was forbidden to enter any district buildings or contact students, parents, or staff. Darlingh also received a separate order from Adria Maddaleni, the school district's chief human-resources officer, banning her from entering district property.

The June 15 Zoom conference took place as scheduled. Just minutes before the hearing, Darlingh and her lawyer received a 126-page packet with 48 exhibits concerning Darlingh's speech at the rally and its aftermath—notably videos of her speech and materials relating to her media appearances, the Chappelle incident, complaints the district had received about her speech from members of the public, and other documents related to the investigation. The packet also included copies of the relevant district policies and rules and the American School Counselor's Association's professional standards for school counselors.

King and Freiberg attended the conference on behalf of the school district, and Darlingh appeared with her counsel. King went through each exhibit, giving Darlingh and her attorney time to read each one, then moved to the next without comment. When this process concluded, King gave Darlingh a ten-minute recess to confer with counsel before responding. Her attorney objected and requested an opportunity to respond in writing. King agreed and gave counsel a two-week deadline to do so.

In her written response Darlingh explained that her speech at the rally was intended to "express[] her concern over some of the harms of gender identity ideology, in particular the recent trend of providing children with unfettered access to hormones—wrong-sex hormones—and

surgery." She explained that when she said, "fuck transgen-
derism," she was "referring to policies and ideologies that
she believes harm children, and not in any way referring to
transgender students or individuals." She also said that she
"has and always will equally love, respect, and serve all
students under her care, including transgender-identifying
students."

Darlingh's response also directly addressed a point of
contention that had arisen from the story in the *Journal
Sentinel*. The article reported that she said she would not use
transgender students' self-identified names or pronouns.
Darlingh asserted that the article was inaccurate and said
that she "would follow the parents' lead" on how to address
their children. She explained that she had asked the news-
paper to correct the record, and it did so, but the clarification
was "buried" in an updated version of the article. Darlingh
also explained that when she spoke out against social and
medical transitioning in her rally speech, she was attempting
to communicate that "she will not be the cause of the stu-
dent's transition—by promoting it, encouraging it, or initiat-
ing it." She said that she was willing to follow district policy
and offered to meet with anyone in the district community
"to apologize directly and to listen to them and to how her
words affected them." She expressed her "hope … to work
with the [d]istrict and any staff or students who were of-
fended by her speech to resolve this so that she and her
colleagues can get back to doing the jobs that they love."

Darlingh's response went unanswered for several
months. She remained on unpaid suspension through the
summer and into the start of the new school year. The
district finally responded on September 30 with a termina-

tion letter. Signed by Maddaleni, the chief human-resources officer, the termination letter highlighted Darlingh's use of vulgar language and the fact that she began her speech by identifying herself as a school counselor in the Milwaukee Public Schools, which was "the lens in which [her] comments were given and received." The letter went on to say that Darlingh's speech violated district rules prohibiting the use of threatening, intimidating, or abusive language; bullying; or engaging in conduct that significantly detracted from the district's image or reputation. Additionally, the letter explained that the speech violated district policies ensuring equitable access to a supportive learning environment for all students regardless of their "individual identities, backgrounds, abilities, and experiences."

Finally, the termination letter noted that Darlingh's public commitment to do everything in her power to prevent any transgender student from transitioning violated the district's expectation that school counselors will "support transgender and gender-nonconforming students and help create a safe environment for them." Darlingh's speech, the letter concluded, was therefore incompatible with the district's commitment "to providing a safe, inclusive, and supportive learning environment for all students." Darlingh was fired effective immediately, making the formal disciplinary hearing unnecessary.

She responded with this suit under 42 U.S.C. § 1983 against Maddaleni, King, Freiberg, and the Milwaukee Board of School Directors alleging that she was fired in retaliation for exercising her First Amendment right to freedom of speech. (She also raised a due-process claim arising from her suspension and the ban on entering school

property. That claim has been stayed and is irrelevant here.) A few weeks after filing suit, Darlingh moved for a preliminary injunction seeking reinstatement to her position. The school district responded to the motion and separately moved to dismiss the First Amendment claim.

The parties consented to proceed before a magistrate judge. *See* 28 U.S.C. § 636(c). Applying the Supreme Court's balancing test for First Amendment free-speech claims in the context of public employment, *see Pickering*, 391 U.S. at 568–69, the judge concluded that the school district's interests as a public employer outweighed Darlingh's free-speech rights. He accordingly denied Darlingh's motion for a preliminary injunction and dismissed the First Amendment claim, setting up this appeal. *See* 28 U.S.C. § 1292(a)(1).

## II. Discussion

Orders granting or denying a preliminary injunction are immediately appealable, *see id.*, and are subject to a mixed standard of review; this appeal, however, begins and ends at the first step in the injunction framework, which raises only a legal question. To win a preliminary injunction, Darlingh had the burden to establish that her First Amendment claim would likely succeed and that she would suffer irreparable harm without preliminary relief; if she satisfied these threshold requirements, she also needed to show that the balance of equities tips in her favor and that an injunction would be consistent with the public interest. *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008).

The first element in the injunction framework is often decisive. *Braam v. Carr*, 37 F.4th 1269, 1272 (7th Cir. 2022). And it is decisive here. Darlingh's First Amendment claim arises

in the public-employment context and rests on allegations that the school district fired her in retaliation for exercising her free-speech rights. To prevail on this claim Darlingh had to prove that (1) she "engaged in constitutionally protected speech"; (2) she suffered a deprivation of a type that is "likely to deter protected speech"; and (3) her "protected speech was a motivating factor in the deprivation." *Harnish-feger v. United States*, 943 F.3d 1105, 1112 (7th Cir. 2019).

The second and third elements are not contested. There's no question that Darlingh was fired for what she said at the "Sisters 4 Sisters" rally. The loss of her job is a significant deprivation, likely to chill protected speech, and causation is not in dispute. The claim comes down to whether Darlingh's speech was constitutionally protected. And that, as we'll see, turns on the application of *Pickering* balancing, which is a question of law. *Id*. at 1113.

Legal issues in an injunction order are subject to de novo review. *Doe v. Univ. of S. Ind.*, 43 F.4th 784, 791 (7th Cir. 2022). We likewise review the judge's dismissal decision de novo. *Kilborn v. Amiridis*, 131 F.4th 550, 556 (7th Cir. 2025). So our review of both aspects of the judge's order merges into a single dispositive legal question: Was Darlingh's speech constitutionally protected? If so, then the school district violated her First Amendment rights by firing her for what she said.

It's well established that "public employees do not sur-render all their First Amendment rights by reason of their employment." *Garcetti v. Ceballos*, 547 U.S. 410, 417 (2006). "[T]he First Amendment protects a public employee's right, in certain circumstances, to speak as a citizen addressing matters of public concern." *Id*. At the same time, however,

"[g]overnment employers, like private employers, need a significant degree of control over their employees' words and actions; without it, there would be little chance for the efficient provision of public services." *Id.* at 418.

The government therefore "has interests as an employer in regulating the speech of its employees that differ significantly from those it possesses in connection with regulation of the speech of the citizenry in general." *Pickering*, 391 U.S. at 568. This principle rests on the "common sense realization that government offices could not function if every employment decision became a constitutional matter." *Connick v. Myers*, 461 U.S. 138, 143 (1983).

The Supreme Court has distilled its decisions in *Pickering* and *Connick* into a two-step framework for determining whether a public employee's speech is constitutionally protected. First, the employee must establish that he "spoke as a citizen on a matter of public concern." *Garcetti*, 547 U.S. at 418. If the employee makes this initial threshold showing, "then the possibility of a First Amendment claim arises." *Id.* The second step asks "whether the government had an adequate justification for treating the employee differently from any other member of the public based on the government's needs as an employer." *Lane v. Franks*, 573 U.S. 228, 242 (2014) (internal quotation marks omitted). To assess the adequacy of the government's justification for burdening an employee's speech, the Court has instructed us to balance the interests of the employee, as a citizen, in commenting on the issue of public concern against the interests of the government, as an employer, in the proper performance of its public functions. *Pickering*, 391 U.S. at 568; *see also Connick*, 461 U.S. at 142.

*Pickering* balancing thus "reflects the importance of the relationship between the speaker's expressions and [his public] employment." *Garcetti*, 547 U.S. at 418. The government "has broader discretion to restrict speech when it acts in its role as employer, but the restrictions it imposes must be directed at speech that has some potential to affect [its] operations." *Id*.

In the district court the school district contested the first step of the *Connick-Pickering* framework—i.e., whether Darlingh spoke as a citizen on a matter of public concern when she delivered her speech at the rally in Madison. The magistrate judge found for Darlingh on this point and the school district has not challenged that ruling. It was wise not to do so. Darlingh delivered her speech at a public rally in front of the state capitol. She spoke on her own time—on a Saturday—and in a traditional public setting for social, political and cultural speech. The purpose of the rally was to voice concerns about gender ideology and transgenderism, so the event—and her speech—dealt with topics that are the subject of current policy and social debate. Indeed, as the Supreme Court has recently emphasized, the treatment protocols for gender dysphoria are evolving and the scientific, policy, and legal debates surrounding transgender issues are profound and unsettled. *United States v. Skrmetti*, 605 U.S. ___, 2025 WL 1698785, at *14 (June 18, 2025). There can be little doubt that Darlingh's impromptu remarks at the rally qualify as citizen speech on a matter of public concern.

When a public employee "speaks as a citizen addressing a matter of public concern, the First Amendment requires a delicate balancing of the competing interests surrounding the speech and its consequences." *Garcetti*, 547 U.S. at 423.

Our cases provide a nonexclusive list of seven factors that may be relevant to *Pickering* balancing:

> (1) whether the speech would create problems in maintaining discipline or harmony among co-workers; (2) whether the employment relationship is one in which personal loyalty and confidence are necessary; (3) whether the speech impeded the employee's ability to perform her responsibilities; (4) the time, place, and manner of the speech; (5) the context in which the underlying dispute arose; (6) whether the matter was one on which debate was vital to informed decisionmaking; and (7) whether the speaker should be regarded as a member of the general public.

*Hicks v. Ill. Dep't of Corr.*, 109 F.4th 895, 901 (7th Cir. 2024) (quoting *Bonds v. Milwaukee Cnty.*, 207 F.3d 969, 981 (7th Cir. 2000)). Other circuits have similar lists. *Compare McVey v. Stacy*, 157 F.3d 271, 278 (4th Cir. 1998) (listing nine factors), *with Bauer v. Sampson*, 261 F.3d 775, 785 (9th Cir. 2001) (listing five factors).

Though we've frequently cited these seven factors, we've also said that it's not necessary to consider each one, *Harnishfeger*, 943 F.3d at 1115, and "merely count[ing] how many factors line up on each side" is not particularly informative, *Volkman v. Ryker*, 736 F.3d 1084, 1092 (7th Cir. 2013). In other words, our seven-factor list is not a doctrinal touchstone and certainly not a straitjacket. Rather than marching through the list, we think it's more meaningful to focus on the specific considerations that bear weight in

evaluating the competing interests in the specific context of this case.

We begin with Darlingh's particularized speech interests, which here are strong. She spoke during an organized political rally, and her speech touched on a matter of intense public concern, which requires the school district to "offer particularly convincing reasons" to justify its decision to fire her. *Gustafson v. Jones*, 117 F.3d 1015, 1019 (7th Cir. 1997). And because Darlingh is a trained educational professional who works with children daily in her role as a school guidance counselor, her perspective on gender-identity issues and their impact on children carries special weight. The Supreme Court's cases "dating back to *Pickering* have recognized that speech by public employees on subject matter related to their employment holds special value precisely because those employees gain knowledge of matters of public concern through their employment." *Lane*, 573 U.S. at 240.

But context is important, and Darlingh's role as a school guidance counselor has nuanced implications here for several reasons. First, her profligate use of vulgar language weakens her speech interests, especially because she is a school counselor and explicitly identified herself by reference to her public employment. Although "in public debate [we] must tolerate insulting, and even outrageous, speech in order to provide adequate breathing space to the freedoms protected by the First Amendment," *Snyder v. Phelps*, 562 U.S. 443, 458 (2011) (internal quotation marks omitted), an expletive-laden tirade by a public-education professional like Darlingh deserves less weight in the *Pickering* balance, *see Curran v. Cousins*, 509 F.3d 36, 49 (1st Cir. 2007) ("Speech

done in a vulgar, insulting, and defiant manner is entitled to less weight in the *Pickering* balance."). Moreover, Darlingh gratuitously attacked people, not just ideas: she vilified people who disagree with her using particularly crude terms. That kind of speech contributes little to any debate. The extreme vulgarity and belligerent tone of her speech diminish the strength of her First Amendment interests even if those interests might otherwise be strong when considered in the abstract.

Second, Darlingh's role as a school guidance counselor heightens the school district's already weighty governmental interests. On that side of the *Pickering* scale, we have previously explained that teachers and guidance counselors occupy roles that entail "an inordinate amount of trust and authority," which makes the government's interests particularly compelling. *Craig v. Rich Twp. High Sch. Dist. 227*, 736 F.3d 1110, 1119 (7th Cir. 2013). These positions by their nature require "a degree of public trust not found in many other positions of public employment." *Melzer v. Bd. of Educ.*, 336 F.3d 185, 198 (2d Cir. 2003). One of the school district's most basic obligations is to ensure a safe and supportive educational environment for all students. It does so through its faculty and staff—including, of course, its guidance counselors.

Darlingh's speech was fundamentally at odds with this foundational duty. It was not a calm, reasoned presentation of her views on this sensitive subject. She made a harsh, angry, and profanity-filled public pledge to carry out her counseling duties in a relentlessly rigid way when it comes to transgender issues. That pledge was hardly compatible with her obligation to build student and parental trust when

counseling children with gender dysphoria or who otherwise struggle with gender-identity concerns. Nor is it compatible with her responsibility as a school counselor to promote respect for and humane treatment of these children by other students. Darlingh vowed that "not a single one" of her students would "ever, ever transition" on her watch, punctuating her promise with multiple expletives. In this way she signaled to students and parents an inability to deal with this sensitive subject with equanimity, civility, and respect for different views. Her speech is hard to reconcile with her professional obligation to approach her counseling duties with empathy and good judgment.

True, Darlingh tried to explain and soften the tone and tenor of her speech in her written response to the school district's charges against her. But it was not unreasonable for the district to conclude that her effort to ameliorate the detrimental effects of her speech was insufficient to restore confidence in her ability to appropriately perform her role as a school counselor. Darlingh explicitly linked her opinions on transgender issues to actions she would take on the job in a manner that conflicted with the school district's mission and policies. School officials reasonably took her at her word.

In short, the school district's interests as a public employer outweighed Darlingh's free-speech rights in these circumstances. Our decision rests on the speech itself, the sensitive nature of Darlingh's job, and the school district's reasonable assessment that her profanity-ridden remarks expressed a fixed commitment to carry out her duties in a way that

conflicted with its mission and policies, to the detriment of the district, students, and parents.[1]

For these reasons, the *Pickering* balance tips in favor of the school district. Darlingh's speech falls outside the scope of the First Amendment's protection as applied in the context of public employment.

<div align="right">AFFIRMED</div>

---

[1] We have no need to consider the incident in Raven Chappelle's classroom. Darlingh objected to giving that episode and its aftermath any weight in the First Amendment analysis, citing the "heckler's veto" doctrine. *See Nelson v. Streeter*, 16 F.3d 145, 150 (7th Cir. 1994) ("First Amendment rights are not subject to the heckler's veto."). This case does not require us to address the extent to which the "heckler's veto" doctrine applies in First Amendment retaliation claims by public employees. *See Craig*, 736 F.3d at 1121 (7th Cir. 2013) (briefly discussing the doctrine in this context).

# UNITED STATES COURT OF APPEALS FOR THE SEVENTH CIRCUIT

Everett McKinley Dirksen
United States Courthouse
Room 2722 - 219 S. Dearborn Street
Chicago, Illinois 60604



Office of the Clerk
Phone: (312) 435-5850
www.ca7.uscourts.gov

**CERTIFIED COPY**

**FINAL JUDGMENT**

A True Copy

July 2, 2025

Teste:

Deputy Clerk
of the United States
Court of Appeals for the
Seventh Circuit

*Before*

DIANE S. SYKES, *Chief Judge*
KENNETH F. RIPPLE, *Circuit Judge*
ILANA DIAMOND ROVNER, *Circuit Judge*

| | |
|---|---|
| | MARISSA DARLINGH,<br><br>                Plaintiff - Appellant |
| No. 23-1610 | v. |
| | ADRIA MADDALENI, et al.,<br><br>                Defendants - Appellees |
| **Originating Case Information:** | |
| District Court No: 2:22-cv-01355-SCD<br>Eastern District of Wisconsin<br>Magistrate Judge Stephen C. Dries | |

The judgment of the District Court is **AFFIRMED**, with costs, in accordance with the decision of this court entered on this date.

Clerk of Court

form name: **c7_FinalJudgment**     (form ID: **132**)

# UNITED STATES COURT OF APPEALS FOR THE SEVENTH CIRCUIT

Everett McKinley Dirksen
United States Courthouse
Room 2722 - 219 S. Dearborn Street
Chicago, Illinois 60604



Office of the Clerk
Phone: (312) 435-5850
www.ca7.uscourts.gov

**ORDER**

July 17, 2025

CERTIFIED COPY

A True Copy
Teste:

*By the Court:*

| | | |
|---|---|---|
| No. 23-1610 | MARISSA DARLINGH,<br><div align="center">Plaintiff - Appellant</div><br>v.<br><br>ADRIA MADDALENI, et al.,<br><div align="center">Defendants - Appellees</div> | |

Deputy Clerk
of the United States
Court of Appeals for the
Seventh Circuit

| **Originating Case Information:** |
|---|
| District Court No: 2:22-cv-01355-SCD |
| Eastern District of Wisconsin |
| Magistrate Judge Stephen C. Dries |

On July 15, 2025, counsel for appellees filed a document labeled as a Bill of Costs. The document, a one-page expense report, fails to comply with Federal Rule of Appellate Procedure 39(d)(1) because it is not "itemized and verified." Because the filing is deficient, this court will not award the requested costs.

# UNITED STATES COURT OF APPEALS FOR THE SEVENTH CIRCUIT



Everett McKinley Dirksen
United States Courthouse
Room 2722 - 219 S. Dearborn Street
Chicago, Illinois 60604

Office of the Clerk
Phone: (312) 435-5850
www.ca7.uscourts.gov

CERTIFIED COPY

A True Copy
Teste:

Deputy Clerk
of the United States
Court of Appeals for the
Seventh Circuit

## NOTICE OF ISSUANCE OF MANDATE

July 24, 2025

To:   Gina M. Colletti
      UNITED STATES DISTRICT COURT
      Eastern District of Wisconsin
      Milwaukee, WI 53202-0000

| No. 23-1610 | MARISSA DARLINGH,<br><br>                                     Plaintiff - Appellant<br><br>v.<br><br>ADRIA MADDALENI, et al.,<br><br>                                     Defendants - Appellees |
|---|---|

| **Originating Case Information:** |
|---|
| District Court No: 2:22-cv-01355-SCD<br>Eastern District of Wisconsin<br>Magistrate Judge Stephen C. Dries |

Herewith is the mandate of this court in this appeal, along with the Bill of Costs, if any. A certified copy of the opinion/order of the court and judgment, if any, and any direction as to costs shall constitute the mandate.

RECORD ON APPEAL STATUS:                    No record to be returned

form name: **c7_Mandate**   (form ID: **135**)